08CV1806
JUDGE BUCKLO
MAGISTRATE JUDGE COLE

# EXHIBIT A

Wells Fargo Funding, I.C
1701 Wells Fargo Way, 1 South
Minneapolis, Minnesota 55408

 Prime (1st)
$15 213
$192.


WELLS
FARGO

## Loan Purchase Agreement

This Loan Purchase Agreement, dated ___May 23, 2007_____ between Wells Fargo Funding, inc., a Minnesota corporation ("Wells Fargo") and __Draper & Kramer Mortgage Corp._____ a __Illinois__ *Delaware* corporation (the "Seller"), in consideration of the promises set forth in this Loan Purchase Agreement and for other good and valuable consideration, sets forth the terms and conditions upon which the Seller agrees to sell to Wells Fargo and Wells Fargo agrees to purchase from the Seller residential Mortgage Loans.

### 1. The Seller Guide.

The Seller has received and reviewed Wells Fargo's Wells Fargo Funding Seller Guide (as it may be amended from time to time, the "Seller Guide"). The parties agree that the Seller Guide along with this Loan Purchase Agreement and any Amendments to this Agreement constitute the complete agreement between the parties as to the sale by the Seller to Wells Fargo and purchase by Wells Fargo from the Seller of residential Mortgage Loans. Any capitalized term used in this Loan Purchase Agreement that is not otherwise defined shall have the meaning set forth in the Seller Guide. Wells Fargo may amend the Seller Guide from time to time upon written notice to the Seller. In the event of any express conflict between the provisions of this Agreement and the provisions of the Seller Guide, the provisions of this Agreement shall control.

### 2. Commitments

The Seller may order Commitments from Wells Fargo in accordance with the Seller Guide for Eligible Mortgage Loans, as Eligible Loan is defined below, which the Seller intends to sell to Wells Fargo. When the Commitment is registered, Wells Fargo will send the Seller a written Commitment Confirmation as set forth in the Seller Guide. Nothing in this Agreement or the Seller Guide requires Wells Fargo to purchase any Loan from the Seller or for Seller to sell any Loan to Wells Fargo.

### 3. Eligible Mortgage loans

Eligible Mortgage Loans are Mortgage Loans which satisfy all of the requirements contained in the Seller Guide and the product profile for the particular Eligible Mortgage Loan shown on the Commitment

### 4. Purchase Price

The Purchase Price for each Eligible Mortgage Loan sold by the Seller to Wells Fargo shall be determined as set forth in the Seller Guide. The Purchase Price will be shown on the Commitment Confirmation relating to the Eligible Mortgage Loan. Wells Fargo agrees to guarantee the Purchase Price for the Eligible Mortgage Loan for the time period shown on the Commitment Confirmation and the Seller agrees to close the Eligible Mortgage Loan and deliver it to Wells Fargo within the time period.

### 5. Penalties and Fees

In the event the Seller does not comply with the loan delivery procedures contained in the Seller Guide, the Seller shall pay Wells Fargo the applicable late delivery, late correction or buyout penalties or fees as provided for in the Seller Guide. The Seller grants Wells Fargo the right of set-off and Wells Fargo may deduct any fees, penalties or other sums owed to Wells Fargo by the Seller under the terms of this Loan Purchase Agreement from the Purchase Price for Eligible Mortgage Loans being purchased by Wells Fargo from the Seller pursuant to this Loan Purchase Agreement

### 6. Representations and Warranties

The Seller hereby makes all representations, warranties and covenants set forth in the Seller Guide as such are amended from time to time

Revised 09/2007

## 7. Specific Performance

The Seller recognizes that Wells Fargo intends to rely on its commitments from the Seller and will without notice to the Seller, make binding commitments in reliance thereon and that actual delivery of the Mortgage Loans under each Commitment is the essence of this Loan Purchase Agreement and is mandatory within the delivery period as set forth in the Seller Guide. The Seller acknowledges and agrees that Wells Fargo shall be entitled, therefore, in addition to the remedies set forth in the Seller Guide, to specific performance if the Seller fails to perform any of the Seller's commitments since money damages may not adequately compensate Wells Fargo for its losses and Wells Fargo may be unable to effect cover in order to satisfy its commitments with third parties. Upon the Seller's insolvency, repudiation or failure in Wells Fargo's sole judgment to perform obligations, Wells Fargo may proceed immediately by its own acts, order or seizure, or such other remedy as may be available at law or equity to take possession of all documents relating to a loan belonging to the Seller which could qualify for sale to Wells Fargo pursuant to the Seller's commitments.

## 8. Notices

All notices to be given under this Agreement shall be mailed first class to the party's principal place of business to the attention of the person designated below or to such other person as a party may designate in writing to the other party.

a. Send notices to the Seller to the attention of: _____

b. Send notices to Wells Fargo to the attention of: _____ Jackson Manley _____

IN WITNESS WHEREOF the parties hereto have entered into this Loan Purchase Agreement as of the date first set forth above.

Agreed to and Accepted by:

Draper & Kramer Mortgage Corp.
(Seller)

By _____
(Signature of Officer)

Brad Bush Sr. Vice President
(Printed Name and Title of Officer)

6/11/07
(Date)

Agreed to and Accepted by:

Wells Fargo Funding, Inc.

By _____
(Signature of Officer) Jackson Manley
                        Vice President
(Printed Name and Title of Officer)

7-2-07
(Date)

Wells Fargo Funding, Inc.
2701 Wells Fargo Way, 1 South
Minneapolis, Minnesota 55467



## Limited Power of Attorney

### LIMITED POWER OF ATTORNEY

<u>Draper & Kramer Mortgage Corp</u> _____ (the "SELLER"), a ~~Illinois~~ <u>Delaware</u>
[Full legal name of the SELLER]                           [State of incorporation]
corporation through the duly authorized representative whose signature appears below makes and appoints and by this
Limited Power of Attorney does make, constitute and appoint WELLS FARGO FUNDING, INC., a Minnesota
corporation, or in the alternative WELLS FARGO BANK, NA (hereinafter collectively referred to as "WELLS
FARGO") the true and lawful attorney-in-fact for the SELLER; and in the SELLER's name and stead to execute, by the
signature of any authorized WELLS FARGO employee or agent, any and all documents for the purpose of assigning and
transferring to WELLS FARGO any and all mortgages, deeds of trust, security instruments, and the related notes,
including, but not limited to the assignments of mortgages, deeds of trust, and security instruments; the note
endorsements, affidavit and agreements, for any mortgage loan transaction closed and funded in the SELLER's name
and committed to WELLS FARGO under that certain Loan Purchase Agreement between the SELLER and WELLS
FARGO dated <u>May 23</u>, <u>2007</u> (the "Agreement"); giving and granting unto the said
attorney-in-fact full power and authority to do and perform all and every act and thing whatsoever requisite and
necessary to be done, and to make, correct, amend, endorse, accept, or deliver all agreements and instruments; as fully,
to all intents and purposes, as the SELLER might or could do if present at the doing thereof through one of its authorized
representatives, with full power of substitution and revocation. The Seller hereby ratifies and confirms all that the said
attorney-in-fact shall lawfully do or cause to be done by virtue of this Limited Power of Attorney.

The SELLER may only revoke this Limited Power of Attorney in writing and only upon the expiration of one hundred
eighty (180) days from the effective date of the Agreement's termination in accordance with the Agreement's terms, and
this Limited Power of Attorney shall be deemed to be a power coupled with an interest for such purpose.

IN TESTIMONY WHEREOF, I have hereto set my hand and seal this <u>11th</u> day of <u>June</u>, <u>2007</u>.

SELLER:   <u>Draper & Kramer Mortgage Corp</u>
          (Full legal name of SELLER entity and, if applicable, full name of any and all d/b/a entities)

BY:       <u>[signature]</u>
          (Signature of authorized officer of SELLER)

          <u>Brad Bush</u>
          (Printed name of authorized officer)

          <u>Sr. Vice President</u>
          (Title of authorized officer)

[SEAL]

SELLER ID # <u>504</u>

STATE OF <u>Il</u>              )
                              ) ss.
COUNTY OF <u>Will</u>          )

Signed and subscribed this <u>11th</u> day of <u>June</u>, <u>2007</u>

<u>Barbara Choat</u>
Notary Public
My commission expires <u>5/16/210</u>

OFFICIAL SEAL
BARBARA CHOAT
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/16/10

Revised 12/07

Wells Fargo Funding, Inc.
2701 Wells Fargo Way, 1 South
Minneapolis, Minnesota 55408



## Secretary's Certification

I, ___Lorraine N. Madsen___, Secretary of, __Draper & Kramer Mortgage Corp.__
(secretary's name)                                                                    (company)

a ___Delaware___ corporation, do hereby certify:
(state)

That ___Forrest D. Bailey___ as ___President & CEO___ is empowered
(signer's name)                    (title)

to execute documents binding the corporation with regards to the sale of Mortgage Loans to Wells Fargo Funding, Inc.

Witness my hand and seal of office this __14th__ day of __June,__ __2007__.

___Lorraine N. Mad___
Signature of Secretary

(Corporate Seal)

Revised DM

08CV1806
JUDGE BUCKLO
MAGISTRATE JUDGE COLE

# EXHIBIT B

# 300 Seller Representations, Warranties and Covenants
## 300.01 General Information

The Seller makes the Representations, Warranties and Covenants contained in this Seller Guide for, and as to, the Seller, the Seller's Third Party Originators and each Loan sold by the Seller to Wells Fargo as of the respective dates of the Loan Purchase Agreement and each Commitment Letter, and as of each Funding Date. Such Representations, Warranties and Covenants are the Seller's sole responsibility. Each Representation, Warrant and Covenant continues in full force and effect for so long as any Loan purchased from the Seller remains outstanding and for so long as Wells Fargo is subject to any risk of loss or liability as to any Loan purchased from the Seller. As is more fully set forth in this Seller Guide, it is expressly understood and agreed that Wells Fargo's rights in connection with the Seller's Representations, Warranties and Covenants survive any particular Loan's Funding Date and any termination of any of the Program Documents, and are not affected by any investigation or review made by, or on behalf of, Wells Fargo, except to the extent expressly waived in writing by Wells Fargo. The word "Seller" whenever used in this Seller Guide section shall include all of the Seller's Third Party Originators, and the pronouns used herein shall include when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

The Seller acknowledges that Wells Fargo purchases the Loans in reliance upon: (i) the truth and accuracy of the Seller's Representations and Warranties set forth in the Program Documents and this Seller Guide, all of which Representations and Warranties relate to a matter material to such purchase; and (ii) the Seller's compliance with each of the agreements, requirements, terms, Covenants, and conditions set forth in the Program Documents and this Seller Guide. These Representations, Warranties and Covenants shall insure to the benefit of Wells Fargo's successors, affiliates and assigns unless Wells Fargo specifically waives a Representation, Warranty or Covenant in writing.

Making the Representations, Warranties, and Covenants contained in this Section does not release the Seller from its obligations under any Representations, Warranties, or Covenants contained in other Seller Guide sections, including the exhibits hereto, or in the Program Documents. The Seller agrees that it will not assert as a defense, to the Seller's obligations in this regard, to lack of control over or knowledge about the Seller's Third Party Originator or the Seller's Third Party Originator's actions, omission, or status.

Wells Fargo reserves the right to require the Seller as a condition to Wells Fargo's purchase of a given Loan or groups of Loans to make additional Warranties in writing.

*Seller Representations and Warranties*

*Seller Representations, Warranties,*
*and Covenants  300*

## 300.02 Representations, Warranties, and Covenants

### FAIR LENDING POLICY

Wells Fargo's commitment to fairness and equal opportunity is clear and unequivocal. Wells Fargo requires the application of fair and consistent origination and underwriting practices by the Seller as well.

In keeping with its commitment to fairness and equal opportunity, Wells Fargo requires Seller to treat all Borrowers and prospective Borrowers in a fair and consistent manner from the first contact with the prospective Borrowers through the last with the Borrower. All should receive the same level of service. Wells Fargo requires Seller to observe this commitment, in particular, in providing assistance to Borrowers and prospective Borrowers on whether to apply for credit, how best to qualify for credit, how to resolve any issues relating to creditworthiness and other aspects of the credit extension process. Wells Fargo requires that all the properties offered to secure the Borrower's Mortgage Loans be underwritten based on property type, occupancy status and the appraised value. The fact that a property is located in an area with a predominant racial or ethnic population is irrelevant.

Discrimination based on race, color, sex, sexual orientation, disability, national or ethnic origin, marital or familial status, religion or age is contrary to Wells Fargo's fundamental principle and commitment and is unlawful.

### CONCERNING THE SELLER AND THE SELLER'S THIRD PARTY ORIGINATORS

The Seller, for itself and the Seller's Third Party Originators, hereby makes the following Representations, Warranties and Covenants to Wells Fargo as follows:

1. **Qualifications of the Seller - Due Organization; Good Standing; Licensing -** The Seller is and shall continue to be duly organized, validly existing, and in good standing under the laws of the United States and under the laws of the state in which the Seller is incorporated, organized and/or conducting business. The Seller has and shall continue to maintain all licenses, registrations and certifications necessary to carry on its business as the Seller is now conducting it and to be licensed, qualified, and in good standing in each state where a Mortgaged Property is located if the laws of any such state so require. The Seller will remain in good standing with state and federal authorities to the extent necessary to ensure the enforceability of all Loans.

   The Seller has disclosed to Wells Fargo all final written reports, actions and sanctions of all federal and state agency and instrumentality reviews, investigations, examinations, audits, actions and sanctions undertaken or imposed within two (2) years prior to the Loan Purchase Agreement's effective date. Except as the Seller may have disclosed to Wells Fargo and Wells Fargo may have approved in writing, the Seller is not operating under any type of agreement or order (including, without limitation, a supervisory agreement, memorandum of understanding, cease and desist order, capital directive, supervisory directive, and consent decree) with or by the Office of Thrift Supervision, Federal Deposit Insurance Corporation, Federal Reserve Board, Office of the Comptroller of the Currency, or any state banking department or other government banking agency, and the Seller is in compliance with any and all capital, leverage or other financial standards imposed by any applicable regulatory authority,

*Seller Representations and Warranties*

### Seller Representations, Warranties, and Covenants  300

2. **Authority** - The Seller has and will maintain full corporate and partnership power and authority, as applicable, to execute and deliver the Program Documents and perform in accordance with its terms, and the Seller has taken all requisite corporate or partnership action to make the Program Documents valid, binding and enforceable upon the Seller in accordance with its terms, subject as to enforcement or remedies, to bankruptcy, insolvency, reorganization, receivership or other laws affecting creditors' rights generally from time to time in effect and general equity principles.  The Seller is duly and validly authorized to execute and deliver all documents, instruments and agreements the Seller is required to execute and deliver under the terms of the Program Documents and to consummate the transactions contemplated by the Program Documents.  The Program Documents and this Seller Guide evidence the Seller's legal, valid, binding and enforceable obligations.

3. **Ordinary Course of Business** - Consummation of the transactions contemplated by the Program Documents and the terms of this Seller Guide are in the ordinary course of the Seller's business, and the Seller's transfer, assignment, and conveyance of the Notes and the Mortgages pursuant to the Program Documents and the terms of this Seller Guide are not subject to the bulk transfer laws or any similar statutory provisions in effect in any applicable jurisdiction.

4. **No Conflicts** - The Seller's execution and delivery of the Loan Purchase Agreement, acquisition, making and sale of the Loans, consummation of Loan Purchase Agreement contemplated transactions, fulfillment of and compliance with the terms and conditions of the Program Documents will not conflict with or result in a breach of any terms, conditions, or provisions of the Seller's articles of incorporation, charter, by-laws, partnership agreement, or other organizational document, or of any legal restriction or regulatory directive or any agreement or instrument to which the Seller is now a party or by which it is bound; nor will such actions by the Seller constitute a default or result in an acceleration under any of the foregoing, result in the violation of any law, rule, regulation, order, judgment, or decree to which the Seller or any of its property is subject, impair the ability of Wells Fargo to realize on a Loan or impair its value.

5. **Ability to Perform** - The Seller has the ability to perform each and every obligation contained in, and to satisfy each and every requirement imposed on the Seller, in the Program Documents and this Seller Guide and no offset, counterclaim, or defense exists to the Seller's full performance of the Program Documents' and this Seller Guide's requirements.

6. **No Adverse Actions** - There is no action, suit, proceeding, inquiry, review, audit or investigation pending or threatened by or against the Seller ("Adverse Action") that, either in any one instance or in the aggregate, could result in any material adverse change in the Seller's business, operations, financial condition, properties or assets or in any material liability on the Seller's part which would draw into question the validity or enforceability of the Program Documents, this Seller Guide, any Loan, or any of the Seller's actions taken, or to be taken in connection therewith; or which would be likely to impair materially Seller's ability to perform under the Program Documents' or this Seller Guide's terms. Seller shall advise Wells Fargo immediately, in writing, of any pending or threatened Adverse Action, or any pending or threatened action to revoke or limit any license, permit, authorization or approval issued or granted to the Seller by any federal, state or local government or quasi–governmental body, or any agency or instrumentality thereof, which is necessary for the Seller to conduct its business, or to impose any penalty or other disciplinary sanction on the Seller, or any other sanction that would materially affect the Seller's business.

*Seller Representations and Warranties*

### Seller Representations, Warranties, and Covenants  300

7. **No Consent Required** – The Seller's execution and performance of, and compliance with, the Program Documents and this Seller Guide; sale of any of the Loans; and consummation of any Program Documents transactions do not require the consent, approval, authority, or order of any court or governmental agency or body, or if required, the Seller has obtained such unconditional approval prior to the related Funding Date.

8. **No Untrue Information** - The Seller's Application, the Program Documents, the promises, agreements, Representations and Warranties contained in this Seller Guide and all other statements, reports, and documents the Seller furnished or will furnish pursuant to the Program Documents and this Seller Guide contain no untrue statement of material fact nor do they fail to contain a material fact necessary to make the statements contained therein not misleading.

9. **No Accrued Liabilities** - Except as the Seller has disclosed to Wells Fargo and Wells Fargo has acknowledged in writing prior to the Loan Purchase Agreement's effective date, there are no accrued liabilities of the Seller with respect to any of the Loans, or circumstances under which Wells Fargo will be liable for any such accrued liabilities as the Seller's successor in interest in and to the Loans.

10. **Origination/Servicing** - The Loans have been legally, properly, prudently, and customarily originated in conformance with the highest standards of the residential mortgage origination and servicing business using Accepted Servicing Practices.

11. **Compliance with Business and Property Laws** - The Seller has complied with, and shall continue to comply with, and has not violated and shall not violate, any law, ordinance, requirement, regulation, rule, or order applicable to its business or properties, the violation of which might adversely affect the Seller's operations or financial conditions or the Seller's ability to consummate the transactions contemplated by the Program Documents and this Seller Guide.

12. **Compliance with Program Documents and Seller Guide** - The Seller has and will comply with all provisions of the Program Documents and this Seller Guide, and will promptly notify Wells Fargo of any occurrence, act, or omission regarding the Seller, the Loan, the Mortgaged Property or the Mortgagor, which occurrence, act, or omission may materially affect the Seller, the Loan, the Mortgaged Property or the Mortgagor.

13. **Inspection of Books and Records** - The Seller shall allow Wells Fargo, or its agent or designee, upon twenty-four (24) hours notice, to inspect all books and records of the Seller pertaining to its mortgage operations and to any Loans purchased by Wells Fargo from the Seller, and the Seller shall, upon Wells Fargo's reasonable request, or as provided for in the remedies provisions of this Seller Guide, allow Wells Fargo to take possession of all files and other material relating to Loans purchased by Wells Fargo.

14. **Servicing Retained Agreement** – With respect to Servicing Retained Loans, the Seller has validly entered into the Mortgage Servicing Contract, and Covenants to enter into any new or amended Mortgage Servicing Contract required by Wells Fargo or the Master Servicer. The Seller hereby Covenants that at all times it will service all Servicing Retained Loans in accordance with the Mortgage Servicing Contract, the Wells Fargo Master Servicing Guide and Accepted Servicing Practices.

*Seller Representations and Warranties*

*Seller Representations, Warranties, and Covenants 300*

## CONCERNING INDIVIDUAL MORTGAGE LOANS

The Seller Represents, Warrants and Covenants the following to Wells Fargo as to each Loan offered for sale under the Program Documents:

15. **Mortgage Loans as Described** - No document, report, data or material furnished to Wells Fargo relating to any Loan (including, without limitation, the Mortgagor's Loan application executed by the Mortgagor) in any Loan File, whether delivered in hard copy, electronically or otherwise, contains any untrue statement of fact or omits to state a fact necessary to make the statements contained in the Loan File not misleading.

16. **Payments Current** - The Mortgagor has made and the Seller has credited all payments required to be made through the related Loan's Funding Date under the terms of the Note. No payment required under the Loan is delinquent nor has any payment under the Loan been delinquent at any time since the origination of the Loan. For the purposes of this paragraph, a Loan will be deemed to be delinquent if the Mortgagor did not pay any payment due within **15 days of such payment's due date OR the month** such payment was due.

17. **No Outstanding Charges** - The Mortgagor has not defaulted under the Loan terms, and has paid any and all taxes, including, without limitation, any and all transfer taxes due and payable to any state or municipality relating to the Mortgaged Property's transfer of ownership and occupancy interest. The Mortgagor has paid all governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments and ground rents and other charges that previously became due and owing or will become due and owing within sixty (60) days of the Funding Date, or the Mortgagor has established an escrow account sufficient to pay such charges.

18. **No Advances** - Except as the Seller has disclosed clearly and conspicuously in writing to Wells Fargo, and Wells Fargo has approved in writing to the Seller, prior to the Funding Date:

    (i) the Seller has not advanced funds, or induced, solicited, or knowingly received any advance of funds by a party other than the Mortgagor, directly or indirectly, for the payment of any amount required under the Loan unless pursuant to an Agency eligible program or, except for interest accruing from the date of the Note or the Loan proceeds disbursement date, whichever is later, to the day that precedes by one (1) month the due date of the first installment of principal and interest; and

    (ii) the Mortgagor has, in compliance with the applicable Underwriting Guidelines, made any down payment required in connection with the Loan, and has received no concession from the Seller, the Mortgaged Property Seller, or any other third party, unless pursuant to an Agency eligible program.

19. **Original Terms/No Release** - No person or entity has impaired, waived, altered, or modified in any respect, except by a written instrument that Wells Fargo has approved, the original Note and Mortgage terms. Any related MI Policy issuer and the title insurer have approved the substance of any Note and Mortgage term waiver, alteration, or modification, to the extent required by the respective policies. No Mortgagor has been released, in whole or in part.

*Seller Representations and Warranties*

*Seller Representations, Warranties,*
*and Covenants 300*

20. **No Defense** - The Loan is not subject to any unexpired right of rescission, set-off, counterclaim, or defense, including, without limitation, the defense of usury. The operation of any of the Note or the Mortgage terms, or the exercise of any right thereunder, will not render either the Note or the Mortgage unenforceable, in whole or in part, or subject to any right of cancellation, set-off, counterclaim, or defense, including, without limitation, the defense of usury, and no such right of cancellation, set-off, counterclaim, or defense has been asserted with respect to the Note or the Mortgage.

21. **Hazard Insurance** - Pursuant to the terms of each Loan, hazard insurance policies meeting Wells Fargo's requirements insure all buildings or other improvements upon the Mortgaged Property and obligates the Mortgagor to maintain such hazard insurance policies at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, or to provide evidence thereof, authorizes the Mortgagee to obtain and maintain such insurance at the Mortgagor's sole cost and expense, and to seek reimbursement from the Mortgagor. Each hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect, to Wells Fargo's benefit upon the consummation of the transactions contemplated by the Program Documents and this Seller Guide. The Seller has not engaged in, and has no knowledge of the Mortgagor having engaged in, any act or omission that would impair the coverage of any hazard insurance policy, the benefits of the endorsement provided for herein, or the validity and binding effect of either. The Loan terms permit the maintenance of an escrow account to pay the premiums for the above-mentioned insurance, and the Mortgagor has not waived the requirement for such escrows, unless otherwise permitted by Wells Fargo or required by applicable law. Each Loan File delivered on the Funding Date contains any required guaranteed initial Flood Zone Determination documentation.

22. **Origination, Underwriting and Servicing Compliance** - The originating, closing and, prior to Wells Fargo becoming responsible for the Loan servicing, the servicing of the Loan was in compliance with, and to the extent that it is within the Seller's control will continue to be in compliance with:

(i) all applicable laws, rules, regulations, decrees, pronouncements, directives, orders, and contractual requirements with respect to the origination, closing, underwriting, processing, and servicing of each Loan; and

(ii) any and all other applicable federal, state, county, municipal, or other local laws, including, without limitation, those laws relating to truth-in-lending, real estate settlement procedures, consumer credit protection, usury limitations, fair housing, equal credit opportunity, collection practices, and real estate appraisals.

23. **Loan Status** - No person or entity has satisfied, canceled, subordinated, or rescinded, in whole or in part the Mortgaged Property and no person or entity has released, in whole or in part, the Mortgage Property from the Mortgage lien, nor executed any instrument that would effect any such release, cancellation, subordination, or rescission. There is no assumption, loss draft or payoff pending on the Loan nor has the Seller received a request for approval of, or notice of any proposed assumption, loss draft or payoff of the Loan.

*Seller Representations and Warranties*

*Seller Representations, Warranties,*
*and Covenants  300*

24. **Location and Type of Mortgaged Property** - The Mortgaged Property is located in the state identified in the Loan File and, unless otherwise provided for in the Program Documents, this Seller Guide or any applicable Underwriting Guidelines, consists of a single parcel of real property with a single family residence erected thereon, or a two-to-four family dwelling, or an individual unit in a planned unit development, condominium project, or cooperative. No portion of the Mortgaged Property is used for commercial purposes in such a manner that knowledgeable and sophisticated investors active in the residential secondary mortgage market would consider the Mortgaged Property commercial, rather than residential property.

25. **Valid First Liens Secured by Real Property** - The Mortgage is a valid, existing, and enforceable first lien on the Mortgaged Property; on all buildings on the Mortgaged Property; on all installations and mechanical, electrical, plumbing, heating, and air conditioning systems located in or affixed to such buildings; and on all additions, alterations, and replacements made at any time with respect to the foregoing.

    The Mortgage lien is subject only to:

    (i) current real property taxes and assessment liens not yet due and payable;

    (ii) covenants, conditions, restrictions, rights of way, easements, and other matters of public record which as of the date of the lien's recording are or were acceptable to mortgage lending institutions generally, are specifically referred to in the Title Policy or, as permitted by Wells Fargo and applicable state law, an attorney's opinion of title, delivered to the Loan originator, and: (a) were referred to or otherwise considered in the appraisal made for the Loan originator or (b) do not adversely affect the Mortgage Property's appraised value set forth in such appraisal; or

    (iii) other matters to which like properties are commonly subject, which other matters do not materially interfere with the benefits of the security intended to be provided by the Mortgage, or the use, enjoyment, value, or marketability of the related Mortgaged Property.

26. **Loan Documents** - All Loan Documents are genuine and complete in all respects and each is the Mortgagor's legal, valid, and binding obligation enforceable in accordance with its terms. All parties to the Note and the Mortgage had legal capacity to enter into the Loan, to execute and deliver the Note and the Mortgage, and did duly and properly execute the Note and the Mortgage. The person who or entity which originated the Loan used the then-current and valid Agency forms and documents, unless Wells Fargo expressly permitted or required in writing other documents.

27. **The Full Disbursement of Proceeds** - The full principal amount of the Loan proceeds have been advanced to Borrower, either by payment directly to such Borrower or by payment made on such Borrower's request or approval and there is no requirement for future advances in the Loan documents. The unpaid balance of the Loan is as represented by the Seller. Any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefore have been complied with. All costs, fees, and expenses incurred in making or closing the Loan and recording the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Note or the Mortgage.

*Seller Representations and Warranties*

*Seller Representations, Warranties,*
*and Covenants 300*

28. **Ownership of Loans** - The Seller is the sole owner and holder of the Loan. Except for the security interest of a Warehouse Lender, which security interest the Seller has disclosed in writing to Wells Fargo, the Loan is not assigned or pledged. The Seller has good and marketable title to the Loan, and has full right to transfer and sell the Loan to Wells Fargo free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim, security interest, right, option, assignment, or servicing agreement with any third party whatsoever, except pursuant to the Program Documents and this Seller Guide, and the Seller has full right and authority (subject to no interest or participation of, or agreement with, any other party) to sell and assign each Loan pursuant to the Program Documents and this Seller Guide.

29. **Third Party Compliance** - When a person or entity:

(i) originates a Loan on the Seller's behalf;

(ii) originates a Loan on its own behalf and sells it to the Seller; or

(iii) performs any act for the Seller which the Program Documents or this Seller Guide requires the Seller to perform, the Seller warrants that such person or entity has complied with all this Seller Guide's requirements with respect to all such Loans and acts. All parties that have had any interest in the Loan, whether as mortgagee, assignee, pledgee, or otherwise, are (or during the period in which they held and disposed of such interest, were) in compliance with any and all applicable requirements concerning licensing and qualifications to do business under the laws of the state where the Mortgaged Property is located.

30. **LTV/MI Policy** - Each Loan's LTV does not exceed the maximum LTV permitted by the applicable Underwriting Guidelines. All MI Policy provisions have been and are being complied with. Each MI Policy is written with a private mortgage insurance company acceptable to Wells Fargo, is the binding obligation of such insurer, is in full force and effect, and has had all premiums due thereunder paid. The Seller has not engaged in any act or omission, and the Seller has no knowledge of any act or omission by or on the Mortgagor's behalf or any other person's or entity's behalf, which act or omission would impair any such MI Policy's coverage or validity, the benefit of the endorsement provided for in, or the validity or binding effect of either. Any Loan subject to a MI Policy obligates the Mortgagor under the MI Policy to maintain such MI Policy to the extent required by law and to pay all required premiums and charges. The Loan interest rate is net of any such insurance premiums.

All loans with mortgage insurance that are deemed eligible for placement in a captive reinsurance arrangement are eligible for placement in Wells Fargo Funding's captive reinsurance arrangement.

31. **Title Insurance** - The Seller is the sole insured under the Title Policy. The Title Policy is in full force and effect, will be in full force and effect upon the consummation of the transactions contemplated in the Loan Purchase Agreement and in this Seller Guide, and is in conformance with applicable Agency requirements. No claims have been made under such Title Policy, the accuracy of any attorney's opinion of title has not been disputed, and no prior Loan holder, including the Seller, has done, by act or omission, anything that would impair the coverage of such Title Policy or the accuracy of such attorney's opinion of title. The attorney's opinion of title, if permitted by Wells Fargo or required by state law, is in a form and substance acceptable to investors purchasing Loans and mortgage lending institutions making Loans in reliance upon such attorney's opinions of title.

## *Seller Representations and Warranties*
### *Seller Representations, Warranties, and Covenants 300*

32. **No Defaults** - There is no default, breach, violation, or event of acceleration existing under the Mortgage or the Note and, to the best of the Seller's knowledge, no event has occurred or condition exists that, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation, or event of acceleration, and neither the Seller nor its predecessors has waived any default, breach, violation, or event of acceleration.

33. **No Mechanic's Lien** - Unless fully covered by a Title Policy acceptable to Wells Fargo, there is no mechanic's or similar lien or claim filed for work, labor, or material (and no rights are outstanding that under applicable law could give rise to such a lien or claim), affecting the related Mortgaged Property, which is or may be a lien prior to, or equal with, the related Mortgage's lien.

34. **Improvement Locations; No Encroachments** - All improvements the underwriter considered in determining the Mortgaged Property's appraised value at origination lie wholly within the Mortgaged Property's boundaries and building restriction lines and no improvements on adjoining properties encroach upon the Mortgaged Property (except those encroachments which the title insurer has affirmatively insured over). No improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation. All Mortgaged Property improvements, including new construction, have been completed in full compliance with any applicable laws, regulations or building codes and standards, and the improvements comply with the laws, regulations, or building codes and standards as of the Funding Date.

35. **Origination Terms** - The person or entity originating the Loan, originated and processed the Loan in accordance with the Loan Purchase Agreement's and this Seller Guide's terms and the Loan was underwritten in accordance with the applicable Underwriting Guidelines in effect when the Loan was originated and processed.

36. **Customary Provisions** - The Loan contains enforceable provisions that give the Mortgage holder rights and remedies to realize against the collateral as expeditiously as applicable law allows, including without limitation,

>   (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale;

>   (ii) otherwise, by non-judicial foreclosure, if applicable, and, if not,

>   (iii) by judicial foreclosure. To the extent permissible under applicable law, the Mortgagor or any other necessary party has waived any homestead or other exemption available to a Mortgagor or other necessary party which would interfere with the right to sell the Mortgaged Property at a trustee's sale or with the right to foreclose the Mortgage.

37. **Occupancy Certifications** - The Mortgaged Property is lawfully occupied under applicable law. The Seller has made or obtained from the appropriate authorities all inspections, licenses, and certificates required to be made or issued with respect to all occupied Mortgaged Property portions, or with respect to the Mortgaged Property's use and occupancy (including, without limitation, certificates of occupancy and fire underwriting certificates).

*Seller Representations and Warranties*

*Seller Representations, Warranties, and Covenants 300*

38. **No Additional Collateral** - The Note is not and has not been secured by any collateral except the corresponding Mortgage lien and the security interest of any applicable security agreement or chattel mortgage, the existence of which the Seller previously disclosed to Wells Fargo and Wells Fargo approved in writing.

39. **Deeds of Trust** - In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by Wells Fargo to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor or reconveyance of the deed of trust.

40. **Acceptable Investment** - There is no circumstance or condition with respect to the Mortgage, the Mortgaged Property, the Mortgagor, or the Mortgagor's credit standing, that can reasonably be expected to cause investors to regard the Loan as an unacceptable investment, cause the Loan to become Delinquent or adversely effect the Loan's value or marketability.

41. **Condominium Project Units and Planned Unit Developments ("PUD")** - As to each condominium unit located in a condominium project or planned unit located in a PUD:

    All Loans secured by units in condominiums or PUDs comply with the applicable condominium or PUD requirements set forth in this Seller Guide and/or appropriate Agency guidelines. With respect to any lien held by a homeowners association, special district, or similar organization for assessments, maintenance fees or similar charges against the Mortgaged Property which is, or appears to be, equal to or prior to the Mortgage Loan, the homeowners association, special district or similar organization have agreed to give at least 60 days written notice before foreclosing on the lien and the Seller will forward such notice to the holder of the Mortgage Loan at least 45 days before foreclosure.

42. **Loan Recording and Transfer** - The Seller has recorded the Note and Mortgage, if necessary, to protect Wells Fargo's interests. The Assignment of Mortgage from the Seller to Wells Fargo or to MERS is in recordable form and is acceptable for recording or filing under the laws of the jurisdiction in which the Mortgaged Property is located or for assignment to MERS. The Loan Assignment to Wells Fargo or MERS validly transfers the Loan, free and clear of any pledge, lien, encumbrance or security interest, and the Seller will not assign or transfer any interest in the Loan to any other person or entity than Wells Fargo or MERS.

43. **Due-on-Sale** - When, and to the extent, allowed by applicable law, the Mortgage contains an enforceable provision for acceleration of the Loan's unpaid principal balance in the event that the Mortgagor sells or transfers the Mortgaged Property without the Mortgagee's prior written consent.

44. **No Graduated Payments or Contingent Interest** - Unless otherwise expressly provided for in the Program Documents or this Seller Guide, none of the documents evidencing or securing the Loan is a graduated payment Loan, and the Loan does not have a shared appreciation or other feature providing for contingent interest or contingent principal.

*Seller Representations and Warranties*

*Seller Representations, Warranties, and Covenants 300*

45. **Mortgaged Property Undamaged; No Condemnation** - The Mortgaged Property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado, or other casualty so as to affect adversely the Mortgaged Property's value as security for the Loan or the use for which the premises were intended. The Mortgaged Property is in good repair. There are no condemnation proceedings by any federal, state, or local authority pending or, to the best of the Seller's knowledge, threatened against the Mortgaged Property.

46. **Collection Practices; Escrow Deposits** - The collection practices used with respect to the Loan have been in accordance with Accepted Servicing Practices, and have been in all respects legal and proper. With respect to escrow deposits and escrow payments, all such payments are in Seller's possession and there exists no deficiency in connection with the escrow deposits and Escrow Payment for which customary arrangements for repayment have not been made. No escrow deposits or escrow payments, or other charges or payments due the Seller, have been capitalized under the Mortgage or Note. All Loans delivered for Funding shall contain the HUD required Initial Escrow Account Disclosure Statement.

47. **No Other Hazards** - To the best of the Seller's knowledge, except as the Seller has specifically disclosed to Wells Fargo and Wells Fargo has approved in writing, the Mortgaged Property is not exposed to environmental hazards (such as toxic or hazardous waste) which are not covered by fire and extended coverage insurance or other available insurance.

48. **Supervision of Loan Originator** - The person or entity originating the Loan was a savings and Loan association, savings bank, commercial bank, credit union, insurance company, mortgage company or similar institution regulated, supervised or examined by a federal or state authority, or by a Mortgagee approved by the Secretary of Housing and Urban Development pursuant to National Housing Act Sections 203 and 211.

49. **Real Estate Appraisals** - Notwithstanding anything contained elsewhere in the Program Documents or this Seller Guide, the Seller hereby represents and warrants that:

   (i) all appraisals conducted in connection with each Loan, comply with applicable federal and state law, and applicable Agency requirements; and

   (ii) with respect to any appraisal requirements imposed by or pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), as amended from time to time, the related Loan is eligible for purchase by a financial institution subject to FIRREA, and, in the case of Conforming Balance Loan sizes, by the Agencies.

50. **Qualified Mortgage** - Each Servicing Retained Loan is a "qualified mortgage" within the meaning of Section 860G of the Internal Revenue Code of 1986, as amended (but without regard to Treasury Regulation § 1.860G-2(f)(2) or any similar rule that treats a defective obligation as a qualified mortgage).

51. **Bankruptcy or Insolvency** - To the best of the Seller's knowledge, the Mortgagor is not a debtor in any state or federal bankruptcy or insolvency proceeding.

*Seller Representations and Warranties*
*Seller Representations, Warranties,*
*and Covenants 300*

52. **Additional Fannie Mae or Freddie Mac Warranties** - For all Loans originated under either the Fannie Mae or Freddie Mac conventional mortgage programs, all Warranties, Representations and obligations required under the Agencies' respective selling programs are hereby referenced, made a part of, and incorporated in their entirety into this Seller Guide.

53. **FHA and VA Guidelines** - Each FHA or VA Loan sold to Wells Fargo meets all requirements and guidelines in effect for such Loan as prescribed by FHA or VA, as applicable, at the time of Wells Fargo's purchase. The Seller further warrants that each such insurable or guaranteeable Loan is eligible for inclusion in a Ginnie Mae pool.

FHA Mortgage Loans/FHA Direct Endorsement (DE) Approval Required - Should the Seller desire to commit FHA Mortgage Loans for sale to Wells Fargo, the Seller represents and warrants that it was at the time of Mortgage Loan origination, is presently, and will continue to be an FHA-approved lender in good standing, possessing full Direct Endorsement (DE) approval and authority under the FHA Direct Endorsement program. Seller further represents and warrants that Seller's DE authority is not subject to FHA Test Case requirements, and that no FHA Mortgage Loans committed for sale to Wells Fargo are subject to FHA Test Case requirements.

54. **No Planned Refinance** - With respect to each FHA or VA loan sold by the Seller to Wells Fargo on or after May 29, 1990, the Selling Lender hereby certifies that:

   1. Neither the Selling Lender, any lender in the chain of title prior to the Selling Lender, nor any affiliate will solicit the borrower(s) to refinance the loan.

   2. The Selling Lender, any lender in the chain of title prior to the Selling Lender, and any of their affiliates have not agreed to and will not agree to a planned refinance. A planned refinance is a refinance of the loan at an interest rate which is less than the immediately proceeding interest rate by less than the basis point decline in the market rate since the origination or last refinance transaction.

   3. The borrower(s) have been or will promptly be informed by the Selling Lender, or any lender in the chain of title prior to the Selling Lender, that the lender, or any of their affiliates, that the Lender will not subsequently solicit the borrower to execute a refinance transaction unless mortgage market rates decline and the borrower(s) are offered an interest rate which is less than the contract rate on the borrower(s) current loan by at least the basis point decline in the market rate since the origination or last refinance transaction. In connection with the required notice to the borrowers, the form of the notice is either identical to or substantially the same as the form of the letter found in this seller guide as Form 30.

55. **Error or Fraud** - Neither the Mortgagor nor any other person or entity involved in the Loan transaction or in its underwriting or documentation (including without limitation, any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with such transaction whether or not the Seller was a party to or had knowledge of such misrepresentation or incorrect information, and no error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to the Loan has taken place on

## Seller Representations and Warranties

### Seller Representations, Warranties, and Covenants  300

the part of the Seller or any other party involved in the Loan's origination or in the application of any insurance in relation to such Loan.

56. **No Options -** No other party has any option or right of first refusal or other arrangement to acquire directly or indirectly any of the Loans offered to Wells Fargo for purchase.

## Seller Representations and Warranties
### Seller Representations, Warranties, and Covenants 300

57. **Loan Payments** - The Seller has not made, directly or indirectly, any payment on the Loan or on any other Loan of the Mortgagor from any other person or entity; the Seller has also not made any agreement with any Mortgagor providing for any variation of the Mortgage Interest Rate, the schedule of payment or other Loan terms and conditions.

58. **Adverse Selection** - The Seller used no adverse selection process or procedures in selecting the Loans to be sold to Wells Fargo.

59. **Securities Law** - Wells Fargo has made no representation whatsoever to the Seller concerning the applicability or inapplicability of the Security Act of 1933, as amended (the "1933 Act") or of any state securities laws (each, a "State Act") to the transactions that are the subject of this Seller Guide. The Seller hereby represents and warrants to Wells Fargo as follows:

(i) The offer, issuance, sale, and delivery of the Loans under the circumstances contemplated hereunder constitute exempted transactions under the registration provisions of the 1933 Act, and the registration of the Loans under the 1933 Act is not required in connection with any such offer, issuance, sale, or delivery of the Loans; and

(ii) The offer, issuance, sale, and delivery of the Loans under the circumstances contemplated under the Program Documents and this Seller Guide constitute exempted transactions under applicable State Acts, and the neither the Loans registration or qualification is required under such State Acts nor is the authorization, approval, or consent of any governmental authority or agency required or necessary in connection with any such offer, issuance, sale, or delivery of the Loans

60. **Predatory Lending/Home Ownership and Equity Protection Act/High Cost Loans** - No Mortgage Loan is subject to the Provisions of the Home Ownership and Equity Protection Act of 1994 as amended or is considered a "high cost", "covered" or "predatory" loan under any applicable state, federal, or local laws or ordinances.

61. **Fair Lending / Equal Credit Opportunity Act** - To the best of Seller's knowledge, Seller and its third party originators have treated all Borrowers in a fair and consistent manner. All borrowers have received the same level of assistance, on whether to apply for credit, how to best qualify for credit, how to resolve any issues relating to creditworthiness and other aspects in the credit extension process. Seller has complied with all provisions of the Equal Credit Opportunity Act and the Fair Housing Act.

*Seller Representations and Warranties*

*Seller Representations, Warranties,*
*and Covenants 300*

## 300.03 Amendments to Representations, Warranties, and Covenants

62. **Cooperative Share Loans**

The Seller makes the following additional Representations and Warranties when the Seller delivers a Cooperative Share Loan to Wells Fargo. These Representations and Warranties are in addition to and do not replace the Representations and Warranties contained in the Wells Fargo Funding Seller Guide and Loan Purchase Agreement as such are amended from time to time.

(i.) **Closing Documents and Requirements.** All Cooperative Share Loan Documents (including, without limitation, any document supplied by Wells Fargo) conform with all state and federal laws applicable to the Seller and to Cooperative Share Loans.

(ii.) **Valid First Lien.** The Seller has caused to be filed the appropriate number of properly executed UCC-1 Financing Statements in the appropriate local and/or state office. The execution of the Loan Security Agreement and the filing of such UCC-1 Financing Statement(s) created and perfected in favor of the Seller or the Seller's Third Party Originator, a valid, subsisting, and enforceable first priority security interest in and to the Shares and the Proprietary Lease, securing payment and performance of the Mortgagor's obligations thereunder and under the Cooperative Share Loan. The Seller has caused to be filed the appropriate number of properly executed UCC-3 Financing Statements necessary to transfer such security interest to Wells Fargo, and any and all additional filings, and assignments, endorsements, and other action necessary or desirable to perfect, protect, and validly assign to Wells Fargo such first priority security interest have been duly made, filed, taken and/or obtained (as the case may be). The lien of the Loan Security Agreement is subject only to the lien of the Corporation for unpaid assessments representing the Mortgagor's pro rata share of the Corporation's payments for its Blanket Mortgage, if any, current real property taxes, insurance premiums, maintenance assessments and other assessments acceptable to Wells Fargo. Except as set forth above, no other financing statement or other instrument similar in effect covering all or any part of the Cooperative Documents is on file in any local or state office.

(iii.) **Acceptable Investment.** The Seller has no knowledge of any circumstance or condition with respect to the Cooperative Documents, the Corporation, or the Cooperative Project, that can reasonably be expected to cause private institutional investors to regard the Cooperative Share Loan as an unacceptable investment, cause the Cooperative Share Loan to become delinquent, or adversely affect the value or marketability of the Cooperative Share Loan.

(iv.) **Compliance with State and Federal Requirements.** The Corporation has been created and exists in full compliance with the requirements for residential cooperatives in the jurisdiction where the Cooperative Project is located.

(v.) **Marketable Title.** The Corporation has good and marketable title to the Cooperative Project and owns the Cooperative Project in fee simple, and such title is free and clear of any adverse lien or encumbrance, except for the lien of the Blanket Mortgage.

(vi.) **Blanket Mortgage.** The Cooperative Share Loan does not violate the terms of the Blanket Mortgage.

## *Seller Representations and Warranties*

### *Seller Representations, Warranties, and Covenants 300*

(vii.) **Recognition Agreement.** A Recognition Agreement exists; the Corporation has the right to enter into the Recognition Agreement; the terms of the Recognition Agreement are valid and binding upon the Corporation; all of the Representations and Warranties made by the Corporation in the Recognition Agreement are true, accurate, and complete in all material respects; and the Seller makes each representation therein to Wells Fargo as if the Seller were the Corporation.

(viii.) **Mortgagor Rights.** The Mortgagor has the right to encumber his or her ownership in the Corporation and occupancy rights to the Cooperative Unit, and the Mortgagor's right to occupy the Cooperative Unit pursuant to the Proprietary Lease extends through the term of the Mortgage, either by its stated term or through renewals.

(ix.) **Amenities.** The Corporation owns the amenities and facilities relating to the Cooperative Project and the sponsor has not retained an ownership interest in those amenities. If the amenities and facilities are subject to a lease between the Corporation and another party, the terms of such lease are not adverse to the interests of the Corporation.

(x.) **Contents of Cooperative Share Loan Documents.** With respect to each Cooperative Share Loan, the Cooperative Documents, including, without limitation, the Recognition Agreement, the Proprietary Lease, or the Assignment of Proprietary Lease, provide that:

(a) In accordance with the Recognition Agreement, the Corporation will not consider to be effective any attempt by the Mortgagor to terminate the Proprietary Lease absent the Seller's prior written consent;

(b) The Corporation is required to notify the Seller of: (i) any delinquency or other default by the Mortgagor, or (ii) further encumbrances, subletting, termination, cancellation, surrender or modification of the Mortgagor's membership in the Corporation or the Proprietary Lease;

(c) If any default by the Mortgagor under the Proprietary Lease (a "Lease Default") can be cured by the payment of money, the Corporation will also notify the Seller promptly of any default involving an amount equal to or exceeding three (3) months maintenance payments and will take no action to terminate the Proprietary Lease or cancel the Shares if the Lease Default is cured either by the Seller for the account of the Mortgagor or by the Mortgagor within fifteen (15) days after such notice of Lease Default or intention to terminate;

(d) If the Lease Default cannot be cured, the Corporation will institute no action to terminate the Proprietary Lease or cancel the Shares until the Seller has had reasonable notice and opportunity, by action or otherwise, to induce the Mortgagor to cure the Lease Default, such opportunity to be no less than the time provided in the Proprietary Lease for the Mortgagor to cure;

(e) If the Corporation shall terminate the Proprietary Lease and cancel the Shares for a Lease Default not curable by the payment of money, then, provided the Seller pays the Corporation the amounts which are due to the Corporation under the Proprietary Lease (including its deficiency clause) when due, the Corporation shall not sell or sublet the Cooperative Unit without the Seller's approval, unless the net proceeds of such sale or subletting shall equal or exceed the amount owing to the Seller by the Mortgagor; and

(f) The Corporation will accept payment from the Seller on behalf of the Mortgagor of any sums due under the Proprietary Lease (including its deficiency clause), any payments made by the Seller under the terms of the Cooperative Documents will be deemed so paid and no such payments shall be deemed to limit the Seller's rights against the Mortgagor pursuant to law.

(xi.) **Project Eligibility.** The Seller is not aware of any change in circumstances, which would result in the Cooperative Project's no longer satisfying Wells Fargo's cooperative project eligibility criteria. (Refer to **Section 825** of this Seller Guide.)

(xii.) **Project Legal Documents.** A qualified attorney has reviewed the Cooperative Project's legal documents and has rendered an opinion that they comply with state and local laws.

## 300.04 Miscellaneous Representations, Warranties, and Covenants

### 1. Year 2000 Readiness

As of January 1, 2000, the Seller hereby represents and warrants that it and that to the best of its knowledge its service providers and vendors, are Year 2000 Ready.

As used in this representation and warranty "Year 2000 Ready" means that the Seller's computer systems, and that to the best of its knowledge those of its service providers and vendors, can provide all of the following functions:

a. Handle date information before, during, and after January 1, 2000, including but not limited to accepting date input, providing date output, and performing calculations on dates or portions of dates;

b. Function accurately and without interruption before, during, and after January 1, 2000, without any change in operations associated with the advent of the new century;

c. Respond to two-digit year-date input in a way that resolves the ambiguity as to century in a disclosed, defined, and predetermined manner; and

d. Store and provide output of date information in ways that are unambiguous as to century.

Wells Fargo's remedy for the Seller's breach of this representation and warranty is limited to actual and direct damages. As amended hereby the Agreement and the Seller Guide including the Seller's duties and obligations contained in the Agreement and the Seller Guide remain in full force and effect.

## Seller Representations and Warranties

### Seller Representations, Warranties, and Covenants  300

### 2. Lender's Alliance Website Access and Usage

If the Seller is granted access into Wells Fargo Funding's *Lender's Alliance* private website, the Seller represents and warrants that it will not disclose the Seller's designated password to anyone nor use it to perform unauthorized functions.

Wells Fargo Funding, Inc. grants client access to the web site provided the Seller covenants and agrees to the following conditions:

1) The Seller will indemnify and hold Wells Fargo Funding, Inc. harmless for any liability due to improper use of the web-site when accessed using Seller's password.

2) Should Seller's only security administrator be out of the office for any reason, Wells Fargo Funding, Inc. will not act as a security administrator on the behalf of the client. This includes, but is not limited to: password resets, adding/deleting employees, and changes to security access.

3) Seller is responsible for notifying Wells Fargo Funding, Inc. if the only security administrator should leave his/her employment. At that time, Wells Fargo Funding, Inc. will delete all user accounts and establish a new security administrator.

The Seller must complete the Web Access Contact Information Form upon accessing the website for the first time.

*Seller Representations and Warranties*

*Seller Representations, Warranties,
and Covenants  300*

*FOR FUTURE USE*

# 305 Events of Default; Remedies; Indemnification

## 305.01 General/Events of Default

This section sets forth events constituting defaults under the terms and conditions of the Program Documents ("Events of Default") and sets forth remedies available to Wells Fargo upon the occurrence of an Event of Default. The Seller is responsible for notifying Wells Fargo immediately upon the Seller's knowledge of any Event of Default.

The *Remedies* available to Wells Fargo vary based on the Loan type, manner of underwriting (if applicable), and the applicable representation, warranty or covenant and are in addition to any other remedies Wells Fargo may have at law or in equity. (See also **Section 305.10** of this Seller Guide.) These remedies include, but are not limited to:

- Repurchase
- Indemnification
- Reasonable Assurances
- Suspension and Termination
- Set-off (Net Fund)
- Withholding of Fundings

The *Events of Default* for which Wells Fargo is entitled to remedies include, but are not limited to:

- Early Payment Default (delinquency or foreclosure)
- Breach of Representation or Warranty
- Uninsurable Loan
- Unmarketable Loan
- Fraud and/or Misrepresentation
- Early Payoff

*Seller Representations and Warranties*

*Events of Default; Remedies; Indemnification 305*

## 305.02 Remedies to Events of Default

### SUMMARY MATRIX - REPURCHASE AND INDEMNIFICATION

The matrix below outlines Events of Default for which Wells Fargo is entitled to select a Repurchase or Indemnification remedy (see **Sections 305.03 and 305.05** below). The remedies are categorized according to product type, Event of Default, underwriting party and from what party Wells Fargo will seek a remedy. Generally, in the event that the Seller underwrites the Loan, the Seller is liable where noted. If the Event of Default occurs, and if Wells Fargo or its agent (i.e., third party underwriter) underwrites the Loan, the Seller is liable only in those cases where the default involves breach of a representation or warranty, misrepresentation, fraud, or Loan documentation.

| | Underwritten By: | | | | | | |
| | Seller / Automated Underwritten | | | Wells Fargo Underwritten | | Contract Underwritten to Wells Fargo Guidelines | |
| | Gov't | Conventional Delegated | | | | | |
| Default Event | Gov't | Conforming | *Non-Conforming | Conforming | *Non-Conforming | Conforming | *Non-Conforming |
| Early Payment Default | Repurchase, Indem. | Repurchase, Indem. | N/A | N/A | N/A | N/A | N/A |
| Government Uninsurability | Repurchase | N/A | N/A | N/A | N/A | N/A | N/A |
| Breach of Representation or Warranty (Loan) | Repurchase | Repurchase | Repurchase | Repurchase | Repurchase | Repurchase | Repurchase |
| Unmarketable Loan | Repurchase | Repurchase | Repurchase | Repurchase₁ | Repurchase₁ | Repurchase₁ | Repurchase₁ |

* VOA, Relocation, and Expanded Solution Program Loans are treated the same as Non-conforming Loans regardless of Loan balance.

**Notes:**
- 'N/A' indicates a remedy is not applicable
- 'Indemnification' indicates an Indemnification option may be available for Conforming Conventional and Insured Government Loans, at the sole discretion of Wells Fargo
- 'Repurchase' indicates Repurchase for defaults involving non-underwriting issues

Revised 3/04→

## *Seller Representations and Warranties*
### *Events of Default; Remedies; Indemnification  305*

## 305.03 Repurchase Events of Default

If any of the events listed below occurs, Wells Fargo shall have the right to require the Seller to Repurchase Wells Fargo's interest in the relevant Mortgage Loan at the Repurchase Price as set forth in **Section 305.04** below.

a.   **EARLY PAYMENT DEFAULT -**

(i) **First Four (4) Payment Default.** Any of the first four (4) payments due to Wells Fargo or its assigns on a FHA or VA Mortgage Loan (a "Government Loan") or on a Delegated Conforming Loan that becomes ninety (90) days or more, Delinquent; <u>or</u>

(ii) **Other Early Payment Defaults.**   Any of the following number of payments due to Wells Fargo or its assigns on the referenced insured Government Loan or on a Delegated Conforming Loan that becomes ninety (90) days or more Delinquent:

- If a HUD repossession without an appraisal, any of the first twelve (12) payments.
- If a VA streamline refinance securing California property and the Seller does not provide a valuation of the property, any of the first twenty-four (24) payments.

b.   **BREACH OF REPRESENTATION OR WARRANTY -** Seller defaults under or breaches, or Wells Fargo or any of its assigns discovers the inaccuracy of, any of the Representations, Warranties or Covenants  set forth in the Program Documents (See generally, **Section 300** of this Seller Guide).

c.   **UNINSURABLE MORTGAGE -** For a Mortgage Loan underwritten by the Seller:

(i) **Certificate of Insurance.** The certificate of insurance has not been duly issued by a Mortgage insurance company or guarantor ("Mortgage Insurer") acceptable to Wells Fargo;

(ii) **Insurance Premium.** The Mortgage Insurance premium has not been paid to the Mortgage Insurer;

(iii) **Insurance Cancellation or Denial.** The Mortgage Insurer cancels coverage and/or denies a claim under such coverage due to fraud, misrepresentation or omission of a material fact or for any other reason related to the eligibility of the Mortgage Loan for Mortgage Insurance or guaranty.

d.   **FRAUD and/or MISREPRESENTATION -** The Borrower or any other party to the Mortgage transaction has made any false representation in conjunction with such transaction, whether or not the Seller was a party to or had knowledge of such false representation.

*Seller Representations and Warranties*
*Events of Default; Remedies; Indemnification 305*

e.    **UNMARKETABLE LOAN** - The Mortgage Loan the Seller delivers to Wells Fargo is unmarketable, or unmarketable on the secondary market without loss to Wells Fargo, including, but not limited to, a Mortgage Loan as to which:

(i)    **Program Documents** - The Seller has not complied with a requirement, term or condition of the Program Documents.

(ii)    **Evidence of Compliance** - The Seller is unable to supply satisfactory evidence of compliance with the Program Documents.

(iii)    **False or Misleading Representation** - The Seller has made one or more false or misleading representations, warranties or covenants to Wells Fargo in the Program Documents or has failed to provide Wells Fargo with information that is true, complete and accurate as to the Mortgage Loan or the Seller.

(iv)    **Underwriting or Documentation** - The Seller did not underwrite and/or document the Mortgage Loan in accordance with Program Document requirements.

(v)    **Protection of Occupants** - The Seller violated or failed to comply with any applicable law designed to protect the health and safety of the Mortgaged Property's occupants (including failure to take any action available to the Seller that would relieve the Mortgage holder from liability under such law or regulation).

## 305.04 Repurchase Remedy

a.    **REPURCHASE PRICE** – The amount the Seller must pay to Wells Fargo upon Wells Fargo's    Repurchase request to the Seller ("Repurchase Price") shall be calculated as follows:

(i)    The Purchase Price
If the Loan has **not** been pooled, the Purchase Price, including any premium pricing plus the Servicing Release Premium ("SRP") paid to the Seller, **or**

If the Loan **has been** pooled, the Purchase Price plus the SRP paid to the Seller at the time of purchase based on the outstanding principal balance due and owing on the Mortgage Loan as of the date of Repurchase, **plus**

(ii)    Modified Loan Amount
Wells Fargo may, as part of its loss mitigation efforts, enter into an agreement modifying the terms of the Loan (Modification Agreement) with a Borrower suffering an involuntary inability to pay their Mortgage under the original terms of the Note. Such Modification Agreement may increase the amount of the unpaid principal balance due to capitalization of interest, Escrow amount and/or other advances. If default should recur on that Loan, the Repurchase Price will include the outstanding principal balance based on the modified Loan amount, **plus**

*Seller Representations and Warranties*
*Events of Default; Remedies; Indemnification  305*

(iii)    **Expenses** - Any and all documentary stamp taxes, recording fees, transfer taxes, and all other expenses payable in connection with any such Repurchase, including, without limitation, any loss relating to the Mortgage Loan, all costs or expenses incurred by Wells Fargo in the course of Repurchasing such Mortgage Loan from a third party, and Wells Fargo's reasonable attorneys' fees; **plus,**

(iv)    **Interest, Penalties and Fees-** Accrued but unpaid interest up to the first day of the month following the date of Repurchase and any penalties or fees charged to Wells Fargo by the Servicer, such as, but not limited to, late fees or restoration fees.

b.    PROCEDURE FOR COMPLETING REPURCHASE

(i)    **Repurchase.** The Seller must Repurchase Wells Fargo's interest in the identified Mortgage by the Repurchase invoice due date. In the event the Repurchase is not completed by the invoice due date, Wells Fargo may net fund (set-off) the amount from subsequent amounts due to the Seller. Alternatively, Wells Fargo may, in its sole discretion, obtain a market price from Secondary Marketing and require Seller to reimburse Wells Fargo for the marketing loss incurred plus the SRP.

(ii)    **Wire Transfer of Funds.** The Seller shall effect Repurchases by wire transfer from the Seller to Wells Fargo of immediately available funds. At its option, Wells Fargo may choose to consider a wire as being received in the following month if it is received in the last three- (3) business days of the given month.

(iii)    **Release of Loan File.** Upon receipt by Wells Fargo of the Seller's funds for Repurchase, Wells Fargo shall release to the Seller the related Loan File(s) and shall execute and deliver to the Seller such instruments of transfer or assignment, in each case without recourse, as shall be necessary to vest in the Seller, or its designee, title to such Repurchased Loans.

(iv)    **Recordation and Transfer Costs / Repurchase Date.** The Seller shall assume the cost of recordation of assignments and other costs of transfer of any Repurchased Loans. The date of Repurchase is the date when Wells Fargo receives the Repurchase Price funds by wire transfer.

**Please Note:** Wells Fargo's decision to require the Seller to Repurchase a Mortgage shall be conclusive. The Seller's failure to comply with Wells Fargo's Repurchase request may result in suspension or termination of selling privileges. Suspension or termination upon the occurrence of one or more of the Repurchase events shall not limit Wells Fargo's right to take other action to enforce its rights or protect its interests, including, but not limited to those remedies set forth in General Remedies (**Section 305.10**).

*Seller Representations and Warranties*
*Events of Default; Remedies; Indemnification  305*

## 305.05 Indemnification Remedy For Early Payment Event Of Default

If an Early Payment Event of Default occurs as set forth in **Section 305.03** and again in this **Section 305.05** on an insured Government Loan or on a Delegated Conforming Loan, Wells Fargo may, at its sole discretion, and instead of exercising its right to demand Repurchase of the related Mortgage Loan as set forth in **Section 305.02**, offer the Seller the option to pay Wells Fargo an Indemnification Amount as set forth in this **Section 305.05**.

   a.    **EARLY PAYMENT DEFAULTS -**

   (i) **First Four (4) Payment Default.** Any of the first four (4) payments due to Wells Fargo or its assigns on an insured Government or on a Delegated Conforming Balance Loan becomes ninety (90) days or more, Delinquent; **or**

   (ii) **Other Early Payment Defaults.** Any of the number of payments due to Wells Fargo or its assigns on an insured Government Loan becomes ninety (90) days or more delinquent as follows:

   - If a HUD repossession without an appraisal, any of the first twelve (12) payments.
   - If a VA streamline refinance securing California property and the Seller does not provide a valuation of the property, any of the first twenty-four (24) payments.

   b.    **INDEMNIFICATION AMOUNT -** The Indemnification Amount, if offered by Wells Fargo in place of Repurchase, shall be as follows:

   (i)    **Insured Government Loans -**
   - **For Insured FHA Loans:** Any SRP paid to the Seller and a non-refundable *$3,000* fee, plus, if the Loan has **not** been pooled, any above par pricing premium.
   - **For Guaranteed VA Loans:** Any SRP paid to the Seller and a non-refundable *$3,000* fee and an additional deposit based on the Loan amount and the state in which the subject Mortgage Property is located. Upon foreclosure, Wells Fargo will reconcile any such additional deposit and either bill the Seller for any additional costs incurred or refund to the Seller any moneys due the Seller, plus if the Loan has **not** been pooled, any above pricing premium.
   (ii)    **For Delegated Conforming Balance Loans:** Any SRP paid to the Seller and a non-refundable *$1,500* fee, plus, if the Loan has **not** been pooled, any above par pricing premium.

The indemnification amount is due from the Seller within (30) days of Wells Fargo's request. In the event the indemnification amount is not received within ninety (90) days of the initial billed date, Wells Fargo will net fund the amount.  (See **305.10 (g.)**)

*Seller Representations and Warranties*

*Events of Default; Remedies; Indemnification* **305**

## 305.06 Early Payoff Event of Default & Remedies

In the event an FHA, VA, RHS Mortgage Loan (a "Government" loan) or a conventional Mortgage Loan (defined as all loan types other than Government loans, and including "jumbo" loans) is paid off in full prior to, or concurrent with, Wells Fargo Home Mortgage ("WFHM") receiving two full monthly payments paid by the borrower to WFHM, in the month those payments are due, (i.e. not net funded), the Seller may be required to reimburse Wells Fargo as follows:

| Loan Type | # of Payments Made to Wells Fargo | Pooled | | Not Pooled | |
|---|---|---|---|---|---|
| | | SRP | Above Par Pricing Premium | SRP | Above Par Pricing Premium |
| Government | 0-1 | YES | NO | YES | YES |
| Conventional Conforming | 0-1 | YES | NO | YES | YES |
| Conventional Non-Conforming | 0-1 | YES[1] | NO | YES[1] | YES[2] |

1. SRP is included in the price at time of funding. Unless otherwise noted on the Funding Transmittal or Trade Ticket, SRP value is 1.3% of the Purchase UPB.

2. Seller will be required to reimburse Wells Fargo for any amount in excess of par plus the SRP included in the purchase price.

*Seller Representations and Warranties*
*Events of Default; Remedies; Indemnification* **305**

## 305.07 Questionable Refinancing Practices Event of Default & Remedies

Questionable refinancing practices (such as those discussed below), constitute an Event of Default. The Seller must include in its policies and procedures for originating new Mortgages, refinancing existing Mortgages and reviewing Mortgages originated by third parties appropriate safeguards to preclude the possibility of violating Wells Fargo's prohibitions against questionable refinancing practices.

    a.    **PROHIBITED ACTIVITIES -**

        (i)  **Selling Loan in Process of Refinancing.** Wells Fargo considers the delivery of any Mortgage that is in the process of being refinanced (or acquiring from, or funding for, a third-party originator) as unacceptable (even if no agreement for future refinancing was entered into at the time of origination). Therefore, the Seller must not deliver for Wells Fargo's purchase or securitization any Mortgage that the Seller (or its affiliates or its third party originators) has agreed to refinance or is currently in the process of refinancing. Wells Fargo considers an originator to be in the process of refinancing a Mortgage if, at the time the Mortgage is delivered to Wells Fargo, the Seller has taken another application from the same Borrower for the same property or has entered into an agreement with one of its third-party originators to acquire or fund another Mortgage that has the same Borrower and property as the Mortgage that is being delivered to Wells Fargo.

        (ii)  **Targeting.** Wells Fargo considers specifically targeting or allowing other Loan originators at any time to specifically target Borrowers whose Mortgages are owned, securitized or serviced by Wells Fargo as unacceptable.

    b.    **PERMITTED ACTIVITIES -** Wells Fargo does not consider the Seller to be engaged in a questionable refinancing practice if the Seller:

        (i)  **General Advertising.** Advertises its availability for handling refinancing of Mortgages it has sold to Wells Fargo as long as the Seller does not specifically target, or allow other Loan originators to specifically target, Borrowers whose Mortgages are owned or securitized by Wells Fargo.

        (ii)  **General Terms.** Promotes the terms it has available for refinancing by sending letters or promotional material to Borrowers or to all Borrowers who have specific types of Mortgages (such as FHA, VA, Conventional fixed-rate, or Conventional adjustable-rate) or to those Borrowers whose Mortgages fall within specific interest rate ranges. The Seller may not, however, treat or allow other Loan originators to treat Mortgages it has sold to Wells Fargo as separate classes of Mortgages for purposes of advertising the availability of refinancing terms.

        (iii) **Payoff Information.** The Seller may provide payoff information and otherwise cooperate with individual Borrowers who contact the Seller about prepaying their Mortgages by advising them of refinancing terms and streamlined origination arrangements that are available, including Wells Fargo's own alternatives.

*Seller Representations and Warranties*
*Events of Default; Remedies; Indemnification* **305**

c.  **REVIEW OF ACTIVITIES / REMEDIES** - Wells Fargo will review Sellers that have high levels of prepayments. If such a review raises serious concerns about the Seller's practices, Wells Fargo will conduct a review of the Seller's origination and refinancing activities to ensure that they are in compliance with Wells Fargo's requirements. Wells Fargo will be entitled to one or more appropriate General Remedies if Wells Fargo finds that the Seller has violated Wells Fargo's policies and requirements set forth in this **Section 305.07**, including, but not limited to, requiring the Seller to make Wells Fargo whole for any losses resulting from claims made by Agencies or investors.

## 305.08 Adverse Financial Condition Of The Seller Event of Default

In the event the Seller undergoes any adverse financial condition Wells Fargo may require one or more applicable remedies set forth in General Remedies **(Section 305.10)**. Adverse Financial Condition shall include but not be limited to:

- Occurrence of an act of insolvency or bankruptcy concerning the Seller.
- The Seller fails to obtain a vacation or stay of involuntary proceedings brought for its reorganization, dissolution or liquidation.
- The Seller fails to meet any capital, leverage, or other financial standard imposed by any laws or applicable regulatory authority.
- Wells Fargo determines in its sole discretion that any material adverse change has occurred in the Seller's financial condition.
- The Seller fails to meet any net worth or ownership requirements as may be set forth in the Program Documents.
- Wells Fargo determines in its sole discretion that the Seller's sales and warranty obligations are disproportionate to its capital and/or assets.

## 305.09 General Events of Default

If any of the events listed below in this Section 305.09 occur, Wells Fargo has the right to demand Repurchase of the related Mortgage Loan as set forth in Repurchase Events of Default **(Section 305.03)**, or Wells Fargo may require one or more applicable remedies set forth in General Remedies **(Section 305.10)**.

a.  **BREACH OF REPRESENTATION OR WARRANTY** - As set forth in Section 305.02 and in this Section 305.09, Seller defaults under or breaches, or Wells Fargo or any of its assigns discovers the inaccuracy of, any of the representations, warranties or covenants concerning the Seller set forth in the Program Documents (See generally, **Section 300** of this Seller Guide.)

*Seller Representations and Warranties*

*Events of Default; Remedies; Indemnification  305*

b.  **GUARANTY AND SUPPORT AGREEMENT DEFAULT** - Any Guarantor of the Seller's obligations defaults under the terms of a Guaranty and Support Agreement (including, without limitation, any default by Guarantor in maintaining any minimum Tangible Net Worth required under such Guaranty and Support Agreement) given to Wells Fargo on the Seller's behalf; any such Guarantor becomes insolvent or bankrupt; Wells Fargo determines in its sole discretion that a material adverse change has occurred in such Guarantor's financial condition; or any Guarantor fails to meet any capital, leverage or other financial standard imposed by any applicable regulatory authority.

c.  **OTHER AGREEMENT DEFAULT** - The Seller defaults under the terms of any other agreement to which the Seller and Wells Fargo are parties.

d.  **FAILURE TO MEET REPURCHASE OBLIGATION** - The Seller fails to Repurchase from Wells Fargo any Mortgage Loan required to be Repurchased under the terms of the Program Documents.

e.  **LEGAL OR REGULATORY ACTION** - The Seller is placed on probation or a federal or state government agency restricts the Seller's activities in any manner; a court finds that the Seller or any of the Seller's principal officers have committed an act constituting civil fraud; or the Seller or an Officer thereof is convicted of any criminal act that relates to lending or Loan servicing activities.

f.  **FAILURE TO MEET INSURER'S APPROVAL STANDARDS** - The Seller is unable to meet the approval standards of any Mortgage Insurer or other entity that provides insurance or other credit enhancements in connection with Wells Fargo's efforts to sell the Mortgage Loans or to borrow based on the collateral value of the Mortgage Loans.

g.  **FAILURE TO DELIVER REQUIRED DOCUMENTS** - The Seller fails to deliver to Wells Fargo any required documents.

h.  **INVALID ASSIGNMENT** - The Seller assigns or attempts to assign its interests, rights or obligations under the Loan Purchase Agreement without Wells Fargo's prior written consent.

## 305.10 General Remedies

Wells Fargo shall have available to it the following General Remedies in the event Wells Fargo has reason to believe that the Seller breached the terms and conditions of the Loan Purchase Agreement, this Seller Guide or that an Event of Default has occurred.

a.    **REAL ESTATE OWNED ("REO") INDEMNIFICATION** - With respect to each Mortgage Loan that is the subject of any breach of one or more representations, warranties or covenants specified in the Program Documents, if Wells Fargo (or Wells Fargo's agent or affiliate, or any subsequent owner of the Mortgage Loan or such owner's agent or affiliate) has acquired title to the related Mortgaged Property through foreclosure, deed-in-lieu of foreclosure, abandonment or reclamation from bankruptcy of the defaulted Mortgage Loan, then, within thirty (30) days after Wells Fargo's demand, the Seller shall, at Wells Fargo's option:

(i) purchase the Mortgaged Property from Wells Fargo at a purchase price equal to the Repurchase Price; or
(ii) if Wells Fargo has sold or otherwise disposed of the Mortgaged Property, indemnify and hold Wells Fargo harmless for any loss resulting therefrom.

b.    **GENERAL INDEMNIFICATION** - The Seller shall indemnify and hold Wells Fargo harmless from and against, and shall pay on behalf of Wells Fargo in the first instance, any and all losses, liabilities (including liabilities for penalties), claims, demands, damages, judgments, costs and expenses including attorneys' fees (both trial and appellate) of every kind and nature resulting from any claim, demand, defense or assertion ("Liability") based or grounded upon, or resulting from a breach of any representation, warranty or obligation contained in or made pursuant to the Program Documents, or from Liability based on or grounded upon, or resulting from such breach or a breach of any representation, warranty or obligation made by Wells Fargo in reliance upon any representation, warranty or obligation made by Seller in or pursuant to the Program Documents. The Seller also shall indemnify Wells Fargo and hold it harmless against all Liabilities incurred by Wells Fargo in enforcing the Program Documents.

c.    **REASONABLE ASSURANCES** - If, at any time during the term of the Loan Purchase Agreement, Wells Fargo has reason to believe that an Event of Default has occurred, Wells Fargo shall have the right to demand, pursuant to written notice from Wells Fargo to the Seller, reasonable assurances that such a belief is in fact unfounded. Any failure by the Seller to provide the reasonable assurances set forth in the written notice and within a time frame specified in the written notice shall constitute an additional Event of Default; provided, however, that, notwithstanding anything set forth in the Program Documents to the contrary, and so long as no other Event of Default has occurred and is continuing, Wells Fargo shall only be entitled to exercise such reasonable assurance remedy as may be necessary or appropriate for Wells Fargo to insulate itself from any potential harm or loss relating to or caused by the facts or circumstances giving rise to such Event of Default.

*Seller Representations and Warranties*
*Events of Default; Remedies; Indemnification 305*

d.  **POSSESSION OF FILES AND DOCUMENTS** - Wells Fargo may proceed immediately by its own acts, order of seizure, or such other remedy as may be available at law or equity to take possession of all Loan Files and Documents relating to a Mortgage Loan belonging to the Seller which could qualify for sale to Wells Fargo pursuant to the Seller's commitments.

e.  **SUSPENSION OR TERMINATION OF SELLING PRIVILEGES**

(i.)  **Suspension** - Without affecting any other of Wells Fargo's remedies, Wells Fargo, by giving written notice to the Seller, may immediately suspend all the Seller's Registrations and Rate-Locks and the Seller will cease to be eligible to obtain new Commitments during the term of such suspension. Upon any such suspension, Wells Fargo may determine in its sole discretion whether it will continue to purchase Mortgage Loans under outstanding Commitments previously obtained by the Seller or refuse to Fund any or all Mortgage Loans, pending the cure, to Wells Fargo's satisfaction, of the Event of Default. If the Event of Default is, in Wells Fargo's judgment, not susceptible of cure, or if such Event of Default is, in Wells Fargo's judgment, susceptible of cure, but has not been cured within thirty (30) calendar days after Wells Fargo gives the Seller written notice of an Event of Default ("Event of Default Notice"), or such other period as Wells Fargo sets forth in such Event of Default Notice, Wells Fargo may, by written notice to the Seller, immediately terminate any and all of Wells Fargo's duties and obligations under the Program Documents.

(ii.)  **Termination Due to Event of Default** - Wells Fargo may immediately terminate the Seller upon an Event of Default.

f.  **RIGHT TO WITHHOLD FUNDINGS** - Upon any termination or suspension, Wells Fargo shall have the right to suspend the Seller's Fundings until such time as Wells Fargo has determined in the exercise of its reasonable judgment that Wells Fargo has insulated itself from any potential harm or loss relating to the Seller's sale of Mortgage Loans to Wells Fargo.

g.  **RIGHT OF SET-OFF  (also known as Net Fund)** - Wells Fargo may set-off and deduct any fees, penalties or other sums owed to Wells Fargo by the Seller under the terms of the Program Documents, which may include indemnification and repurchase invoices.

h.  **NOTIFICATION OF AGENCIES OR REGULATORS** - Wells Fargo may notify any relevant Agency or regulator of the occurrence of an Event of Default involving fraud or misrepresentation.

*Seller Representations and Warranties*

*Events of Default; Remedies; Indemnification 305*

i.   **INDEMNIFICATION FOR LETTER OF CREDIT** - If a Mortgage Loan is unacceptable to a Wells Fargo Investor as a result of defective documentation or other Loan quality defects which the Seller does not cure by the date established for a final pool certification for the pool in which Wells Fargo places the Mortgage Loan, the Seller shall, upon demand, Repurchase the Mortgage Loan at the Repurchase Price or, at Wells Fargo's sole discretion, indemnify and hold Wells Fargo or its assigns harmless from any cost, expense, or loss relating to the Mortgage Loan, including without limitation, the costs incurred by Wells Fargo for the issuance of a Letter of Credit.

**Please Note:** Nothing in this section shall be deemed or construed to limit, waive or impair any of Wells Fargo's rights or remedies under any Program Documents or other section of this Seller Guide.

## 305.11 Notification of Breach

Wells Fargo shall be under no obligation to notify the Seller of the occurrence of any breach of the Seller's representations, warranties or covenants hereunder, or of the occurrence or existence of any other Event of Default. All of Wells Fargo's remedies hereunder, including, without limitation, the Repurchase Remedy with respect to the Mortgage Loan, any purchase obligation with respect to the Mortgaged Property, and the indemnification with respect to any breach of a Representation, Warranty or Covenant (or any other Event of Default), shall exist regardless of the dates of Wells Fargo's discovery and notice to the Seller of the breach and Wells Fargo's demand for any remedy. Notwithstanding any other provision of the Program Documents to the contrary, the Seller shall remain liable for all remedies hereunder even if Wells Fargo discovers a breach after the Mortgage Loan no longer exists.

## 305.12 Waiver of Defaults/Remedies

Wells Fargo may waive any default by the Seller and its consequences, only in a written waiver specifying the nature and terms of such waiver. No such waiver shall extend to any subsequent or other default or impair any right consequent thereto, nor shall any delay by Wells Fargo in exercising, or failure to exercise, any right arising from such default affect or impair Wells Fargo's rights as to such default or any subsequent default. All of Wells Fargo's remedies are non-exclusive and cumulative. Wells Fargo's failure to exercise any of its remedies does not constitute a waiver of that remedy in the future as to the same or any other Seller default.

## 305.13 Termination

### TERMINATION WITHOUT CAUSE

In addition to the provisions set forth elsewhere in the Program Documents for termination of the Loan Purchase Agreement or any of the other Program Documents, either the Seller or Wells Fargo may terminate the Loan Purchase Agreement or any of the Program Documents without cause (which termination shall have the effect outlined below) at any time upon prior written notice of termination to the other party. The party giving the notice of termination must specify the effective date of termination in such notice and such date of termination must be at least thirty (30) days after the date such party sends such written notice.

*Seller Representations and Warranties*

*Events of Default; Remedies; Indemnification  305*

## EFFECT OF TERMINATION

a.    **WITHOUT CAUSE** - Provided that termination is without cause, as provided in the immediately preceding section, and provided that no Event of Default on the part of the Seller has occurred, termination of the Loan Purchase Agreement by Wells Fargo shall not apply to any Mortgage Loans that have been Registered with Wells Fargo by the Seller before the effective date of the termination.

b.    **DUE TO BREACH OR AN EVENT OF DEFAULT** - If Wells Fargo terminates the Loan Purchase Agreement or any Program Document due to an Event of Default, Wells Fargo may refuse to Register or Fund any or all Mortgage Loans from the date of the notice of termination.  The Seller will not be entitled to a termination fee or any other compensation from Wells Fargo for any reason or cause relating to any consequential, incidental or indirect damages arising out of, or in connection with, the Seller's suspension or termination.

c.    **SURVIVAL OF REMEDIES** - It is understood and agreed that Wells Fargo's remedies set forth in this Section, in the Loan Purchase Agreement, this Seller Guide and /or other Program Documents shall survive the sale and delivery of the related Mortgage Loan to Wells Fargo and Wells Fargo's funding of the related Purchase Price, and will continue in full force and effect, notwithstanding any termination of the related Loan Purchase Agreement and this Seller Guide, or any restrictive or qualified endorsement on any Note or Assignment of Mortgage or Mortgage Loan approval or other examination of or Wells Fargo's failure to examine any related Mortgage Loan File.

08CV1806
JUDGE BUCKLO
MAGISTRATE JUDGE COLE

# EXHIBIT C

GUARANTY AND SUPPORT AGREEMENT

This Guaranty and Support Agreement (the "Guaranty") is made on 6/1/2007, by **Draper and Kramer. Incorporated** ("Guarantor"), a Corporation, to and for the benefit of Wells Fargo Funding, Inc (hereinafter referred to as "Wells Fargo"), a Minnesota corporation

WHEREAS, Wells Fargo has agreed to purchase from time to time from **Draper and Kramer Mortgage Corp** ("the Seller") certain residential mortgage loans (each, a "Mortgage Loan") pursuant to the terms, obligations, and agreements contained in' (i) that certain Loan Purchase Agreement dated 5/23/2007 between Wells Fargo and the Seller (the "Purchase Agreement"), together with any and all commitments that may hereafter be executed by and between Wells Fargo and the Seller (individually, a "Commitment," and collectively, the "Commitments") (the Purchase Agreement and the Commitments, together with any and all other documents, instruments, and materials now and hereafter issued, executed and/or delivered in connection with the Purchase Agreement and the Commitments, including but not limited to Wells Fargo's Seller Guide and the Program Documents defined in the Seller Guide, (hereafter collectively called the "Instruments"); and

WHEREAS, the Purchase Agreement requires the Seller, in certain prescribed circumstances, to repurchase Mortgage Loans it sold to Wells Fargo under the Purchase Agreement and otherwise to indemnify and hold Wells Fargo harmless from and against any and all claims, losses, costs, and damages Wells Fargo may suffer as a result of Wells Fargo's purchase of Mortgage Loans from the Seller; and

WHEREAS, Wells Fargo has advised Guarantor and the Seller that Wells Fargo will not purchase any Mortgage Loans from the Seller under the Instruments unless, among other matters, Guarantor guarantees to Wells Fargo the timely payment of any amounts owing under the Instruments as provided in this Guaranty; and

WHEREAS, Guarantor as the ~~parent~~ sister company of the Seller will derive substantial financial benefits from the Instruments.

NOW, THEREFORE, to induce Wells Fargo to purchase Mortgage Loans from the Seller under the Instruments and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.    **Incorporation of Recitals.** The foregoing recitals are hereby acknowledged and agreed to be true and are hereby incorporated into the body of this Guaranty by reference to the same extent as if set forth in full in the body of this Guaranty.

2.    **Guaranty of Payment and Performance.** Guarantor hereby absolutely and unconditionally and irrevocably guarantees to Wells Fargo, its successors and assigns (i) the prompt and unconditional payment of any amount properly due Wells Fargo from the Seller from time to time under the Instruments, including all interest, fees, costs, charges, expenses, and reasonable attorneys' fees to which Wells Fargo is entitled under the Instruments and this Guaranty as such fees shall become due and payable under the Instruments, and (ii) the performance of all obligations by the Seller pursuant to the terms of the Instruments. The obligations of Guarantor set forth in parts (i) and (ii) of this paragraph are hereafter collectively referred to as the "Obligations." This is a guaranty of payment and performance and not a guaranty of collection. Guarantor shall have all defenses of Seller

3.    **Stock Ownership of Guarantor.** Guarantor will directly own and hold the entire legal title to and beneficial interest in all outstanding shares of stock of the Seller having the power under ordinary circumstances to vote for the election of members of the Board of Directors of the Seller, and Guarantor will not directly or indirectly pledge or in any way encumber or otherwise dispose of any such shares of the Seller's stock.

4.   **No Subrogation.** If, for any reason, the Seller now is or hereafter becomes indebted to Guarantor, such indebtedness and all interest thereon shall, at all times, be subordinate in all respects to the Obligations, and Guarantor shall not be entitled to enforce or receive payment until the Obligations have been fully satisfied. Notwithstanding any payments made by Guarantor under this Guaranty, Guarantor shall not be entitled to be subrogated to any of the rights of Wells Fargo against the Seller.

5.   **Benefit.** This Guaranty may be assigned or transferred in whole or in part by Wells Fargo only in conjunction with, and the benefit of this Guaranty shall automatically pass with, a transfer or assignment of any portion of the Instruments to any subsequent owner or holder. All references to Wells Fargo in this Guaranty shall be deemed to include any successor or assignee of Wells Fargo or any subsequent owner or holder of the Instruments.

6.   **Actions by Wells Fargo.** No action that Wells Fargo may take or omit to take in connection with the Instruments, nor any course of dealing with the Seller or any other person, shall release Guarantor's obligations under this Guaranty, affect this Guaranty in any way, or afford Guarantor any recourse against Wells Fargo; provided however that nothing herein shall give Wells Fargo rights in addition to those afforded in the Instruments. By way of example, but not in limitation, Guarantor hereby expressly agrees that Wells Fargo may, from time to time, and without notice to Guarantor, in accordance with the terms of the Instruments:

   (a)   Amend, change, or modify, in whole or in part, the Instruments;
   (b)   Accelerate, change, extend, or renew the time for repurchase of Mortgage Loans by the Seller under the Instruments;
   (c)   Waive any terms, conditions, or covenants of the Instruments, or grant any extension of time or forbearance for performance of the Instruments;
   (d)   Compromise or settle any amount due or owing, or claimed to be due or owing, under the Instruments; and
   (e)   Release, substitute, or add a guarantor or any guarantors of the Instruments.

   The provisions of this Guaranty shall extend and be applicable to all renewals, amendments, extensions, and modifications of the Instruments, and all references to the Instruments shall be deemed to include any renewal, extension, amendment, and modification of the Instruments.

7.   **Representations and Warranties.** Guarantor hereby warrants and represents to Wells Fargo that: (a) each and every warranty, representation, and obligation made or undertaken by the Seller in the Instruments is true and correct; (b) this Guaranty constitutes a legal, valid, and binding obligation on the Guarantor, and is fully enforceable in accordance with its terms; (c) any and all balance sheets, net worth statements, and other financial data that have been given to Wells Fargo with respect to Guarantor, fairly and accurately represent the financial condition of Guarantor as of their date, and since their date there has been no material adverse change in Guarantor's financial conditions; (d) except as may be set out on any exhibit attached hereto: (i) there are no legal proceedings, material claims, or demands pending against, or to the knowledge of Guarantor threatened against, Guarantor or any of Guarantor's assets; (ii) Guarantor is not in material breach or material default of any legal agreement or obligation; and (iii) no event (including Guarantor's execution and delivery of this Guaranty) has occurred which, with notice and/or the lapse of time or action by a third party, could result in Guarantor's material breach or material default under any legal agreement or obligation. (e) Guarantor's execution and delivery of this Guaranty have been: (1) specifically approved by Guarantor's Board of Directors, and such approval is reflected in the minutes of the meetings of such Board of Directors; or (2) approved by an officer of Guarantor, which officer was duly authorized by Guarantor's Board of Directors to enter into such types of transactions, and such authorization is reflected in the minutes of the meetings of such Board of Directors. This Guaranty constitutes the "written agreement" governing Guarantor's rights and obligations with respect to Wells Fargo in connection with Guarantor's role as the Seller's Guarantor, and Guarantor shall continuously maintain all components of such "written

agreement" as an official record of Guarantor or any its successors, that Guarantor controls, and (f) except as may have been disclosed to and approved by Wells Fargo in writing. Guarantor is not operating under any type of agreement or order (including, without limitation, a supervisory agreement, memorandum or understanding, cease and desist order, capital directive, supervisory directive, and consent decree) with the or by the Office of Thrift Supervision, Federal Deposit Insurance Corporation, Federal Reserve Board, Office of the Comptroller of the Currency, or any state banking department or other government banking agency

8.    **Waiver of Notice.** Guarantor hereby expressly waives: (a) presentment and demand for payment of the principal of or interest on the Obligations and protest of nonpayment; (b) notice of acceptance of this Guaranty and of presentment, demand, and protest; (c) notice of any default hereunder or under the Obligations and of all indulgences; (d) demand for observance, performance, or enforcement of any terms or provisions of this Guaranty or the Obligations or any other agreement respecting the Obligations; and (e) all other notices and demands otherwise required by law that Guarantor may lawfully waive.

9.    **Independent Obligation.** The Obligations and liabilities of Guarantor under this Agreement shall be, in each instance, joint and several, absolute and unconditional, and independent of any obligations of the Seller. Wells Fargo may proceed directly against Guarantor to enforce Wells Fargo's rights under this Guaranty without proceeding against or joining the Seller. Guarantor hereby waives any rights it may have to compel Wells Fargo to proceed against the Seller. Neither the demand by Wells Fargo against the Seller for repurchase of a Mortgage Loan or indemnification, nor the exercise of any remedies against the Seller, shall in any way affect Guarantor's Obligations under this Guaranty, even though any rights that Guarantor may have against the Seller or others may be extinguished, diminished, or otherwise affected by such action.

10.    **Delegation.** Guarantor's Obligations under this Guaranty shall not be assigned nor delegated

11.    **No Oral Change.** This Guaranty may not be changed or amended, except by a writing signed by the party against whom enforcement of such change or amendment is sought, and none of the Obligations of Guarantor shall be released or waived by Wells Fargo, except by a writing signed by Wells Fargo.

12.    **Cost of Enforcement.** Guarantor jointly and severally agrees to indemnify Wells Fargo for all costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred or paid by Wells Fargo in enforcing this Guaranty, whether or not litigation is commenced.

13.    **Governing Law and Consent to Jurisdiction.** This Guaranty shall be governed by and construed in accordance with the substantive laws of the State of California. In the event of any litigation arising out of the Obligations or this Guaranty, Guarantor agrees that the substantive laws of the State of California shall apply, including, without limitation, all provisions relating to the rights and remedies of the owner or holder of the Instruments against any security therefor and/or Guarantor. Any judicial proceeding brought against the Guarantor with respect to the Obligations or this Guaranty may be brought in any court of competent jurisdiction in the State of California, irrespective of where the Guarantor may reside or be located at the time of such proceeding, and by execution and delivery of this Guaranty, the Guarantor hereby consents to the non-exclusive jurisdiction of any such applicable court and waives any defense or opposition to such jurisdiction. Nothing herein contained, however, shall prevent any Wells Fargo, or its successors or assigns under the Instruments, from bringing any action or exercising any rights against any security or against Guarantor or against any property of Guarantor within any other jurisdiction or state. Initiating such proceeding or taking such action in any other jurisdiction or state shall not constitute a waiver of the agreement contained herein that the laws of the State of California shall govern the rights and duties of the parties hereunder.

14. **Invalidity of Particular Provisions** If any term or provision of this Guaranty shall be determined to be illegal or unenforceable, all other terms and provisions shall nevertheless remain effective and shall be enforced to the fullest extent permitted by law

15. **Notice of Special Events.** If Guarantor shall become bankrupt or insolvent, or any application shall be made to have Guarantor declared bankrupt or insolvent, or Guarantor shall make an assignment for the benefit of the creditors, or if Guarantor shall be placed in conservatorship or receivership, written notice of such occurrence or event shall be promptly furnished to Wells Fargo by Guarantor.

16. **Notices.** Any demands or other communications hereunder to Wells Fargo or Guarantor shall be in writing and shall be personally delivered, telecopied, or mailed (by registered or certified United States mail, postage prepaid), to the addresses set forth below or to such other addresses as either Wells Fargo or Guarantor may hereafter furnish in writing to the other, and shall be deemed effective upon the earlier of (i) the date of delivery (if delivered personally or telecopied); (ii) the next Business Day after the date of mailing (if sent by express mail or other overnight delivery for next day delivery); or (iii) three (3) Business Days after the date of mailing (if sent by registered or certified United States mail).

WELLS FARGO:    Wells Fargo Funding, Inc.
2701 Wells Fargo Way
Minneapolis, MN 55467
Attention Institutional Risk Management

With copy to:    Wells Fargo Bank, NA
1 Home Campus, 6th Floor
Des Moines, IA 50328
Attention: Legal Department

THE SELLER:    Draper and Kramer Mortgage Corp

4005 Quadrangle Dr Suite A
Bolingbrook, IL 60440

GUARANTOR:    Draper and Kramer, Incorporated
33 W Monroe St Suite 1900
Chicago, IL 60603

17. **Termination of Guaranty.** This Guaranty shall be of no further force or effect, and shall be irrevocably terminated upon full and indefeasible payment of any and all amounts required to be paid by the Seller to Wells Fargo under the Instruments, and any additional amounts to be paid by Guarantor under this Guaranty, whereupon liability of Guarantor hereunder shall automatically cease. Until all obligations of the Seller to Wells Fargo under the Instruments have been fully performed, Guarantor shall have no right to subrogation against the Seller.

18. **Reinstatement of Guaranty.** This Guaranty shall continue to be effective, or be reinstated, as the case may be, if at any time payment of all or any part of the Obligations is rescinded or must otherwise be restored or returned by Wells Fargo upon the insolvency, bankruptcy, dissolution, liquidation, or reorganization of the Seller or upon or as a result of the appointment of a receiver, or conservator of, or trustee or similar officer for, the Seller or any substantial part of its property, or otherwise, all as though such payment had not been made.

19.    **Heirs, Successors, and Assigns.** The Obligations of Guarantor herein shall be binding upon Guarantor and Guarantor's heirs, successors, assigns, executors, and administrators, jointly and severally, for the performance of the Guarantor's Obligations contained in this Guaranty.

20.    **Counterparts.** This Guaranty may be executed in one or more counterparts, each of which shall have the force and effect of an original, and all of which shall constitute but one document.

21.    **Waiver of Jury Trial.** Guarantor hereby, (i) covenants and agrees not to elect a trial by jury of any issue triable of right by a jury, and (ii) waives any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by Guarantor, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. Wells Fargo is hereby authorized and requested to submit this Guaranty to any court having jurisdiction over the subject matter and the parties hereto, so as to serve as conclusive evidence of Guarantor's waiver of the right to jury trial. Further, Guarantor hereby certifies that no representative or agent of Wells Fargo (including Wells Fargo's counsel) has represented, expressly or otherwise, to any of the undersigned that Wells Fargo will not seek to enforce this waiver of the right to jury trial provision.

IN WITNESS WHEREOF, this Guaranty has been executed under seal as of the day and year first written above by a duly authorized officer of Guarantor.

GUARANTOR:    Draper and Kramer, Incorporated

By: _____    (SEAL)

Name: Forrest D Bailey

Title: President and CEO

08CV1806
JUDGE BUCKLO
MAGISTRATE JUDGE COLE

# EXHIBIT D



# Home Equity Loan / Home Equity Line Purchase Agreement

Wells Fargo Bank, N.A.
Wells Fargo Home Equity
9540 Ferril Court
MAC X0851-014
Carlsbad, CA 92008

*C C G*

**WELLS FARGO**

This Loan/Line Purchase Agreement, dated ___October 31, 2003___ between Wells Fargo Bank, N.A., a national banking association, (hereinafter referred to as "Wells Fargo Home Equity") and

___Draper and Kramer Mortgage Corp.___

a ___Delaware___ corporation (the "Seller"), in consideration of the promises set forth in this Home Equity Loan/ Home Equity Line of Credit Purchase Agreement and for other good and valuable consideration, sets forth the terms and conditions upon which the Seller agrees to sell to Wells Fargo Home Equity, and Wells Fargo Home Equity agrees to purchase from the Seller Home Equity Loans/ Home Equity Lines of Credit.

### 1. The Seller Guide.

The Seller has received and reviewed Wells Fargo Home Equity's Home Equity Seller Guide (as it may be amended from time to time, the "Seller Guide"). The parties agree that the Seller Guide along with this Home Equity Loan/ Home Equity Line of Credit Purchase Agreement and any Amendments to this Agreement constitute the complete agreement between the parties as to the sale by the Seller to Wells Fargo Home Equity and purchase by Wells Fargo Home Equity from the Seller of Home Equity Loans/ Home Equity Lines of Credit. Any capitalized term used in this Home Equity Loan/ Home Equity Line of Credit Purchase Agreement that is not otherwise defined shall have the meaning set forth in the Seller Guide. Wells Fargo Home Equity may amend the Seller Guide from time to time upon written notice to the Seller. In the event of any express conflict between the provisions of this Agreement and the provisions of the Seller Guide, the provisions of this Agreement shall control.

### 2. Commitments

The Seller may order Commitments from Wells Fargo Home Equity in accordance with the Seller Guide for Eligible Home Equity Loans/ Home Equity Lines of Credit, as Eligible Home Equity Loan/ Home Equity Line of Credit is defined below, which the Seller intends to sell to Wells Fargo Home Equity. When the Commitment is registered, Wells Fargo Home Equity will send the Seller a written Commitment Confirmation as set forth in the Seller Guide. Nothing in this Agreement or the Seller Guide requires Wells Fargo Home Equity to purchase any Home Equity Loan/ Home Equity Line of Credit from the Seller or for Seller to sell any Home Equity Loans/ Home Equity Lines of Credit to Wells Fargo Home Equity.

### 3. Eligible Home Equity Loans/ Home Equity Lines of Credit

Eligible Home Equity Loans/ Home Equity Lines of Credit are Home Equity Loans/ Home Equity Lines of Credit which satisfy all of the requirements contained in the Seller Guide and the product profile for the particular Eligible Home Equity Loan/ Home Equity Line of Credit shown on the Commitment.

### 4. Purchase Price

The Purchase Price for each Eligible Home Equity Loan/ Home Equity Line of Credit sold by the Seller to Wells Fargo Home Equity shall be determined as set forth in the Seller Guide. The Purchase Price will be shown on the Commitment Confirmation relating to the Eligible Home Equity Loan/ Home Equity Line of Credit. Wells Fargo Home Equity agrees to guarantee the Purchase Price for the Eligible Home Equity Loan/ Home Equity Line of Credit for the time period shown on the Commitment Confirmation and the Seller agrees to close the Eligible Home Equity Loan/ Home Equity Line of Credit and deliver it to Wells Fargo Home Equity within the time period.

Home Equity Loan /
Home Equity Line
Purchase Agreement

Wells Fargo Bank, N.A.
Wells Fargo Home Equity
5540 Faurel Court
MAC X0801-014
Carlsbad, CA 92008



## 5. Penalties and Fees

In the event the Seller does not comply with the Loan/Line delivery procedures contained in the Seller Guide, the Seller shall pay Wells Fargo Home Equity the applicable late delivery, late correction or buyout penalties or fees as provided for in the Seller Guide. The Seller grants Wells Fargo Home Equity the right of set-off and Wells Fargo Home Equity may deduct any fees, penalties or other sums owed to Wells Fargo Home Equity by the Seller under the terms of this Home Equity Loan/ Home Equity Line of Credit Purchase Agreement from the Purchase Price for Eligible Home Equity Loans/ Home Equity Lines of Credit being purchased by Wells Fargo Home Equity from the Seller pursuant to this Home Equity Loan/ Home Equity Line of Credit Purchase Agreement.

## 6. Representations and Warranties

The Seller hereby makes all representations, warranties and covenants set forth in the Seller Guide as such are amended from time to time.

## 7. Millennium Certification and Warranty

The Seller hereby certifies, represents, warrants and covenants that all critical systems and software necessary for the Seller to meet its obligations and duties under this Agreement and any Amendment hereto, and that to the best of its knowledge those of its service providers and vendors, is "Year 2000 Ready." As used in this Agreement "Year 2000 Ready" means all systems, software and pieces of equipment record, store, process, calculate, sort, compare, transfer, and present any dates or date-related activities at the same level of functionality as would otherwise be provided in the absence of a "Millennium Date" (any date after December 31, 1999) or leap year occurrence. Wells Fargo Home Equity may at the time of the execution of this Agreement or at anytime thereafter in its sole discretion, require the Seller to provide Wells Fargo Home Equity with the additional Certification and Warranty and the information regarding Year 2000 Readiness set forth in Exhibit "A" to this Agreement.

## 8. Specific Performance

The Seller recognizes that Wells Fargo Home Equity intends to rely on its commitments from the Seller and will without notice to the Seller, make binding commitments in reliance thereon and that actual delivery of the Home Equity Loan/ Home Equity Line of Credit under each Commitment is the essence of this Home Equity Loan/ Home Equity Line of Credit Purchase Agreement and is mandatory within the delivery period as set forth in the Seller Guide. The Seller acknowledges and agrees that Wells Fargo Home Equity shall be entitled, therefore, in addition to the remedies set forth the Seller Guide, to specific performance if the Seller fails to perform any of the Seller's commitments since money damages may not adequately compensate Wells Fargo Home Equity for its losses and Wells Fargo Home Equity may be unable to effect cover in order to satisfy its commitments with third parties. Upon the Seller's insolvency, repudiation or failure in Wells Fargo Home Equity's sole judgment to perform its obligations, Wells Fargo may proceed immediately by its own acts, order or seizure, or such other remedy as may be available at law or equity to take possession of all document relating to a Loan/Line belonging to the Seller which could qualify for sale to Wells Fargo Home Equity pursuant to this Seller's commitments.

## 9. Reproduction of Documents and Counterparts

This Agreement and all amendments, consents, waivers and modifications hereto which may hereafter be executed, including any and all documents in connection with the [Broker Origination/Seller] Application, financial statements and certifications related thereto, may be reproduced by any photographic, photostatic, microfilm micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial, dispute resolution or administrative proceeding, whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible evidence.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument."

Home Equity Loan /
Home Equity Line
Purchase Agreement

Wells Fargo Bank, N.A.
Wells Fargo Home Equity
6540 Fermi Court
MAC X0901-014
Carlsbad, CA 92008


WELLS
FARGO

**10. Notices**

All notices to be given under this Agreement shall be mailed first class to the party's principal place of business to the
attention of the person designated below or to such other person as a party may designate in writing to the other party.

a.  Send notices to the Seller to the attention of:     ROBERT L. SHIELD

DRAPER AND KRAMER MORTGAGE CORP.

100 W. 22ND STREET, SUITE 101

LOMBARD, IL 60148

b.  Send notices to Wells Fargo Home Equity to the attention of: Institutional Lending Director

Wells Fargo Home Equity

5540 Fermi Court Suite 200

MAC X0801-014

Carlsbad, CA 92008

IN WITNESS WHEREOF the parties hereto have entered into this Loan/Line Purchase Agreement as of the date first set fo
above.

Agreed to and Accepted by:

DRAPER AND KRAMER MORTGAGE CORP.
(Seller)

By:
(Signature of Officer)

ROBERT L. SHIELD
(Printed Name and Title of Officer)

11-18-03
(Date)

Agreed to and Accepted by:

Wells Fargo Bank, N.A., a national banking associatio

By:
(Signature of Officer)

MICHAEL ANDERSEN, AVP
(Printed Name and Title of Officer)

11/23/03
(Date)

Revised 02/25/02
Wells Fargo Home Equity Confidential

Page 3 of 4

CORPORATE RESOLUTION
OF
DRAPER AND KRAMER MORTGAGE CORP.
(A Delaware Corporation)

RESOLVED, that the President, Secretary, Senior Vice President, Vice President, or Vice President and Treasurer, of this corporation, or any one or more of them, be and each of them is, authorized and empowered in the name of and on behalf of this corporation and under its corporate seal, from time to time while these resolutions are in effect, to originate and sell mortgage loans to WELLS FARGO HOME EQUITY, Carlsbad, California and to execute any and all agreements, documents and to furnish any information required or deemed necessary or proper by WELLS FARGO HOME EQUITY, Carlsbad, California in connection with the foregoing.

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct copy of a resolution presented to and adopted by the Board of Directors of Draper and Kramer Mortgage Corp. by Unanimous Written Consent of Directors and written Consent of Sole Shareholder October 30, 2003, and that such resolution is duly recorded in the minutes of this corporation and that such resolution remains in full force and effect as of the date hereof. I further certify that the following persons were duly elected or designated and are present incumbents of the respective offices set out after their names as of the date hereof:

Todd A. Schultz, Senior Vice President and CFO
Robert L. Shield, Jr., Senior Vice President
William Kearney, Vice President
Jacqueline Earle-Sanchez, Vice President

IN WITNESS WHEREOF, I set my hand and affix the seal of said corporation as of the 30th day of October, 2003.

Lorraine N. Madsen
Secretary

**Blanket
Power of Attorney**

Wells Fargo Bank, N.A.
Wells Fargo Home Equity
5540 Farmi Court MAC X0801-014
Carlsbad CA 92008


WELLS FARGO

DRAPER AND KRAMER MORTGAGE CORP.        (the "SELLER"), a    DELAWARE
    [Full legal name of the SELLER]                                                                    [State of incorporation]
corporation through the duly authorized representative whose signature appears below and by this
Blanket Power of Attorney does make, constitute and appoint WELLS FARGO BANK, N.A. (hereinafter referred to as
"WELLS FARGO HOME EQUITY"), a Colorado corporation, the true and lawful attorney-in-fact for the SELLER; and
in the SELLER's name and stead to execute, by the signature of any authorized WELLS FARGO HOME EQUITY
employee or agent, any and all documents for the purpose of assigning and transferring to WELLS FARGO HOME
EQUITY any and all mortgages, deeds of trust, security instruments, and the related notes, including, but not Limited to
the assignments of mortgages, deeds of trust, and security instruments; the note endorsements, affidavit and agreements,
for any mortgage loan transaction closed and funded in the SELLER's name and committed to WELLS FARGO under
that certain Loan Purchase Agreement between the SELLER and WELLS FARGO HOME EQUITY dated
    OCTOBER 31 , 2003 (the "Agreement"), giving and granting unto the said attorney-in-fact full
power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done, and to
make, correct, amend, endorse, accept, or deliver all agreements and instruments; as fully, to all intents and purposes, as
the SELLER might or could do if present at the doing thereof through one of its authorized representatives, with full
power of substitution and revocation. The Seller hereby ratifies and confirms all that the said attorney-in-fact shall
lawfully do or cause to be done by virtue of this Blanket Power of Attorney.

The SELLER may only revoke this Blanket Power of Attorney in writing and only upon the expiration of one hundred
eighty (180) days from the effective date of the Agreement's termination in accordance with the Agreement's terms, and
this Blanket Power of Attorney shall be deemed to be a power coupled with an interest for such purpose.

IN TESTIMONY WHEREOF, I have hereto set my hand and seal this 31 day of OCTOBER , 2003.

SELLER:        DRAPER AND KRAMER MORTGAGE CORP.
            (Full legal name of SELLER entity and, if applicable, full name of any and all d/b/a entities)

BY:
            (Signature of authorized officer of SELLER)

            ROBERT L. SHIELD
            (Printed name of authorized officer)

            SR. VICE PRESIDENT
            (Title of authorized officer)

[SEAL]

SELLER ID # _____

Revised 02/25/02                                                                                    Page 1 of 1
Wells Fargo Home Equity Confidential

08CV1806
JUDGE BUCKLO
MAGISTRATE JUDGE COLE

# EXHIBIT E

## 300.01: General Information (08/13/07)

The Seller makes the Representations, Warranties and Covenants contained in this Home Equity Seller Guide for, and as to, the Seller, the Seller's Correspondents and each Home Equity Loans/Lines of Credit sold by the Seller to Wells Fargo Home Equity as of the respective dates of Home Equity Loans/Lines of Credit Purchase Agreement and each Commitment Letter, and as of each Funding Date. Such Representations, Warranties and Covenants are the Seller's sole responsibility. Each Representation, Warrant and Covenant continues in full force and effect for so long as any Home Equity Loans/Lines of Credit purchased from the Seller remains outstanding and for so long as Wells Fargo Home Equity is subject to any risk of loss or liability as to any Home Equity Loans/Lines of Credit purchased from the Seller. As is more fully set forth in this Home Equity Seller Guide, it is expressly understood and agreed that Wells Fargo Home Equity's rights in connection with the Seller's Representations, Warranties and Covenants survive any particular Home Equity Loans/Lines of Credit's Funding Date and any termination of any of the Correspondent Package, and are not affected by any investigation or review made by, or on behalf of, Wells Fargo Home Equity, except to the extent any said rights are expressly waived in writing by Wells Fargo Home Equity. The word "Seller" whenever used in this Home Equity Seller Guide section shall include all of the Seller's Correspondents, and the pronouns used herein shall include when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

The Seller acknowledges that Wells Fargo Home Equity purchases the Home Equity Loans/Lines of Credits in reliance upon: (i) the truth and accuracy of the Seller's Representations and Warranties set forth in the Correspondent Package and this Home Equity Seller Guide, all of which Representations and Warranties relate to a matter material to such purchase; and (ii) the Seller's compliance with each of the agreements, requirements, terms, covenants, and conditions set forth in the Correspondent Package and this Home Equity Seller Guide. These Representations, Warranties and Covenants shall inure to the benefit of Wells Fargo Home Equity's successors, affiliates and assigns unless Wells Fargo Home Equity expressly waives a Representation, Warranty or Covenant in writing.

Making the Representations, Warranties, and Covenants contained in this Section does not release the Seller from its obligations under any Representations, Warranties, or Covenants contained in other Home Equity Seller Guide sections, including the exhibits hereto, or in the Correspondent Package. The Seller agrees that it will not assert as a defense, to the Seller obligations in this regard, to lack of control over or knowledge about the Seller's Correspondent or the Seller's Correspondent's actions, omission, or status.

Wells Fargo Home Equity reserves the right to require the Seller as a condition to Wells Fargo Home Equity's purchase of a given Home Equity Loans/Lines of Credit or groups of Home Equity Loans/Lines of Credits to make additional representations, warranties and covenants in writing, from time to time, at Wells Fargo Home Equity's sole discretion.

## 300.02: Representation, Warranties, and Covenants (08/13/07)

**FAIR LENDING POLICY**

Wells Fargo's commitment to fairness and equal opportunity is clear and unequivocal. Wells Fargo requires the application of fair and consistent origination and underwriting practices by the Seller as well.

In keeping with its commitment to fairness and equal opportunity, Wells Fargo requires Seller to treat all Borrowers/Obligors and prospective Borrowers/Obligors in a fair and consistent manner from the first contact with the prospective Borrowers through the last with the Borrower/Obligor. All should receive the same level of service. Wells Fargo requires Seller to observe this commitment, in particular, in providing assistance to Borrowers/Obligors and prospective Borrowers/Obligors on whether to apply for credit, how best to qualify for credit, how to resolve any issues relating to creditworthiness and other aspects of the credit extension process. Wells Fargo requires that all the properties offered to secure the Borrower's/Obligor's Home Equity Loans/Home Equity Lines of Credit be underwritten based on property type, occupancy status and the appraised value. The fact that a property is located in an area with a predominant racial or ethnic population is irrelevant.

Discrimination based on race, color, sex, sexual orientation, disability, national or ethnic origin, marital or familial status, religion or age is contrary to Wells Fargo's fundamental principle and commitment and is unlawful.

## CONCERNING THE SELLER AND THE SELLER CORRESPONDENT

The Seller, for itself and the Seller's Correspondents, hereby makes the following Representations, Warranties and Covenants to Wells Fargo Home Equity as follows:

1. **Qualifications of the Seller – Due Organization; Good Standing; Licensing –** The Seller is and shall continue to be duly organized, validly existing, and in good standing under the laws of the United States and under the laws of the state in which the Seller is incorporated, organized and/or conducting business. The Seller has and shall continue to maintain all licenses, registrations and certifications necessary to carry on its business as the Seller is now conducting it and to be licensed, qualified, and in good standing in each state where a Mortgaged Property is located if the laws of any such state so require. The Seller will remain in good standing with state and federal authorities to the extent necessary to ensure the enforceability of all Home Equity Loans/Lines of Credits.

    The Seller has disclosed to Wells Fargo Home Equity all final written reports, actions and sanctions of all federal and state agency and instrumentality reviews, investigations, examinations, audits, actions and sanctions undertaken or imposed within two (2) years prior to Home Equity Loans/Lines of Credit Purchase Agreement's effective date. Except as the Seller may have disclosed to Wells Fargo Home Equity and Wells Fargo Home Equity may have approved in writing, the Seller is not operating under any type of agreement or order (including, without limitation, a supervisory agreement, memorandum of understanding, cease and desist order, capital directive, supervisory directive, and consent decree) with or by the Office of Thrift Supervision, Federal Deposit Insurance Corporation, Federal Reserve Board, Office of the Comptroller of the Currency, or any state banking department or other government banking agency, and the Seller is in compliance with any and all capital, leverage or other financial standards imposed by any applicable regulatory authority.

2. **Authority –** The Seller has and will maintain full corporate and partnership power and authority, as applicable, to execute and deliver the Correspondent Package and perform in accordance with its terms, and the Seller has taken all requisite corporate or partnership action to make the Correspondent Package valid, binding and enforceable upon the Seller in accordance with its terms, subject as to enforcement or remedies, to bankruptcy, insolvency, reorganization, receivership or other laws affecting creditors' rights generally from time to time in effect and general equity principles. The Seller is duly and validly authorized to

execute and deliver all documents, instruments and agreements the Seller is required to execute and deliver under the terms of the Correspondent Package and to consummate the transactions contemplated by the Correspondent Package. The Correspondent Package and this Home Equity Seller Guide evidence the Seller's legal valid, binding and enforceable obligations.

3. **Ordinary Course of Business -** Consummation of the transactions contemplated by the Correspondent Package and the terms of this Home Equity Seller Guide are in the ordinary course of the Seller's business, and the Seller's transfer, assignment, and conveyance of the Notes and the Mortgages pursuant to the Correspondent Package and the terms of this Home Equity Seller Guide are not subject to the bulk transfer laws or any similar statutory provisions in effect in any applicable jurisdiction.

4. **No Conflicts -** The Seller's execution and delivery of the Home Equity Loans/Lines of Credit Purchase Agreement, acquisition, making and sale of the Home Equity Loans/Lines of Credits, consummation of Home Equity Loans/Lines of Credit Purchase Agreement contemplated transactions, fulfillment of and compliance with the terms and conditions of the Correspondent Package will not conflict with or result in a breach of any terms, conditions, or provisions of the Seller's articles of incorporation, charter, by-laws, partnership agreement, or other organizational document, or of any legal restriction or regulatory directive or any agreement or instrument to which the Seller is now a party or by which it is bound; nor will such actions by the Seller constitute a default or result in an acceleration under any of the foregoing, result in the violation of any law, rule, regulation, order, judgment, or decree to which the Seller or any of its property is subject, impair the ability of Wells Fargo Home Equity to realize on a Home Equity Loans/Lines of Credit or impair its value.

5. **Ability to Perform -** The Seller has the ability to perform each and every obligation contained in, and to satisfy each and every requirement imposed on the Seller, in the Correspondent Package and this Home Equity Seller Guide and no offset, counterclaim, or defense exists to the Seller's full performance of the Correspondent Package' and this Home Equity Seller Guide's requirements.

6. **No Adverse Actions -** There is no action, suit, proceeding, inquiry, review, audit or investigation pending or threatened by or against the Seller ("Adverse Action") that, either in any one instance or in the aggregate, could result in any material adverse change in the Seller's business, operations, financial condition, properties or assets or in any material liability on the Seller's part which would draw into question the validity or enforceability of the Correspondent Package, this Home Equity Seller Guide, any Home Equity Loans/Lines of Credit, or any of the Seller's actions taken, or to be taken in connection therewith; or which would be likely to impair materially Seller's ability to perform under the Correspondent Package' or this Home Equity Seller Guide's terms. Seller shall advise Wells Fargo Home Equity immediately, in writing, of any pending or threatened Adverse Action, or any pending or threatened action to revoke or limit any license, permit, authorization or approval issued or granted to the Seller by any federal, state or local government or quasi-governmental body, or any agency or instrumentality thereof, which is necessary for the Seller to conduct its business, or to impose any penalty or other disciplinary sanction on the Seller, or any other sanction that would materially affect the Seller's business.

7. **No Consent Required -** The Seller's execution and performance of, and compliance with, the Correspondent Package and this Home Equity Seller Guide; sale of any of the Home Equity Loans/Lines of Credits; and consummation of any contemplated Correspondent Package transactions do not require the consent, approval, authority, or order of any court or governmental agency or body, or if required, the Seller has obtained such unconditional approval prior to the related Funding Date.

8. **No Untrue Information -** The Seller's Application, the Correspondent Package, the

promises, agreements, Representations and Warranties contained in this Home Equity Seller Guide and all other statements, reports, and documents the Seller furnished or will furnish pursuant to the Correspondent Package and this Home Equity Seller Guide contain no untrue statement of material fact nor do they fail to contain a material fact necessary to make the statements contained therein not misleading.

9.  **No Accrued Liabilities -** Except as the Seller has disclosed to Wells Fargo Home Equity and Wells Fargo Home Equity has acknowledged in writing prior to the Home Equity Loans/Lines of Credit Purchase Agreement's effective date, there are no accrued liabilities of the Seller with respect to any of the Home Equity Loans/Lines of Credits, or circumstances under which Wells Fargo Home Equity will be liable for any such accrued liabilities as the Seller's successor in interest in and to the Home Equity Loans/Lines of Credits.

10. **Origination/Servicing -** The Home Equity Loans/Lines of Credits have been legally, properly, prudently, and customarily originated in conformance with the highest standards of the residential Mortgage origination and servicing business using Accepted Servicing Standards.

11. **Compliance with Business and Property Laws -** The Seller has complied with, and shall continue to comply with, and has not violated and shall not violate, any law, ordinance, requirement, regulation, rule, or order applicable to its business or properties, the violation of which might adversely affect the Seller's operations or financial conditions or the Seller's ability to consummate the transactions contemplated by the Correspondent Package and this Home Equity Seller Guide.

12. **Compliance with Correspondent Package and Home Equity Seller Guide -** The Seller has and will comply with all provisions of the Correspondent Package and this Home Equity Seller Guide, and will promptly notify Wells Fargo Home Equity of any occurrence, act, or omission regarding the Seller, the Home Equity Loans/Lines of Credit, the Mortgaged Property or the Mortgagor, which occurrence, act, or omission may materially affect the Seller, the Home Equity Loans/Lines of Credit, the Mortgaged Property or the Mortgagor.

13. **Inspection of Books and Records -** The Seller shall allow Wells Fargo Home Equity, or its agent or designee, upon twenty-four (24) hours notice, to inspect all books and records of the Seller pertaining to its Mortgage operations and to any Home Equity Loans/Lines of Credits purchased by Wells Fargo Home Equity from the Seller, and the Seller shall, upon Wells Fargo Home Equity's reasonable request, or as provided for in the remedies provisions of this Home Equity Seller Guide, allow Wells Fargo Home Equity to take possession of all files and other material relating to Home Equity Loans/Lines of Credits purchased by Wells Fargo Home Equity.

14. **National Bank Guideline Compliance -** If Seller is a national bank subject to the regulatory supervision of the Office of the Comptroller of the Currency (OCC), Seller is in material compliance with the standards set forth in Part III of the OCC's Guidelines Establishing Standards for Residential Mortgage Lending Practices, OCC 2005-3 as became effective April 8, 2005.

## CONCERNING INDIVIDUAL HOME EQUITY LOANS/HOME EQUITY LINES OF CREDIT

The Seller represents, warrants and covenants the following to Wells Fargo Home Equity as to each Home Equity Loans/Lines of Credit offered for sale under the Correspondent Package, whether purchased by Wells Fargo Home Equity or not:

15. **Home Equity Loans/Lines of Credits as Described -** No document, report, data or material furnished to Wells Fargo Home Equity relating to any Home Equity Loans/Lines of Credit (including, without limitation, the Mortgagor's Home Equity Loans/Lines of Credit application

executed by the Mortgagor) in any Home Equity Loans/Lines of Credit File, whether delivered in hard copy, electronically or otherwise, contains any untrue statement of fact or omits to state a fact necessary to make the statements contained in the Home Equity Loans/Lines of Credit File not misleading.

16. **Payments Current –** The Mortgagor has made and the Seller has credited all payments required to be made through the related Home Equity Loans/Lines of Credit's Funding Date under the terms of the Note. No payment required under the Home Equity Loans/Lines of Credit is delinquent nor has any payment under the Home Equity Loans/Lines of Credit been delinquent at any time since the origination of the Home Equity Loans/Lines of Credit. For the purposes of this paragraph, a Home Equity Loans/Lines of Credit will be deemed to be delinquent if the Mortgagor did not pay any payment due within **15 days of such payments due date OR the month** such payment was due, whichever is earlier.

17. **No Outstanding Charges –** The Mortgagor has not defaulted under the Home Equity Loans/Lines of Credit terms, and has paid any and all taxes, including, without limitation, any and all transfer taxes due and payable to any state or municipality relating to the Mortgaged Property's transfer of ownership and occupancy interest. The Mortgagor has paid all governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments and ground rents and other charges that previously became due and owing or will become due and owning within sixty (60) days of the Funding Date, or the Mortgagor has established an escrow account sufficient to pay such charges.

18. **No Advances –** Except as the Seller has disclosed clearly and conspicuously in writing to Wells Fargo Home Equity, and Wells Fargo Home Equity has approved in writing to the Seller, prior to the Funding Date:

    (i)    the Seller has not advanced funds, or induced, solicited, or knowingly received any advance of funds by a party other than the Mortgagor, directly or indirectly, for the payment of any amount required under the Home Equity Loans/Lines of Credit, except for interest accruing from the date of the Note or the Home Equity Loans/Lines of Credit proceeds disbursement date, whichever is later, to the day that precedes by one (1) month the due date of the first installment of principal and interest; and

    (ii)   the Mortgagor has, in compliance with the applicable Underwriting Guidelines, made any down payment required in connection with the Home Equity Loans/Lines of Credit, and has received no concession from the Seller, the Seller of the Mortgaged Property, or any other third party.

19. **Original Terms/No Release –** No person or entity has impaired, waived, altered, or modified in any respect, except by a written instrument that Wells Fargo Home Equity has approved, the original Note and Mortgage terms. Any related title insurer have approved the substance of any Note and Mortgage term waiver, alteration, or modification, to the extent required by the respective policies. No Mortgagor has been released, in whole or in part.

20. **No Defense –** The Home Equity Loans/Lines of Credit is not subject to any unexpired right of rescission, set-off, counterclaim, or defense, including, without limitation, the defense of usury. The operation of any of the Note or the Mortgage terms, or the exercise of any right thereunder, will not render either the Note or the Mortgage unenforceable, in whole or in part, or subject to any right of cancellation, set-off, counterclaim, or defense, including, without limitation, the defense of usury, and no such right of cancellation, set-off, counterclaim, or defense has been asserted with respect to the Note or the Mortgage.

21.
    **Hazard Insurance –** Pursuant to the terms of each Home Equity Loans/Lines of Credit, hazard insurance policies meeting Wells Fargo Home Equity's requirements insure all buildings or other improvements upon the Mortgaged Property and obligates the Mortgagor to maintain

such hazard insurance policies at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, or to provide evidence thereof, authorizes the Mortgagee to obtain and maintain such insurance at the Mortgagor's sole cost and expense, and to seek reimbursement from the Mortgagor. Each hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect, to Wells Fargo Home Equity's benefit upon the consummation of the transactions contemplated by the Correspondent Package and this Home Equity Seller Guide. The Seller has not engaged in, and has no knowledge of the Mortgagor having engaged in, any act or omission that would impair the coverage of any hazard insurance policy, the benefits of the endorsement provided for herein, or the validity and binding effect of either. Each Home Equity Loans/Lines of Credit File delivered on the Funding Date contains guaranteed initial Flood Zone Determination documentation.

22. **Origination, Underwriting and Servicing Compliance –** The originating, closing and, prior to Wells Fargo Home Equity becoming responsible for the Home Equity Loans/Lines of Credit servicing, the servicing of the Home Equity Loans/Lines of Credit was in compliance with and, to the extent that it is within the Seller's control, will continue to be in compliance with:

   (i)    all applicable laws, rules, regulations, decrees, pronouncements, directives, orders, and contractual requirements with respect to the origination, closing, underwriting, processing, and servicing of each Home Equity Loans/Lines of Credit;

   (ii)   any and all other applicable federal, state, county, municipal, or other local laws, including, without limitation, those laws relating to truth-in-lending, fair lending, real estate settlement procedures, consumer credit protection, usury limitations, fair housing, equal credit opportunity, collection practices, and real estate appraisals: and

   (iii)  all applicable anti-money laundering laws and regulations, including but not limited to the Bank Secrecy Act and its subsequent revisions and enhancements, the Customer Identification Program requirements of the USA Patriot Act, Office of Foreign Assets Control requirements (collectively the "Anti-Money Laundering Laws"), and has established an anti-money laundering compliance program as required by the applicable Anti-Money Laundering Laws, and maintains, and will maintain, sufficient information to identify the applicable Borrower/Obligor for purposes of the Anti-Money Laundering Laws.

23. **Home Equity Loans/Lines of Credit Status –** No person or entity has satisfied, canceled, subordinated, or rescinded, in whole or in part the Mortgaged Property and no person or entity has released, in whole or in part, the Mortgage Property from the Mortgage lien, nor executed any instrument that would effect any such release, cancellation, subordination, or rescission. There is no assumption, loss draft or payoff pending on the Home Equity Loans/Lines of Credit nor has the Seller received a request for approval of, or notice of any proposed assumption, loss draft or payoff of the Home Equity Loans/Lines of Credit.

24. **Location and Type of Mortgaged Property –** The Mortgaged Property is located in the state identified in the Home Equity Loans/Lines of Credit File and, unless otherwise provided for in the Correspondent Package, this Home Equity Seller Guide or any applicable Underwriting Guidelines, consists of a single parcel of real property with a single family residence erected thereon, or a two-to-four family dwelling, or an individual unit in a planned unit development or condominium project. No portion of the Mortgaged Property is used for commercial purposes in such a manner that knowledgeable and sophisticated investors active in the residential secondary Mortgage market would consider the Mortgaged Property commercial, rather than residential property.

25. **Valid Second Liens Secured by Real Property – As to any Home Equity Loan/Line of Credit,** the Mortgage is a valid, existing, and enforceable second lien on the Mortgaged Property; on all buildings on the Mortgaged Property; on all installations and mechanical,

electrical, plumbing, heating, and air conditioning systems located in or affixed to such buildings; and on all additions, alterations, and replacements made at any time with respect to the foregoing.

The Second Mortgage lien is subject only to:

(i)   (a) A superior Wells Fargo Funding Loan as defined in the Wells Fargo Funding Seller Guide, or (b) A superior first Mortgage lien that secures a debt obligation that does not allow retention of lien priority status for non-obligatory advances or that contains a provision which prohibits the placement of any additional liens on the Mortgage property.

(ii)   current real property taxes and assessment liens not yet due and payable;

(iii)   covenants, conditions, restrictions, rights of way, easements, and other matters of public record which as of the date of the lien's recording are or were acceptable to Mortgage lending institutions generally, are specifically referred to in the Title Policy delivered to the Home Equity Loans/Lines of Credit originator, and: (a) were referred to or otherwise considered in the appraisal made for the Home Equity Loans/Lines of Credit originator or (b) do not adversely affect the Mortgage Property's appraised value set forth in such appraisal; or

(iv)   other matters to which like properties are commonly subject, which other matters do not materially interfere with the benefits of the security intended to be provided by the Mortgage, or the use, enjoyment, value, or marketability of the related Mortgaged Property.

26. **Home Equity Loans/Lines of Credit Documents -** All Home Equity Loans/Lines of Credit Documents are genuine and complete in all respects and each is the Mortgagor's legal, valid, and binding obligation enforceable in accordance with its terms. All parties to the Note and the Mortgage had legal capacity to enter into the Home Equity Loans/Lines of Credit, to execute and deliver the Note and the Mortgage, and did duly and properly execute the Note and the Mortgage. The person who or entity which originated the Home Equity Loans/Lines of Credit used current, valid and legally compliant forms and documents, unless Wells Fargo Home Equity expressly permitted or required in writing other documents.

27. **The Full Disbursement of Proceeds -** With respect to Home Equity Loans only, the full principal amount of the Home Equity Loans proceeds have been advanced to Borrower, either by payment directly to such Borrower or by payment made on such Borrower's request or approval and there is no requirement for future advances in the Home Equity Loans documents. The unpaid balance of the Home Equity Loans/Lines of Credit is as represented by the Seller. Any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefore have been complied with. All costs, fees, and expenses incurred in making or closing the Home Equity Loans/Lines of Credit and recording the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Note or the Mortgage.

28. **Ownership of Home Equity Loans/Lines of Credits -** The Seller is the sole owner and holder of the Home Equity Loans/Lines of Credit. Except for the security interest of a Warehouse Lender, which security interest the Seller has disclosed in writing to Wells Fargo Home Equity, the Home Equity Loans/Lines of Credit is not assigned or pledged. The Seller has good and marketable title to the Home Equity Loans/Lines of Credit, and has full right to transfer and sell the Home Equity Loans/Lines of Credit to Wells Fargo Home Equity free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim, security interest, right, option, assignment, or servicing agreement with any third party whatsoever, except pursuant to the Correspondent Package and this Home Equity Seller Guide, and the Seller has full right and authority (subject to no interest or participation of, or agreement with,

any other party) to sell and assign each Home Equity Loans/Lines of Credit pursuant to the Correspondent Package and this Home Equity Seller Guide.

29. **Third Party Compliance -** When a person or entity:

   (i)   originates a Home Equity Loans/Lines of Credit on the Seller's behalf,

   (ii)  originates a Home Equity Loans/Lines of Credit on its own behalf and sells it to the Seller; or

   (iii) performs any act for the Seller which the Correspondent Package or this Home Equity Seller Guide requires the Seller to perform, the Seller warrants that such person or entity has complied with all this Home Equity Seller Guide's requirements with respect to all such Home Equity Loans/Lines of Credits and acts. All parties that have had any interest in the Home Equity Loans/Lines of Credit, whether as Mortgagee, assignee, pledgee, or otherwise, are (or during the period in which they held and disposed of such interest, were) in compliance with any and all applicable requirements concerning licensing and qualifications to do business under the laws of the state where the Mortgaged Property is located.

30. **CLTV -** Each Home Equity Loans/Lines of Credit's CLTV does not exceed the maximum CLTV permitted by the applicable Underwriting Guidelines.

31. **Title Insurance -** The Seller is the sole insured under the Title Policy. The Title Policy is in full force and effect, will be in full force and effect upon the consummation of the transactions contemplated in the Home Equity Loans/Lines of Credit Purchase Agreement and in this Home Equity Seller Guide, and is in conformance with applicable Agency requirements. No claims have been made under such Title Policy, the accuracy of any attorney's opinion of title has not been disputed, and no prior Home Equity Loans/Lines of Credit holder, including the Seller, has done, by act or omission, anything that would impair the coverage of such Title Policy or the accuracy of such attorney's opinion of title. The attorney's opinion of title, if applicable or required by state law, is in a form and substance acceptable to Mortgage lending institutions making Loans/Lines in reliance upon such attorney's opinions of title.

32. **No Defaults -** There is no default, breach, violation, or event of acceleration existing under the Mortgage or the Note and, to the best of the Seller knowledge, no event has occurred or condition exists that, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation, or event of acceleration, and neither the Seller nor its predecessors has waived any default, breach, violation, or event of acceleration.

33. **No Mechanic's Lien -** Unless fully covered by a Title Policy acceptable to Wells Fargo Home Equity, there is no mechanic's or similar lien or claim filed for work, labor, or material (and no rights are outstanding that under applicable law could give rise to such a lien or claim), affecting the related Mortgaged Property, which is or may be a lien prior to, or equal with, the related Mortgage's lien.

34.

   **Improvement Locations; No Encroachments -** All improvements the underwriter considered in determining the Mortgaged Property's appraised value at origination lie wholly within the Mortgaged Property's boundaries and building restriction lines and no improvements on adjoining properties encroach upon the Mortgaged Property (except those encroachments which the title insurer has affirmatively insured over). No improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation. All Mortgaged Property improvements, including new construction, have been completed in full compliance with any applicable laws, regulations or building codes and standards, and the improvements comply with the laws, regulations, or building codes and standards as of the

Funding Date.

35. **Origination Terms –** The person or entity originating the Home Equity Loans/Lines of Credit, originated and processed the Home Equity Loans/Lines of Credit in accordance with the Home Equity Loans/Lines of Credit Purchase Agreement's and this Home Equity Seller Guide's terms and underwrote the Home Equity Loans/Lines of Credit in accordance with the applicable Underwriting Guidelines in effect when the Home Equity Loans/Lines of Credit was originated and processed.

36. **Customary Provisions –** The Home Equity Loans/Lines of Credit contains enforceable provisions that give the Mortgage holder rights and remedies to realize against the collateral as expeditiously as applicable law allows, including without limitation,

   (i)    in the case of a Mortgage designated as a deed of trust, by trustee's sale;

   (ii)   otherwise, by non-judicial foreclosure, if applicable, and, if not,

   (iii)  by judicial foreclosure. To the extent permissible under applicable law, the Mortgagor or any other necessary party has waived any homestead or other exemption available to a Mortgagor or other necessary party which would interfere with the right to sell the Mortgaged Property at a trustee's sale or with the right to foreclose the Mortgage.

37. **Occupancy Certifications –** The Mortgaged Property is lawfully occupied under applicable law. The Seller has made or obtained from the appropriate authorities all inspections, licenses, and certificates required to be made or issued with respect to all occupied Mortgaged Property portions, or with respect to the Mortgaged Property's use and occupancy (including, without limitation, certificates of occupancy and fire underwriting certificates).

38. **No Additional Collateral –** The Note is not and has not been secured by any collateral except the corresponding Mortgage lien and the security interest of any applicable security agreement or chattel Mortgage, the existence of which the Seller previously disclosed to Wells Fargo Home Equity and Wells Fargo Home Equity approved in writing.

39. **Deeds of Trust –** In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by Wells Fargo Home Equity to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor or reconveyance of the deed of trust.

40. **Acceptable Investment –** There is no circumstance or condition with respect to the Mortgage, the Mortgaged Property, the Mortgagor, or the Mortgagor's credit standing, that can reasonably be expected to cause private institutional investors to regard the Home Equity Loans/Lines of Credit as an unacceptable investment, cause the Home Equity Loans/Lines of Credit to become Delinquent or adversely affect the Home Equity Loans/Lines of Credit's value or marketability.

41.
   **Condominium Project Units and Planned Unit Developments ("PUD") –** As to each condominium unit located in a condominium project or planned unit located in a PUD:

   (i)    The condominium project or PUD has been created and is existing in full compliance with the enabling statute requirements of the jurisdiction in which the condominium project or PUD is located and with all other applicable laws;

   (ii)   The condominium project or PUD constituent documents contain customary and enforceable provisions protecting the rights of each unit's second Mortgagee, as specified in the appropriate Agency guidelines;

(iii) Any second Mortgagee obtaining title to a condominium project unit or PUD unit pursuant to the remedies provided in a Mortgage or a Mortgage foreclosure will not be liable for such condominium project unit's or PUD unit's unpaid dues or charges which accrue prior to the Mortgagee's acquisition of title to such condominium project unit or PUD unit unless specifically provide for by applicable law;

(iv) All taxes, assessments, and charges, that may become liens prior to the first Mortgage under applicable law, relate only to the individual condominium project unit or PUD unit and not to the condominium project or PUD as a whole;

(v) The requisite percentage of condominium project units or PUD units specified in the applicable Underwriting Guidelines have been sold and conveyed to bona fide purchasers who have closed or who are legally obligated to close. One owner's purchase of multiple condominium project units or PUD units have been counted as one sale when counting the number of condominium project unit or PUD unit sales to determine if this sales requirement has been met;

(vi) Condominium Project or PUD dues or charges include an adequate reserve funds for maintenance, repairs and replacement of those common elements that must be replaced on a periodic basis, and are payable in regular installments rather than by special assessments;

(vii) All Home Equity Loans/Lines of Credit secured by condominium project units or PUD units comply with the applicable condominium or PUD requirements set forth in this Home Equity Seller Guide and the applicable Underwriting Guidelines; and

(viii) With respect to any lien held by a homeowners' association, special district, or similar organization for assessments, maintenance fees or similar charges against the Mortgaged Property which is or appears to be, equal to or prior to the Mortgage, the homeowners' association, special district or similar organization have agreed to give at least sixty (60) days written notice before foreclosing on the lien and the lienholder will forward such notice to the Mortgage holder at least forty-five (45) days before foreclosure.

42. **Home Equity Loans/Lines of Credit Recording and Transfer –** The Seller has recorded the Note and Mortgage, if necessary, to protect Wells Fargo Home Equity's interests. The Assignment of Mortgage from the Seller to Wells Fargo Home Equity is in recordable form and is acceptable for recording or filing under the laws of the jurisdiction in which the Mortgaged Property is located. The Home Equity Loans/Lines of Credit Assignment to Wells Fargo Home Equity validly transfers the Home Equity Loans/Lines of Credit to Wells Fargo Home Equity, free and clear of any pledge, lien, encumbrance or security interest, and the Seller will not assign or transfer any interest in the Home Equity Loans/Lines of Credit to any other person or entity.

43. **Due-on-Sale –** When, and to the extent, allowed by applicable law, the Mortgage contains an enforceable provision for acceleration of the Home Equity Loans/Lines of Credit's unpaid principal balance in the event that the Mortgagor sells or transfers the Mortgaged Property without the Mortgagee's prior written consent.

44.
**No Graduated Payments, Contingent Interest, Cooperative Share Home Equity Loans/Lines of Credit, , , any Loans that contain a provision for priority lien status for non-obligatory advances, or any Loans/lines that contain a provision which prohibits the placement of any additional liens on the Mortgaged property.** Unless otherwise expressly provided for in the Correspondent package or this Home Equity Seller Guide, none of the documents evidencing or securing the Home Equity Loans/Lines of Credit is a graduated payment Home Equity Loans/Lines of Credit, and the Home Equity Loans/Lines of Credit does not have a shared appreciation or other feature providing for cooperative or contingent interest

or cooperative or contingent principal.

45. **Mortgaged Property Undamaged; No Condemnation -** The Mortgaged Property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado, or other casualty so as to affect adversely the Mortgaged Property's value as security for the Home Equity Loans/Lines of Credit or the use for which the premises were intended. The Mortgaged Property is in good repair. There are no condemnation proceedings by any federal, state, or local authority pending or, to the best of the Seller knowledge, threatened against the Mortgaged Property.

46. **Collection Practices; Escrow Deposits -** The collection practices used with respect to the Home Equity Loans/Lines of Credit have been in accordance with Accepted Servicing Practices, and have been in all respects legal and proper. With respect to escrow deposits and escrow payments, all such payments are in Seller possession and there exists no deficiency in connection with the escrow deposits and Escrow Payment for which customary arrangements for repayment have not been made. No escrow deposits or escrow payments, or other charges or payments due the Seller, have been capitalized under the Mortgage or Note. All Mortgage Loans delivered for Funding shall contain the HUD required Initial Escrow Account Disclosure Statement if applicable, as defined in the Wells Fargo Funding Seller Guide. There are no escrow deposits or payments associated with the Home Equity Loans/Lines of Credit as of the Funding Date.

47. **No Other Hazards -** To the best of the Seller's knowledge, except as the Seller has specifically disclosed to Wells Fargo Home Equity and Wells Fargo Home Equity has approved in writing, the Mortgaged Property is not exposed to environmental hazards (such as toxic or hazardous waste) which are not covered by fire and extended coverage insurance or other available insurance.

48. **Supervision of Home Equity Loans/Lines of Credit Originator -** The person or entity originating the Home Equity Loans/Lines of Credit was a savings and Loan association, savings bank, commercial bank, credit union, insurance company, or similar institution supervised and examined by a federal or state authority, or by a Mortgagee approved by the Secretary of Housing and Urban Development pursuant to National Housing Act Sections 203 and 211.

49.
**Real Estate Appraisals -** Each appraisal conducted in connection with a Loan complies with applicable federal and state law, and applicable Agency requirements; and with respect to any appraisal requirements imposed by or pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), as amended from time to time, the related Loan is eligible for purchase by a financial institution subject to FIRREA, and, in the case of Conforming Balance Loan sizes, by the Agencies. Each appraisal is made by an appraiser who meets all of the following requirements:

(i)     Is either a licensed or certified residential appraiser or a certified general appraiser, by the state, as required for the particular appraisal;

(ii)    Is in good standing with the applicable state appraisal licensing agency;

(iii)   Is independent of Wells Fargo, the Seller, and the Seller's affiliates and subsidiaries, and is not involved in the Loan transaction in any way except as the appraiser;

(iv)    Does not have any present or prospective direct or indirect interest, financial or otherwise, in the property that is the subject of the appraisal report;

(v)     Has no personal bias, or interest with respect to any of the parties involved in the transaction relating to the appraisal, including but not limited to the Seller or the Seller's directors, officers, employees or agents;

(vi) Made a personal inspection of the property that is the subject of the appraisal report;

(vii) Was not assigned the appraisal based on any required or expected minimum or specific valuation of the appraised property, and whose compensation was not based upon reporting a predetermined value of the appraised property or any other information contingent upon some event which, at the time of the appraisal, had not occurred;

(viii) **Was not assigned the appraisal by the same person responsible for the sole approval authority for granting the loan request, and**

(ix) Demonstrates sufficient experience and education in the appraisal of properties similar to the subject property

50. **Valuation Products –** Where permitted, approved alternative valuation products such as Automated Valuation Models (AVMs) may be utilized in accordance with current guidelines. Where more than one such approved product is available, Sellers origination process prohibits the practice of "Value Shopping". "Value Shopping" is defined as the practice of obtaining multiple AVMs and selecting the one to be used based on the market value it returned. Factors other than the actual value must be used when selecting which model to use in decisioning the loan.

51. **Bankruptcy or Insolvency –** To the best of the Seller's knowledge, the Mortgagor is not a debtor in any state or federal bankruptcy or insolvency proceeding.

52. **Error or Fraud –** Neither the Mortgagor nor any other person or entity involved in the Home Equity Loans/Lines of Credit transaction or in its underwriting or documentation (including without limitation, any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with such transaction whether or not the Seller was a party to or had knowledge of such misrepresentation or incorrect information, and no error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to the Home Equity Loans/Lines of Credit has taken place on the part of the Seller or any other party involved in the Home Equity Loans/Lines of Credit's origination or in the application of any insurance in relation to such Home Equity Loans/Lines of Credit.

53. **No Options –** No other party has any option or right of first refusal or other arrangement to acquire directly or indirectly any Home Equity Loans/Lines of Credit offered to Wells Fargo Home Equity for purchase.

54. **Home Equity Loans/Lines of Credit Payments –** The Seller has not made, directly or indirectly, any payment on the Home Equity Loans/Lines of Credit or on any other Home Equity Loans/Lines of Credit of the Mortgagor from any other person or entity; the Seller has also not made any agreement with any Mortgagor providing for any variation of the Mortgage Interest Rate, the schedule of payment or other Home Equity Loans/Lines of Credit terms and conditions.

55. **Adverse Selection –** The Seller used no adverse selection process or procedures in selecting the Home Equity Loans/Lines of Credits to be sold to Wells Fargo Home Equity.

56. **Securities Law –** Wells Fargo Home Equity has made no representation whatsoever to the Seller concerning the applicability or inapplicability of the Security Act of 1933, as amended (the "1933 Act") or of any state securities laws (each, a "State Act") to the transactions that are the subject of this Home Equity Seller Guide. The Seller hereby represents and warrants to Wells Fargo Home Equity as follows:

(i)   The offer, issuance, sale, and delivery of the Home Equity Loans/Lines of Credits under the circumstances contemplated hereunder constitute exempted transactions under the registration provisions of the 1933 Act, and the registration of the Home Equity Loans/Lines of Credits under the 1933 Act is not required in connection with any such offer, issuance, sale, or delivery of the Home Equity Loans/Lines of Credits; and

(ii)  The offer, issuance, sale, and delivery of the Home Equity Loans/Lines of Credits under the circumstances contemplated under the Correspondent Package and this Home Equity Seller Guide constitute exempted transactions under applicable State Acts, and the neither the Home Equity Loans/Lines of Credits registration or qualification is required under such State Acts nor is the authorization, approval, or consent of any governmental authority or agency required or necessary in connection with any such offer, issuance, sale, or delivery of the Home Equity Loans/Lines of Credits.

57.  **No Home Equity Loan/Home Equity Line of Credit Is a High Cost, Threshold, Predatory Loan or Section 32 Covered Loan or a Refinance of the Same -** No Home Equity Loan/Home Equity Line of Credit is subject to or is covered under any federal, state or municipal law regulating high cost loans, predatory loans, or threshold loans, including but not limited to, loans subject to Section 103(aa) of Truth-in-Lending Act, as amended, or Section 226.32 of the Federal Reserve Board, Regulation Z, as amended ("Section 32 Loans"). Furthermore, no Home Equity Loan/Home Equity Line of Credit represents a refinance, in whole or in part, of a transaction that was subject to or covered under any such federal, state or municipal law regulating high cost loans, predatory loans, or threshold loans, including, but not limited to Section 32 Loans.

58.  **Fair Lending / Equal Credit Opportunity Act -** To the best of Seller's knowledge, Seller and its third party originators have treated all Borrowers/Obligors in a fair and consistent manner. All Borrowers/Obligors have received the same level of assistance, on whether to apply for credit, how to best qualify for credit, how to resolve any issues relating to creditworthiness and other aspects in the credit extension process. Seller has complied with all provisions of the Equal Credit Opportunity Act and the Fair Housing Act.

59.  **Fair Pricing Policy -** All Home Equity Loans/Home Equity Lines of Credit comply with Wells Fargo's Fair Pricing Policy, which does not allow the funding of any "High Cost" mortgage loans or home equity financing. All Home Equity Loans/Home Equity Lines of Credit have passed a High Cost Mortgage Test, whether or not they are covered by high cost mortgage regulation, HOEPA (section 226.32 of Regulation Z), or any state or local high cost, covered or predatory lending law or ordinance. This includes owner-occupied refinances, non-owner occupied refinances, purchase money transactions and cash-out transactions. Interest rates and other pricing terms reasonably reflect the costs and risks of originating the Home Equity Loan/Home Equity Line of Credit. All Home Equity Loans/Home Equity Lines of Credit comport to Seller's established policies with respect to maximum points and charges, overages, yield spread premiums or other compensation vehicles, and established limits on total broker and lender compensation.

60.  **Predatory Lending/Home Ownership and Equity Protection Act/High Cost Loans -** No Home Equity Loan/Home Equity Line of Credit is subject to the Provisions of the Home Ownership and Equity Protection Act of 1994 as amended or is considered a "high cost", "covered" or "predatory" loan under any applicable state, federal, or local laws or ordinances.

**Prohibited Practices -** Seller and its third party originators have not engaged in any of the following practices with respect to Home Equity Loans/Home Equity Lines of Credit purchased or to be purchased by Wells Fargo:

a.   Encouraging a borrower to default on an existing loan/extension of credit in connection with the refinance of all or part of the existing loan/extension of credit;

b.   Financing single premium credit life, disability or unemployment insurance products with the proceeds of the Home Equity Loan/Home Equity Line of Credit;

c.   Refinancing of a Special Subsidized Mortgage. **A "Special Subsidized Mortgage"** means a residential mortgage loan including home equity financing that is originated or subsidized by or through a state, local, or tribal government or nonprofit organization and that in some circumstances:

- does not have to be completely repaid; or

- requires only partial payments be made.

Examples include, but are not limited to, a mortgage granted by organizations such as Habitat for Humanity or a local housing authority.

d.   Contracting for a prepayment premium.

e.   Payment to a home improvement contractor from the proceeds of the Home Equity Loan/Home Equity Line of Credit other than by a check made payable either to the consumer, or jointly to the consumer and the home improvement contractor, or through an independent third party escrow agent;

f.   Payment of Home Equity Loan/Home Equity Line of Credit payments in advance from the loan proceeds; and

g.   Contracting for an increase in the interest rate upon default of the Home Equity Loan/Home Equity Line of Credit at a level not commensurate with risk mitigation

61.  **Responsible Lending; Benefit to Borrower; Ability to Repay -** Seller agrees to use best efforts to ensure that each extension of credit offered to a Borrower/Obligor is consistent with his or her needs, objectives and financial situation. Each Home Equity Loan/Home Equity Line of Credit, the proceeds of which have been used to refinance a previous mortgage loan or home equity financing, offers a documented, demonstrable, tangible net economic benefit to the borrower. Appropriate assessment and documentation has been performed of the borrowers'/Obligor's ability to repay each Home Equity Loan/Home Equity Line of Credit in accordance with its terms. Timely, sufficient and accurate information has been provided to borrowers concerning each Home Equity Loan/Home Equity Lines of Credit's terms, costs, risks and benefits. Total loan compensation for each Home Equity Loan/Home Equity Lines of Credit, including compensation to third party originators, has been structured to avoid providing any incentive to originate a loan with predatory or abusive characteristics.

62.  **Ohio Properties** – Each Home Equity Loan/Home Equity Line of Credit secured by property located in Ohio, irrespective of the originating lender's exempt status under the Ohio Consumer Sales Practices Act, relies on full verified documentation of the borrower's financial resources to determine the Mortgagor's probability of repayment, and all supporting documentation used by the originating lender to analyze the probability of repayment at time of origination is contained in the Closed Package.

63.  **Colorado Properties** – For each Home Equity Loan/Home Equity Line of Credit secured by property located in Colorado which involves a mortgage broker, a reasonable inquiry as to the Borrower's current and prospective income has been made and appears in the Closed Package, and an analysis of reasonableness of the income has been performed.

64.  **Minnesota Properties** - Each Home Equity Loan/Home Equity Line of Credit secured by property located in Minnesota, irrespective of the originating lender's exempt status under the Minnesota Mortgage Originator and Servicer Licensing Act (the "MN Act"), relies on verified

documentation of the borrower's financial resources to determine the borrower's probability of repayment, and all supporting documentation used by the originating lender to analyze the probability of repayment at time of origination is contained in the Closed Package. If such Home Equity Loan/Home Equity Line of Credit is a variable rate Home Equity Loan/Home Equity Line of Credit, the Borrower(s) was (were) qualified using the Home Equity Loan's/Home Equity Line of Credit's fully indexed rate (as such term is defined in the MN Act), and a repayment schedule which achieves full amortization over the life of the Home Equity Loan/Home Equity Line of Credit.

08CV1806
JUDGE BUCKLO
MAGISTRATE JUDGE COLE

# EXHIBIT F

## GUARANTY AND SUPPORT AGREEMENT

This Guaranty and Support Agreement (the "Guaranty") is made on 1/29/2007, by DKH, Inc ("Guarantor"), a Corporation, to and for the benefit of Wells Fargo Bank, N.A., a national banking association, (hereinafter referred to as "Wells Fargo").

WHEREAS, Wells Fargo has agreed to purchase from time to time from **Draper and Kramer Mortgage Corp** ("the Seller") certain Home Equity Loans/Home Equity Lines of Credit (each, a "Mortgage Loan") pursuant to the terms, obligations, and agreements contained in: (i) that certain Loan Purchase Agreement dated 10/31/2003 between Wells Fargo Bank, N.A. and the Seller (the "Purchase Agreement"), together with any and all commitments that may hereafter be executed by and between Wells Fargo and the Seller (individually, a "Commitment," and collectively, the "Commitments") (the Purchase Agreement and the Commitments, together with any and all other documents, instruments, and materials now and hereafter issued, executed and/or delivered in connection with the Purchase Agreement and the Commitments, including but not limited to Wells Fargo's Seller Guide and the Program Documents defined in the Seller Guide, (hereafter collectively called the "Instruments"); and

WHEREAS, the Purchase Agreement requires the Seller, in certain prescribed circumstances, to repurchase Mortgage Loans it sold to Wells Fargo under the Purchase Agreement and otherwise to indemnify and hold Wells Fargo harmless from and against any and all claims, losses, costs, and damages Wells Fargo may suffer as a result of Wells Fargo's purchase of Mortgage Loans from the Seller; and

WHEREAS, Wells Fargo has advised Guarantor and the Seller that Wells Fargo will not purchase any Mortgage Loans from the Seller under the Instruments unless, among other matters, Guarantor guarantees to Wells Fargo the timely payment of any amounts owing under the Instruments as provided in this Guaranty; and

WHEREAS, Guarantor as the parent company of the Seller will derive substantial financial benefits from the Instruments.

NOW, THEREFORE, to induce Wells Fargo to purchase Mortgage Loans from the Seller under the Instruments and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.    Incorporation of Recitals. The foregoing recitals are hereby acknowledged and agreed to be true and are hereby incorporated into the body of this Guaranty by reference to the same extent as if set forth in full in the body of this Guaranty.

2.    Guaranty of Payment and Performance. Guarantor hereby absolutely and unconditionally and irrevocably guarantees to Wells Fargo, its successors and assigns: (i) the prompt and unconditional payment of any amount properly due Wells Fargo from the Seller from time to time under the Instruments, including all interest, fees, costs, charges, expenses, and reasonable attorneys' fees to which Wells Fargo is entitled under the Instruments and this Guaranty as such fees shall become due and payable under the Instruments; and (ii) the performance of all obligations by the Seller pursuant to the terms of the Instruments. The obligations of Guarantor set forth in parts (i) and (ii) of this paragraph are hereafter collectively referred to as the "Obligations." This is a guaranty of payment and performance and not a guaranty of collection. Guarantor shall have all defenses of Seller.

3.    Stock Ownership of Guarantor. Guarantor will directly own and hold the entire legal title to and beneficial interest in all outstanding shares of stock of the Seller having the power under ordinary circumstances to vote for the election of members of the Board of Directors of the Seller, and Guarantor will not directly or indirectly pledge or in any way encumber or otherwise dispose of any such shares of the Seller's stock.

4.  **No Subrogation.** If, for any reason, the Seller now is or hereafter becomes indebted to Guarantor, such indebtedness and all interest thereon shall, at all times, be subordinate in all respects to the Obligations, and Guarantor shall not be entitled to enforce or receive payment until the Obligations have been fully satisfied. Notwithstanding any payments made by Guarantor under this Guaranty, Guarantor shall not be entitled to be subrogated to any of the rights of Wells Fargo against the Seller.

5.  **Benefit.** This Guaranty may be assigned or transferred in whole or in part by Wells Fargo only in conjunction with, and the benefit of this Guaranty shall automatically pass with, a transfer or assignment of any portion of the Instruments to any subsequent owner or holder. All references to Wells Fargo in this Guaranty shall be deemed to include any successor or assignee of Wells Fargo or any subsequent owner or holder of the Instruments.

6.  **Actions by Wells Fargo.** No action that Wells Fargo may take or omit to take in connection with the Instruments, nor any course of dealing with the Seller or any other person, shall release Guarantor's obligations under this Guaranty, affect this Guaranty in any way, or afford Guarantor any recourse against Wells Fargo; provided however that nothing herein shall give Wells Fargo rights in addition to those afforded in the Instruments. By way of example, but not in limitation, Guarantor hereby expressly agrees that Wells Fargo may, from time to time, and without notice to Guarantor, in accordance with the terms of the Instruments:

    (a)  Amend, change, or modify, in whole or in part, the Instruments;
    (b)  Accelerate, change, extend, or renew the time for repurchase of Mortgage Loans by the Seller under the Instruments;
    (c)  Waive any terms, conditions, or covenants of the Instruments, or grant any extension of time or forbearance for performance of the Instruments;
    (d)  Compromise or settle any amount due or owing, or claimed to be due or owing, under the Instruments; and
    (e)  Release, substitute, or add a guarantor or any guarantors of the Instruments.

    The provisions of this Guaranty shall extend and be applicable to all renewals, amendments, extensions, and modifications of the Instruments, and all references to the Instruments shall be deemed to include any renewal, extension, amendment, and modification of the Instruments.

7.  **Representations and Warranties.** Guarantor hereby warrants and represents to Wells Fargo that: (a) each and every warranty, representation, and obligation made or undertaken by the Seller in the Instruments is true and correct; (b) this Guaranty constitutes a legal, valid, and binding obligation on the Guarantor, and is fully enforceable in accordance with its terms; (c) any and all balance sheets, net worth statements, and other financial data that have been given to Wells Fargo with respect to Guarantor, fairly and accurately represent the financial condition of Guarantor as of their date, and since their date there has been no material adverse change in Guarantor's financial conditions; (d) except as may be set out on any exhibit attached hereto: (i) there are no legal proceedings, material claims, or demands pending against, or to the knowledge of Guarantor threatened against, Guarantor or any of Guarantor's assets; (ii) Guarantor is not in material breach or material default of any legal agreement or obligation; and (iii) no event (including Guarantor's execution and delivery of this Guaranty) has occurred which, with notice and/or the lapse of time or action by a third party, could result in Guarantor's material breach or material default under any legal agreement or obligation; (e) Guarantor's execution and delivery of this Guaranty have been: (1) specifically approved by Guarantor's Board of Directors, and such approval is reflected in the minutes of the meetings of such Board of Directors; or (2) approved by an officer of Guarantor, which officer was duly authorized by Guarantor's Board of Directors to enter into such types of transactions, and such authorization is reflected in the minutes of the meetings of such Board of Directors. This Guaranty constitutes the

"written agreement" governing Guarantor's rights and obligations with respect to Wells Fargo in connection with Guarantor's role as the Seller's Guarantor, and Guarantor shall continuously maintain all components of such "written agreement" as an official record of Guarantor or any its successors, that Guarantor controls; and (f) except as may have been disclosed to and approved by Wells Fargo in writing, Guarantor is not operating under any type of agreement or order (including, without limitation, a supervisory agreement, memorandum or understanding, cease and desist order, capital directive, supervisory directive, and consent decree) with the or by the Office of Thrift Supervision, Federal Deposit Insurance Corporation, Federal Reserve Board, Office of the Comptroller of the Currency, or any state banking department or other government banking agency.

8. **Waiver of Notice.** Guarantor hereby expressly waives: (a) presentment and demand for payment of the principal of or interest on the Obligations and protest of nonpayment, (b) notice of acceptance of this Guaranty and of presentment, demand, and protest; (c) notice of any default hereunder or under the Obligations, and of all indulgences; (d) demand for observance, performance, or enforcement of any terms or provisions of this Guaranty or the Obligations or any other agreement respecting the Obligations; and (e) all other notices and demands otherwise required by law that Guarantor may lawfully waive.

9. **Independent Obligation.** The Obligations and liabilities of Guarantor under this Agreement shall be, in each instance, joint and several, absolute and unconditional, and independent of any obligations of the Seller. Wells Fargo may proceed directly against Guarantor to enforce Wells Fargo's rights under this Guaranty, without proceeding against or joining the Seller. Guarantor hereby waives any rights it may have to compel Wells Fargo to proceed against the Seller. Neither the demand by Wells Fargo against the Seller for repurchase of a Mortgage Loan or indemnification, nor the exercise of any remedies against the Seller, shall in any way affect Guarantor's Obligations under this Guaranty, even though any rights that Guarantor may have against the Seller or others may be extinguished, diminished, or otherwise affected by such action.

10. **Delegation.** Guarantor's Obligations under this Guaranty shall not be assigned nor delegated.

11. **No Oral Change.** This Guaranty may not be changed or amended, except by a writing signed by the party against whom enforcement of such change or amendment is sought, and none of the Obligations of Guarantor shall be released or waived by Wells Fargo, except by a writing signed by Wells Fargo.

12. **Cost of Enforcement.** Guarantor jointly and severally agrees to indemnify Wells Fargo for all costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred or paid by Wells Fargo in enforcing this Guaranty, whether or not litigation is commenced.

13. **Governing Law and Consent to Jurisdiction.** This Guaranty shall be governed by and construed in accordance with the substantive laws of the State of California. In the event of any litigation arising out of the Obligations or this Guaranty, Guarantor agrees that the substantive laws of the State of California shall apply, including, without limitation, all provisions relating to the rights and remedies of the owner or holder of the Instruments against any security therefor and/or Guarantor. Any judicial proceeding brought against the Guarantor with respect to the Obligations or this Guaranty may be brought in any court of competent jurisdiction in the State of California, irrespective of where the Guarantor may reside or be located at the time of such proceeding, and by execution and delivery of this Guaranty, the Guarantor hereby consents to the non-exclusive jurisdiction of any such applicable court and waives any defense or opposition to such jurisdiction. Nothing herein contained, however, shall prevent any Wells Fargo, or its successors or assigns under the Instruments, from bringing any action or exercising any rights against any security or against Guarantor or against any property of Guarantor within any other jurisdiction or state. Initiating such proceeding or taking such action in any other jurisdiction or

state shall not constitute a waiver of the agreement contained herein that the laws of the State of California shall govern the rights and duties of the parties hereunder.

14. **Invalidity of Particular Provisions.** If any term or provision of this Guaranty shall be determined to be illegal or unenforceable, all other terms and provisions shall nevertheless remain effective and shall be enforced to the fullest extent permitted by law.

15. **Notice of Special Events.** If Guarantor shall become bankrupt or insolvent, or any application shall be made to have Guarantor declared bankrupt or insolvent, or Guarantor shall make an assignment for the benefit of the creditors, or if Guarantor shall be placed in conservatorship or receivership, written notice of such occurrence or event shall be promptly furnished to Wells Fargo by Guarantor.

16. **Notices.** Any demands or other communications hereunder to Wells Fargo or Guarantor shall be in writing and shall be personally delivered, telecopied, or mailed (by registered or certified United States mail, postage prepaid), to the addresses set forth below or to such other addresses as either Wells Fargo or Guarantor may hereafter furnish in writing to the other, and shall be deemed effective upon the earlier of: (i) the date of delivery (if delivered personally or telecopied); (ii) the next Business Day after the date of mailing (if sent by express mail or other overnight delivery for next day delivery); or (iii) three (3) Business Days after the date of mailing (if sent by registered or certified United States mail)

WELLS FARGO:          Wells Fargo Bank, N.A.
                      Home Equity Division
                      5540 Fermi Court
                      Carlsbad, CA 92008
                      Attention: Institutional Risk Management

With copy to:         Wells Fargo Bank, NA
                      1 Home Campus, 6th Floor
                      Des Moines, IA 50328
                      Attention: Legal Department

THE SELLER:           Draper and Kramer Mortgage Corp

                      33 West Monroe St., Suite 1900
                      Chicago, IL 50603

GUARANTOR:            DKIL, Inc

                      33 West Monroe St., Suite 1900
                      Chicago, IL 50603

17. **Termination of Guaranty.** This Guaranty shall be of no further force or effect, and shall be irrevocably terminated upon full and indefeasible payment of any and all amounts required to be paid by the Seller to Wells Fargo under the Instruments, and any additional amounts to be paid by Guarantor under this Guaranty, whereupon liability of Guarantor hereunder shall automatically cease. Until all obligations of the Seller to Wells Fargo under the Instruments have been fully performed, Guarantor shall have no right to subrogation against the Seller.

18. **Reinstatement of Guaranty.** This Guaranty shall continue to be effective, or be reinstated, as the case may be, if at any time payment of all or any part of the Obligations is rescinded or must otherwise be restored or returned by Wells Fargo upon the insolvency, bankruptcy, dissolution, liquidation, or

reorganization of the Seller or upon or as a result of the appointment of a receiver, or conservator of, or trustee or similar officer for, the Seller or any substantial part of its property, or otherwise, all as though such payment had not been made.

19. **Heirs, Successors, and Assigns.** The Obligations of Guarantor herein shall be binding upon Guarantor and Guarantor's heirs, successors, assigns, executors, and administrators, jointly and severally, for the performance of the Guarantor's Obligations contained in this Guaranty.

20. **Counterparts.** This Guaranty may be executed in one or more counterparts, each of which shall have the force and effect of an original, and all of which shall constitute but one document.

21. **Waiver of Jury Trial.** Guarantor hereby: (i) covenants and agrees not to elect a trial by jury of any issue triable of right by a jury; and (ii) waives any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by Guarantor, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. Wells Fargo is hereby authorized and requested to submit this Guaranty to any court having jurisdiction over the subject matter and the parties hereto, so as to serve as conclusive evidence of Guarantor's waiver of the right to jury trial. Further, Guarantor hereby certifies that no representative or agent of Wells Fargo (including Wells Fargo's counsel) has represented, expressly or otherwise, to any of the undersigned that Wells Fargo will not seek to enforce this waiver of the right to jury trial provision.

IN WITNESS WHEREOF, this Guaranty has been executed under seal as of the day and year first written above by a duly authorized officer of Guarantor.

GUARANTOR: DKH, Inc

By: _____ (SEAL)

Name: Forrest L. Bailey

Title: President and CEO

08CV1806
JUDGE BUCKLO
MAGISTRATE JUDGE COLE

# EXHIBIT G



MAC X2401-061
1 Home Campus
Des Moines, IA 50328-0001
515 213-4762
515 213-5192 Fax

<u>Legal Department</u>

December 21, 2007

Draper & Kramer Mortgage Corp.
33 West Monroe St.
Chicago, IL 60603
Attn: Courtney Lance

Re:    Notice of Default under Wells Fargo Funding's Loan Purchase Agreement dated May
23, 2007 and Wells Fargo Bank's Home Equity Loan/Home Equity Line Purchase
Agreement dated October 31, 2003.

Dear Ms. Lance,

Wells Fargo Funding, Inc., entered into a Loan Purchase Agreement with Draper & Kramer
Mortgage Corporation ("Draper") on May 23, 2007. In addition, Wells Fargo Bank, N.A.
entered into a Home Equity Loan/Home Equity Line Purchase Agreement with Draper on
October 31, 2007. The subject loans were then purchased by Wells Fargo from Draper. As
legal counsel for Wells Fargo, I have been asked to contact you in regard to this matter.

You have been notified that during our normal course of business, we discovered material
defects regarding the loans referenced below. You have not provided us sufficient information
or documentation to cure these defects and as a result of this breach of representations and
warranties, Wells Fargo demands repurchase of the specified loans and reimbursement for
other fees. (see attached documents).

Pursuant to the Agreements this letter constitutes a formal demand that you immediately;

- Repurchase the Wells Fargo Funding "Bolger" loan, loan number 193955176, in the
amount of $291,192.11;
- Repurchase the Wells Fargo Funding "Juneau" loan, loan number 139610752, in the
amount of 135,978.51;
- Repurchase the Wells Fargo Funding " Butler" loan, loan number 0199551714, in an
amount yet to be determined (information will be forthcoming prior to expiration date of
demand) ;
- Reimburse Wells Fargo Funding for non-MERS penalties of $25.00;
- Repurchase the Wells Fargo Bank  "Antink" loan, loan number 6540640839, in the amount
of $219,233.34;
- Repurchase the Wells Fargo Bank "Chapman" loan, loan number  6540840728, in the
amount of $28,231.95;

December 21, 2007
Page 2

- Repurchase the Wells Fargo Bank "Betacour" loan, loan number 6541655349, in the amount of $62,189.95;
- Repurchase the Wells Fargo Bank "Parker" loan, loan number 6542177095, in the amoun of 92,969.40;
- Repurchase the Wells Fargo Bank "Myrlie" loan, loan number 6541762657, in the amount of $109,134.35
- Repurchase the Wells Fargo Bank "Wright" loan, loan number 6540607234, in the amoun of $239,844.32.(invoice to be provided prior to expiration date of demand)

Total repurchase amounts owed to Wells Fargo Funding total $427,170.62, plus Butler loan.
Total reimbursement amounts owed to Wells Fargo Funding total $25.00.
Total repurchase amounts owed to Wells Fargo Bank, N.A. total $751,603.31.

Repurchase and reimbursement must be completed by January 4th, 2008.  Please contact Brian Fricke at 217-547-8616 at the time of wiring. He will be able to furnish the appropriate wiring information and verify the receipt of funds.

**Note**:  **In the event that Draper fails to tender the total amount due on or before the time limit specified in this letter, we will take all steps necessary and appropriate to protect our legal rights. This letter does not constitute a waiver of any of our rights, claims, or remedies.**

Sincerely,

David L. Peters
Associate General Counsel

Enclosures


**WELLS
FARGO**

1 Home Campus
Des Moines, IA 50328-0001
515 213-4762
515 213-5192 Fax

<u>Legal Department</u>

December 21, 2007

Draper and Kramer, Inc.
33 West Monroe St.
Chicago, IL 60603
Attn: Forrest Bailey

Re:  Notice of Default under Wells Fargo Funding's Loan Purchase Agreement dated May 23, 2007 and Wells Fargo Bank's Home Equity Loan/Home Equity Line Purchase Agreement dated October 31, 2003.

Dear Mr. Bailey,

Wells Fargo Funding, Inc., entered into a Loan Purchase Agreement with Draper & Kramer Mortgage Corporation ("Draper") on May 23, 2007. In addition, Wells Fargo Bank, N.A. entered into a Home Equity Loan/Home Equity Line Purchase Agreement with Draper on October 31, 2007. The subject loans were then purchased by Wells Fargo from Draper. As legal counsel for Wells Fargo, I have been asked to contact you in regard to this matter.

You have been notified that during our normal course of business, we discovered material defects regarding the loans referenced below. You have not provided us sufficient information or documentation to cure these defects and as a result of this breach of representations and warranties, Wells Fargo demands repurchase of the specified loans and reimbursement for other fees. (see attached documents).

Pursuant to the Agreements this letter constitutes a formal demand that you immediately;

- Repurchase the Wells Fargo Funding "Bolger" loan, loan number 193955176, in the amount of $291,192.11;
- Repurchase the Wells Fargo Funding "Juneau" loan, loan number 139610752, in the amount of 135,978.51;
- Repurchase the Wells Fargo Funding " Butler" loan, loan number 0199551714, in an amount yet to be determined (information will be forthcoming prior to expiration date of demand) ;
- Reimburse Wells Fargo Funding for non-MERS penalties of $25.00;
- Repurchase the Wells Fargo Bank "Antink" loan, loan number 6540640839, in the amount of $219,233.34;
- Repurchase the Wells Fargo Bank "Chapman" loan, loan number 6540840728, in the amount of $28,231,95;

December 21, 2007
Page 2

- Repurchase the Wells Fargo Bank "Betacour" loan, loan number 6541655349, in the amount of $62,189.95;
- Repurchase the Wells Fargo Bank "Parker" loan, loan number 6542177095, in the amount of 92,969.40;
- Repurchase the Wells Fargo Bank "Myrlie" loan, loan number 6541762657, in the amount of $109,134.35
- Repurchase the Wells Fargo Bank "Wright" loan, loan number 6540607234, in the amount of $239,844.32.(invoice to be provided prior to expiration date of demand)

Total repurchase amounts owed to Wells Fargo Funding total $427,170.62, plus Butler loan.
Total reimbursement amounts owed to Wells Fargo Funding total $25.00.
Total repurchase amounts owed to Wells Fargo Bank, N.A. total $751,603.31.

Repurchase and reimbursement must be completed by January 4th, 2008. Please contact Brian Fricke at 217-547-8616 at the time of wiring. He will be able to furnish the appropriate wiring information and verify the receipt of funds.

**Note: In the event that Draper fails to tender the total amount due on or before the time limit specified in this letter, we will take all steps necessary and appropriate to protect our legal rights. This letter does not constitute a waiver of any of our rights, claims, or remedies.**

Sincerely,

David L. Peters
Associate General Counsel

Enclosures



1 Home Campus
Des Moines, IA 50328-0001
515 213-4762
515 213-5192 Fax

<u>Legal Department</u>

December 21, 2007

DKH, Inc.
33 West Monroe St.
Chicago, Il. 60603
Attn: Forrest Bailey

Re:   Notice of Default under Wells Fargo Funding's Loan Purchase Agreement dated May
      23, 2007 and Wells Fargo Bank's Home Equity Loan/Home Equity Line Purchase
      Agreement dated October 31, 2003.

Dear Mr. Bailey,

Wells Fargo Funding, Inc., entered into a Loan Purchase Agreement with Draper & Kramer
Mortgage Corporation ("Draper") on May 23, 2007. In addition, Wells Fargo Bank, N.A.
entered into a Home Equity Loan/Home Equity Line Purchase Agreement with Draper on
October 31, 2007. The subject loans were then purchased by Wells Fargo from Draper. As
legal counsel for Wells Fargo, I have been asked to contact you in regard to this matter.

You have been notified that during our normal course of business, we discovered material
defects regarding the loans referenced below. You have not provided us sufficient information
or documentation to cure these defects and as a result of this breach of representations and
warranties, Wells Fargo demands repurchase of the specified loans and reimbursement for
other fees. (see attached documents).

Pursuant to the Agreements this letter constitutes a formal demand that you immediately;

- Repurchase the Wells Fargo Funding "Bolger" loan, loan number 193955176, in the
  amount of $291,192.11;
- Repurchase the Wells Fargo Funding "Juneau" loan, loan number 139610752, in the
  amount of 135,978.51;
- Repurchase the Wells Fargo Funding " Butler" loan, loan number 0199551714, in an
  amount yet to be determined (information will be forthcoming prior to expiration date of
  demand) ;
- Reimburse Wells Fargo Funding for non-MERS penalties of $25.00;
- Repurchase the Wells Fargo Bank "Antink" loan, loan number 6540640839, in the amount
  of $219,233.34;
- Repurchase the Wells Fargo Bank "Chapman" loan, loan number 6540840728, in the
  amount of $28,231,95;

December 21, 2007
Page 2

- Repurchase the Wells Fargo Bank "Betacour" loan, loan number 6541655349, in the amount of $62,189.95;
- Repurchase the Wells Fargo Bank "Parker" loan, loan number 6542177095, in the amount of 92,969.40;
- Repurchase the Wells Fargo Bank "Myrlie" loan, loan number 6541762657, in the amount of $109,134.35
- Repurchase the Wells Fargo Bank "Wright" loan, loan number 6540607234, in the amount of $239,844.32.(invoice to be provided prior to expiration date of demand)

Total repurchase amounts owed to Wells Fargo Funding total $427,170.62, plus Butler loan.
Total reimbursement amounts owed to Wells Fargo Funding total $25.00.
Total repurchase amounts owed to Wells Fargo Bank, N.A. total $751,603.31.

Repurchase and reimbursement must be completed by January 4th, 2008.  Please contact Brian Fricke at 217-547-8616 at the time of wiring. He will be able to furnish the appropriate wiring information and verify the receipt of funds.

**Note:**  **In the event that Draper fails to tender the total amount due on or before the time limit specified in this letter, we will take all steps necessary and appropriate to protect our legal rights.  This letter does not constitute a waiver of any of our rights, claims, or remedies.**

Sincerely,

David L. Peters
Associate General Counsel

Enclosures

go Funding, Inc.
7
Vabash Ave
d, IL 62711

## Repurchase, Indemnification, and Final Loss Analysis Invoice



WEl
FAR

ber 20, 2007

ID: 9520

| | |
|---|---|
| Correspondent Client Service Rep: | Rob Loesch |
| Phone Number: | (812) 312-73 |
| Email Address: | robert.p.loesch@wellsfargo.com |

r & Kramer Mortgage Corp
st Monroe Street
io, IL 60603

| | |
|---|---|
| Sales Manager: | Sergio Murer |
| Phone Number: | (217) 498-20 |

Courtney Lance

| | |
|---|---|
| Client Billing Contact: | Lynn Spence |
| Phone Number: | (217) 547-88 |
| Fax Number: | (866) 359-39 |
| Email Address: | lynn.spencer@wellsfargo.com |

### Repurchase Request(s)

| | | | Comments/Reason: |
|---|---|---|---|
| d Action: | Repurchase | Current UPB: | $250,794.38 | |
| Type: | Non-Conforming | Interest: | $22,879.70 | FHLMC repurchase issues: LTV of 80% |
| Reason: | Investor Required | Escrow Advance: | $8,197.74 | the subject mortgage exceeds the maxin allowed for a three-unit investment prush |
| nt Loan #: | 8404093 | SRP: | $4,062.87 | transaction of 75%. Missing Credit report |
| M Loan #: | 193955176 | Premium Pricing: | $0.00 | the Borrower. Loan is in the REO proces |
| Borrower: | BOLGER | PMI/MIP Fee: | $0.00 | If property is sold prior to lender repurchasing, lender is responsible for th |
| t Address: | 614 N. TRUMBULL AVENUE | Late Fee(s): | $116.45 | REO make whole plus the SRP. |
| State, Zip: | CHICAGO, IL 60624 | NSF Fee(s): | $0.00 | |
| oan Type: | Conv | Attorney Fee(s): | $5,140.99 | |
| n Insured: | No | Inspection Fee(s): | $0.00 | |
| 09K Loan: | No | Credit/Misc fee(s): | $0.00 | |
| rest Rate: | 6 | Total Repurchase Amount: | $291,192.11 | |

ing Status: Foreclosure Sale Held

| | | | | |
|---|---|---|---|---|
| Funded Date: | 6/1/2004 | Initial Billed Date: | 11/6/2007 | ***This repurchase has been billed for 44 |
| mt Due WFHM: | 6/1/2004 | Repurchase Funds effective through: | 1/1/2008 | Please remit funds immediately. |
| mt Due WFHM: | 7/1/2008 | | | |

***Please call to verify repurchase figures prior to wiring funds. Your repurchase contact is listed at the top of this invoice.***

Notice: Net funding will begin on all outstanding invoice amounts October 15, 2007. This will be applied t
tanding amounts billed on the September 2007 invoice, as well as, any previous amounts past due. This v
our net funding warning notice and no other communication will be sent from our office. If you have any q
regarding the net funding process, please contact your Correspondent Client Services Representative

. Include a copy of this statement with your payment. Thank you for doing business with Wells Fargo Fu

| | | | | |
|---|---|---|---|---|
| Type: | Conforming | Interest: | $9,352.52 | |
| Reason: | Investor Required | Escrow Advance: | $2,043.23 | |
| t Loan #: | 8437626 | SRP: | $2,367.58 | |
| I Loan #: | 139810752 | Premium Pricing: | $0.00 | |
| orrower: | JUNEAU | PMI/MIP Fee: | $0.00 | |
| Address: | 520 78TH AVE NE | Late Fee(s): | $384.38 | |
| tate, Zip: | SPRING LAKE PARK   MN 55 | NSF Fee(s): | $0.00 | |
| an Type: | Conv | Attorney Fee(s): | $2,043.23 | |
| Insured: | No | Inspection Fee(s): | $30.00 | |
| 3K Loan: | No | Credit/Misc fee(s): | $0.00 | |
| est Rate: | 4.75 | Total Repurchase Amount: | $135,978.61 | |

Premo repurchase reason. The subject mortgage was delivered as an 80% no cash out refinance however, it did not meet the definition of a refinance transaction. The Borrower's total monthly obligations were understated. Loan is in the REO process property is sold prior to lender repurchasing lender is responsible for the REO make whole plus the SRP.

| | | | |
|---|---|---|---|
| g Status: | Foreclosure Sale Hold | | |
| Funded Date: | 10/14/2004 | Initial Billed Date: | 12/14/2007 |
| nt Due WFHM: | 11/1/2004 | Repurchase Funds effective through: | 11/1/2007 |
| mt Due WFHM: | 6/1/2006 | | |

***Please call to verify repurchase figures prior to wiring funds. Your repurchase contact is listed at the top of this invoice.***

2 Outstanding Repurchase(s) Totaling          $427,170.62

Statement of Account Total Due:          $427,170.62

e remit payment to:

**Wiring Instructions:**
Wells Fargo Bank, NA
ABA No.: 121000248
Account Name: Wells Fargo Funding
Account No.: 1080364
Ref: Springfield Financial Processing

**Mailing Address:**
Wells Fargo Funding, Inc.
Financial Processing Department
4800 W Wabash Ave
Springfield, IL 62711
Attn: Lynn Spencer (X2803-027)

Notice: Net funding will begin on all outstanding invoice amounts October 15, 2007. This will be applied to tanding amounts billed on the September 2007 Invoice, as well as, any previous amounts past due. This w ur net funding warning notice and no other communication will be sent from our office. If you have any q regarding the net funding process, please contact your Correspondent Client Services Representative

e include a copy of this statement with your payment. Thank you for doing business with Wells Fargo Fu

| abash Ave | Commitment Fees, Early Payoffs, Truth-in-Lending Discrepancies, Underwriting Fees, Escrow Deficiencies, Non MERS Penalties, File Return Fees, Final Doc Procurement Fees, File Copy Fees, Buydown Fees, and Tax Penalties |  |
| , IL 62711 | | |

**ber 20, 2007**

ID:      9520

**& Kramer Mortgage Corp**
st Monroe Street, 19th Floor
o, IL 60603

Courtney Lance

| | |
|---|---|
| Correspondent Client Service Rep: | Rob Loesch |
| Phone Number: | (612) 312-7. |
| Email Address: | robert.p.loesch@wellsfargo.com |
| Sales Manager: | Sergio Mure |
| Phone Number: | (217) 498-2 |
| Final Doc/Mem: | John Kealy |
| Phone: | (651) 605-3 |
| Client Billing Contact: | Lynn Spenc |
| Phone Number: | (217) 547-8 |
| Fax Number: | (888) 359-3 |
| Email Address: | lynn.spencer@wellsfargo.com |

## Non MERS Penalties

elow are MERS Registration Penalties owed Wells Fargo. These fees are invoiced in accordance with Sections 565.06(c) of argo Funding Seller Guide. If you have any questions or need further information, please contact the Post Closing Lender s Department at 800-825-9108 extension 56294, or contact your assigned Post Closing Lender Relations Analyst directly..

| ice Date | Number of Loans | Penalty Month | Amount Du |
|---|---|---|---|
| /6/2007 | 1 | 9520-July 2007 | $25.00 |

| | |
|---|---|
| Total Due for Non MERS Penalties: | $25.00 |

**\*\*Payment due upon receipt of this invoice\*\*\***

| | |
|---|---|
| Statement of Account Total Due: | $25 |

mit Payment to:

king Instructions:
randing will begin on all outstanding invoice amounts as of October 15, 2007. This will be applied to rls Fargo Bank, NA ... billed on the September 2007 invoice, as well as any ... amounts past due. This w ... ur Net funding warning notice and no other communication ... count Name: Wells Fargo Funding Inc. ... Funding the net funding process, please contact your ... client Services Representative, count No.: 1080364 ... include a copy of this statement with your payment. Thank you for doing business with Wells Fargo Fun

Mailing Address:
Wells Fargo Funding Inc.
... Department, ...
Springfield, IL 62711

c
Vabash Ave
i, IL 62711

ber 20, 2007

D: 9520

**WEL**
**FAR**

| | |
|---|---|
| Repurchase Contact: | Sharon Neich |
| Phone Number: | (217) 547-8621 |
| Fax Number: | (217) 547-8025 |
| Email Address: | sharon.neich@wellsfargo.com |

& Kramer Mortgage Corp
st Monroe Street
o, IL 60603

| | |
|---|---|
| Sales Manager: | Sergio Murer |
| Phone Number: | (217) 498-2043 |

Courtney Lance

| | |
|---|---|
| Client Relations Representative: | Marshall Pressler |
| Phone Number: | (800) 832-1298 |

## Repurchase Request(s)

| | | | | |
|---|---|---|---|---|
| ed Action: Repurchase | | Current UPB: | $195,000.00 | Comments/Reason: |
| Reason: Investor Required | | Interest: | $18,986.86 | Repurchase Reason: Misrep |
| nt Loan #: 8464095 | | Premium Pricing: | $3,900.00 | |
| M Loan #: 6540540839 | | Expense Fee: | $92.50 | |
| Borrower: Antink | | Late Fee(s): | $497.98 | |
| Address: 2500 S State St | | NSF Fee(s): | $0.00 | |
| State, Zip: Lockport, IL 60441 | | Misc fee(s): | $756.00 | |
| Interest Rate: | 0 | Total Repurchase Amount: | $219,233.34 | |
| Funded Date: | 12/2/2004 | Initial Billed Date: | 8/6/2007 | **This repurchase has been billed for 13( |
| Pmt Due WFHM: | 1/1/2005 | Repurchase Funds effective through: | 1/1/2008 | Please remit funds immediately. |
| Pmt Due WFHM: | 3/1/2007 | | | |

***Please call to verify repurchase figures prior to wiring funds. Your repurchase contact is listed at the top of this invoice.***

| | | | | |
|---|---|---|---|---|
| ired Action: Repurchase | | Current UPB: | $29,936.47 | Comments/Reason: |
| Reason: Investor Required | | Interest: | $1,287.48 | Repurchase Reason: Misrep  Total due reflects $4801.08 applied from net fund |
| nt Loan #: 8476459 | | Premium Pricing: | $1,200.00 | |
| M Loan #: 6540840728 | | Expense Fee: | $92.50 | |
| Borrower: Chapman | | Late Fee(s): | $214.10 | |
| Address: 940 Barclay Street | | NSF Fee(s): | $0.00 | |
| State, Zip: Saint Paul, MN 55106 | | Misc fee(s): | $302.50 | |
| Interest Rate: | 0 | Total Repurchase Amount: | $28,231.95 | |
| Funded Date: | 1/20/2005 | Initial Billed Date: | 8/6/2007 | **This repurchase has been billed for 13: |
| Pmt Due WFHM: | 3/1/2005 | Repurchase Funds effective through: | 1/1/2008 | Please remit funds immediately. |
| Pmt Due WFHM: | 3/1/2007 | | | |

***Please call to verify repurchase figures prior to wiring funds. Your repurchase contact is listed at the top of this invoice.***

| | | |
|---|---|---|
| Reason: Investor Required | Interest: | $2,562.87 |
| t Loan #: 7058373 | Premium Pricing: | $2,145.00 |
| l Loan #: 6541655349 | Expense Fee: | $92.50 |
| orrower: Betacour | Late Fee(s): | $97.08 |
| Address: 2418 Forestview Avenue | NSF Fee(s): | $0.00 |
| tate, Zip: River Grove, IL 60171 | Misc fee(s): | $92.50 |

| | | | |
|---|---|---|---|
| Interest Rate: | 0 | Total Repurchase Amount: | $62,189.05 |
| Funded Date: | 9/13/2005 | Initial Billed Date: | 9/10/2007 |
| mt Due WFHM: | 11/1/2005 | Repurchase Funds effective through: | 1/1/2008 |
| mt Due WFHM: | 3/1/2006 | | |

**This repurchase has been billed for   101 Please remit funds immediately.**

***Please call to verify repurchase figures prior to wiring funds. Your repurchase contact is listed at the top of this invoice.***

| | | |
|---|---|---|
| red Action: Repurchase | Current UPB: | $89,898.51 |
| Reason: Investor Required | Interest: | -$938.32 |
| nt Loan #: 7108293 | Premium Pricing: | $1,898.71 |
| M Loan #: 8542177095 | Expense Fee: | $92.50 |
| Borrower: Parker | Late Fee(s): | $32.36 |
| t Address: 6611 South Upham Street | NSF Fee(s): | $0.00 |
| State, Zip: Littleton, CO 80123 | Misc fee(s): | $109.00 |

Comments/Reason:
Repurchase Reason: Misrep

| | | | |
|---|---|---|---|
| Interest Rate: | 0 | Total Repurchase Amount: | $92,969.40 |
| Funded Date: | 1/24/2006 | Initial Billed Date: | 9/10/2007 |
| Pmt Due WFHM: | 3/1/2006 | Repurchase Funds effective through: | 1/1/2008 |
| Pmt Due WFHM: | 2/1/2007 | | |

**This repurchase has been billed for   10: Please remit funds immediately.**

***Please call to verify repurchase figures prior to wiring funds. Your repurchase contact is listed at the top of this invoice.***

| | | |
|---|---|---|
| rired Action: Repurchase | Current UPB: | $99,948.53 |
| Reason: Investor Required | Interest: | $4,898.54 |
| ent Loan #: 7055403 | Premium Pricing: | $3,698.15 |
| HM Loan #: 6541762657 | Expense Fee: | $92.50 |
| Borrower: Myrlie | Late Fee(s): | $222.63 |
| t Address: 14660 Furlong Circle | NSF Fee(s): | $0.00 |
| , State, Zip: Hastings, MN 55033 | Misc fee(s): | $276.00 |

Comments/Reason:
Repurchase Reason: Misrep

| | | | |
|---|---|---|---|
| Interest Rate: | 0 | Total Repurchase Amount: | $109,134.35 |
| Funded Date: | 10/27/2005 | Initial Billed Date: | 9/10/2007 |
| Pmt Due WFHM: | 12/1/2005 | Repurchase Funds effective through: | 1/1/2008 |
| Pmt Due WFHM: | 9/1/2006 | | |

**This repurchase has been billed for   10 Please remit funds immediately.**

***Please call to verify repurchase figures prior to wiring funds. Your repurchase contact is listed at the top of this invoice.***

**5 Outstanding Repurchase(s) Totaling       $511,758.9**

**Statement of Account Total Due:       $511,758.9**

**Wiring Instructions:**
Wells Fargo Bank, NA
ABA No.: 121000248
Account Name: Wells Fargo Funding
Account No.: 1080364
Ref: Springfield Financial Processing

**Mailing Address:**
Wells Fargo Funding, Inc.
Financial Processing Department
4800 W Wabash Ave
Springfield, IL 62711
Attn: Sharon Nelch (X2803-03C)

# EXHIBIT H

March 14, 2008

**\*\*Confidential\*\***

**Courtney Lance**
**Draper & Kramer Mortgage Corp.**
**33 West Monroe Street, 19th Floor**
**Chicago, IL 60603**

RE: Notice of Demand for Repurchase of Loan
   **Ogden, Kevin**
   **341 Park Avenue, Cary, IL 60013**
   Wells Fargo Home Equity #654654 **2310175** 0001

   Client ID #**504**

Repurchase Due Date: **April 14, 2008**

Dear **Courtney Lance:**

   Pursuant to the provisions of the Home Equity Loan/Line of Credit Purchase Agreement between Wells Fargo Bank, NA and **Draper & Kramer Mortgage Corp..** Wells Fargo is hereby making its demand for repurchase with regard to the loan referenced above.

   The demand is based on breach of representations, warranties and covenants contained in Section 305.02 of the Wells Fargo Home Equity Seller Guide. Below is a copy of the section with regards to Breach Of Representation Or Warranty: 305.02b & 305.07a.

   305.02 Repurchase Events of Default
If any of the events listed below occurs, in addition to the other remedies available to Wells Fargo Home Equity as outlined in Section 305.01, Wells Fargo Home Equity shall have the right to require the Seller to Repurchase Wells Fargo Home Equity's interest in the relevant Home Equity Loans/Lines of Credit at the Repurchase Price as set forth in Section 305.03.

   b. BREACH OF REPRESENTATION OR WARRANTY - Seller defaults under or breaches, or Wells Fargo Home Equity discovers the inaccuracy of, any of the representations, warranties or covenants concerning the Seller set forth in the Correspondent Package (See generally, Section 300 of this Home Equity Seller Guide).

   305.07 General Events of Default & Remedies
If any of the events listed below in this Section 305.07 occur, Wells Fargo Home Equity has the right to demand Repurchase of the related Home Equity Loans/Lines of Credit as set forth in Repurchase Events of default (Section 305.02), or Wells Fargo Home Equity may require one or more applicable remedies set forth in General Remedies (Section 305.08).

   a. BREACH OF REPRESENTATION OR WARRANTY - As set forth in Section 305.02 and in this Section 305.07, Seller defaults under or breaches, or Wells Fargo Home Equity or any of its assigns discovers the inaccuracy of, any of the representations, warranties or covenants concerning the Seller set forth in the Correspondent Package (See generally, Section 300 of this Home Equity Seller Guide.)

The specific breach for the transaction is:

Commit Amount: $32,500
Purchase Date: 3/1/06
Collections Status: Account has been Charged Off
Amount of Charge Off: $31,700.84
Foreclosure Status: None
Senior Lienholder: Sovereign Bank
TPO: @ Mortgage Inc.

Wells Fargo is requesting repurchase due to income misrepresentation.

The application indicates the borrower is the Owner of Ogden Enterprises earning $10,000 per month.

The borrower filed for Chapter 7 Bankruptcy Protection jointly with the non-applicant spouse on 10/30/07. The Statement of Financial Affairs which is supported by income provided by the borrower reflects the following income.

| 2005 | $8,000 Gross Annual Wages |
| | $36,670 Business Income |
| 2006 | $2,000 Gross Annual Wages |
| | -$90,120 Business Income |
| 2007 | $47,883 YTD Net Loan Repayments |

Using the verified income of $3,722 per month for 2005 the debt to income ratio is 100.34% and a material credit policy violation.

Section 300.02 #52Error or Fraud - Neither the Mortgagor nor any other person or entity involved in the Home Equity Loans/Lines of Credit transaction or in its underwriting or documentation (including without limitation, any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with such transaction **whether or not the Seller was a party to or had knowledge of such misrepresentation or incorrect information, and no error, omission, misrepresentation**, negligence, fraud or similar occurrence with respect to the Home Equity Loans/Lines of Credit has taken place on the part of the Seller or any other party involved in the Home Equity Loans/Lines of Credit's origination or in the application of any insurance in relation to such Home Equity Loans/Lines of Credit.

**A billing statement with the details of the repurchase price due to Wells Fargo will be mailed to you within the next few days. Draper & Kramer Mortgage Corp.** is contractually required to repurchase Wells Fargo's interest in the identified mortgage and remit the repurchase price to Wells Fargo Bank N.A. no later than thirty (30) days from the notification date. Wells Fargo will take all actions necessary to protect our legal rights if said repurchase is not completed within this timeframe.

Please be advised that to the extent you have received non-public personal information regarding a bank customer or consumer in connection with the Repurchase Demand, Wells Fargo shall rely on you to comply with all applicable privacy laws and your continued obligations under the terms of our Agreement regarding the same. Contacting the borrower regarding an account legally owned by Wells Fargo is a violation of Federal Collection Laws.

Please contact me at (760) 804-5553 if you have any questions regarding this matter. My fax number is (760) 804-5550 and my email address is alexis.d.cosio@wellsfargo.com.  Thank you in advance for your prompt assistance and response.

Sincerely,

Alexis Cosio
Wells Fargo Bank, NA
Wells Fargo Home Equity
Credit Risk Management

cc:     **Sergio Murer**

# EXHIBIT I

March 14, 2008

**Confidential**

Courtney Lance
**Draper & Kramer Mortgage Corp.**
**33 West Monroe Street, 19th Floor**
**Chicago, IL 60603**

RE: Notice of Demand to make Wells Fargo whole for Loan
**Mazloum, Suzanne**
**2430 Baldwin Street, Wayne, MI 48214**
Wells Fargo Home Equity #654654 **2309094** 0001

Client ID #**504**

Due Date: **April 14, 2008**

Dear **Courtney Lance**:

Pursuant to the provisions of the Home Equity Loan/Line of Credit Purchase Agreement between Wells Fargo Bank, NA and **Draper & Kramer Mortgage Corp.,** Wells Fargo is hereby making its demand to make us whole with regard to the loan (Account # 654654 **2309094** 0001).

The demand is based on breach of representations, warranties and covenants contained in Section 305.02 of the Wells Fargo Home Equity Seller Guide. Below is a copy of the section with regards to Breach Of Representation Or Warranty: 305.02b & 305.07a.

305.02 Repurchase Events of Default
If any of the events listed below occurs, in addition to the other remedies available to Wells Fargo Home Equity as outlined in Section 305.01, Wells Fargo Home Equity shall have the right to require the Seller to Repurchase Wells Fargo Home Equity's interest in the relevant Home Equity Loans/Lines of Credit at the Repurchase Price as set forth in Section 305.03.

b. BREACH OF REPRESENTATION OR WARRANTY - Seller defaults under or breaches, or Wells Fargo Home Equity discovers the inaccuracy of, any of the representations, warranties or covenants concerning the Seller set forth in the Correspondent Package (See generally, Section 300 of this Home Equity Seller Guide).

305.07 General Events of Default & Remedies
If any of the events listed below in this Section 305.07 occur, Wells Fargo Home Equity has the right to demand repurchase of the related Home Equity Loans/Lines of Credit as set forth in Repurchase Events of default (Section 305.02), or Wells Fargo Home Equity may require one or more applicable remedies set forth in General Remedies (Section 305.08).

a. BREACH OF REPRESENTATION OR WARRANTY - As set forth in Section 305.02 and in this Section 305.07, Seller defaults under or breaches, or Wells Fargo Home Equity or any of its assigns discovers the inaccuracy of, any of the representations, warranties or covenants concerning the Seller set forth in the Correspondent Package (See generally, Section 300 of this Home Equity Seller Guide.)

**The specific breach for the transaction is:**

**Commit Amount: $28,500**
**Collections Status:  Account has been Charged Off**
**Amount of Charge Off: $28,173.23**
**Foreclosure Status:  Sale Date 3/5/08**
**Senior Lienholder:  WAMU**
**TPO: Dynamic Mortgage**

**Wells Fargo is requesting Draper and Kramer Mortgage Corporation make us whole due to undisclosed properties and credit policy violations.**

**The borrower purchased a property located at 6131 Whitefield Street, Dearborn Heights, MI 1/5/06, just one week prior to the subject application.  There are two mortgages secured to this property for $218,502 which results in a monthly payment of $1,543.  The debt to income ratio including the undisclosed mortgages is 68.37% and a credit policy violation.**

**Section 300.02 of the Wells Fargo Seller Guide States:**

**Error or Fraud -** Neither the Mortgagor nor any other person or entity involved in the Home Equity Loans/Lines of Credit transaction or in its underwriting or documentation (including without limitation, any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with such transaction **whether or not the Seller was a party to or had knowledge of such misrepresentation or incorrect information,** and no error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to the Home Equity Loans/Lines of Credit has taken place on the part of the Seller or any other party involved in the Home Equity Loans/Lines of Credit's origination or in the application of any insurance in relation to such Home Equity Loans/Lines of Credit.

**A Billing Statement with the details of the Make Whole Demand, due to Wells Fargo, will be mailed to you within a few days.  Draper & Kramer Mortgage Corp.** is contractually required to make Wells Fargo whole for the identified mortgage and remit this amount to Wells Fargo Bank N.A. no later than thirty (30) days from the notification date.  Wells Fargo will take all actions necessary to protect our legal rights if the said transaction is not completed within this timeframe.

Please be advised that to the extent you have received non-public personal information regarding a bank customer or consumer in connection with this Demand, Wells Fargo shall rely on you to comply with all applicable privacy laws and your continued obligations under the terms of our Agreement regarding the same.

Please contact me at (760) 804-5553 if you have any questions regarding this matter.  My fax number is (760) 804-5550 and my email address is alexis.d.cosio@wellsfargo.com.  Thank you in advance for your prompt assistance and response.

Sincerely,

Alexis Cosio
Wells Fargo Bank, NA
Wells Fargo Home Equity
Credit Risk Management

cc:    **Sergio Murer**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

WELLS FARGO FUNDING,          )
a Minnesota corporation, and   )
WELLS FARGO BANK, N.A., a national )
banking association,           )
                               )
            Plaintiffs,        )        Case No.  FILED: MARCH 28, 2008
                               )                  08CV1806 RCC
      v.                       )                  JUDGE BUCKLO
                               )                  MAGISTRATE JUDGE COLE
DRAPER & KRAMER MORTGAGE CORP., )
a Delaware corporation, DRAPER AND )
KRAMER, INCORPORATED, a Delaware )
Corporation, and DKH, Inc., a Delaware )
corporation,                   )
                               )
            Defendants.        )

**COMPLAINT AT LAW**

Plaintiffs, WELLS FARGO FUNDING ("Wells Fargo"), and WELLS FARGO

BANK, N.A., ("Wells Fargo Bank") by their undersigned attorneys and for their complaint

against Defendants DRAPER & KRAMER MORTGAGE CORP. ("DKMC"), DRAPER

AND KRAMER, INCORPORATED ("DK, INC.") and DKH, INC. ("DKH") allege as

follows:

**THE PARTIES**

1.     Plaintiff Wells Fargo Funding is a corporation organized and existing

under the laws of the State of Minnesota and maintains its principal place of business in

Minnesota  Wells Fargo Funding has offices in Illinois and regularly engages in the

purchase of mortgage loans in Illinois.

2.     Plaintiff Wells Fargo Bank, N.A. is a national association chartered in

Sioux Falls, South Dakota, with its principal place of business in San Francisco,

California.

3.      Defendant DKMC is a Delaware corporation with its principal place of business in Chicago, Illinois.

4.      Defendant DK, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

5.      Defendant DKH is a Delaware corporation with its principal place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

6.      This court has jurisdiction over the subject matter of this action pursuant to Title 28 of the United States Code § 1332(a)(1) and (c)(1), because the matter in controversy exceeds $75,000 exclusive of costs and interest and is between citizens of different states. Venue is proper in this District pursuant to Title 28 of the United States Code § 1391(a)(1) and (2) and (c) because a substantial portion of the events giving rise to the Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

**A.      Home Loan Purchase Agreement and Guaranty Agreement**

7.      On or about May 23, 2007, DKMC and Wells Fargo entered into a Loan Purchase Agreement (the "Loan Agreement"), in which Wells Fargo agreed to purchase and DKMC agreed to sell certain residential mortgage loans.  (A copy of the Agreement is attached hereto as Exhibit A).

8.      Paragraph 1 of the Loan Agreement incorporates the Wells Fargo Funding Seller Guide ("Seller Guide"), which together form the complete agreement between the parties.  (A copy of the relevant representations and warranties of the Seller Guide is attached hereto as Exhibit B).

9.     Pursuant to the Loan Agreement, DKMC had the option to sell to Wells Fargo loans meeting the qualifications listed in § 300.02 of the Seller Guide.  As set forth under the Seller Guide, DKMC agreed to provide accurate and complete loan documentation and made various representations, warranties and covenants with respect to loans sold to Wells Fargo.

10.     In the event DKMC failed to fulfill its obligation to deliver qualifying loans with sufficient documentation or breached any representations, warranties and/or covenants made regarding any of the loans, the Loan Agreement and Seller Guide provide, *inter alia*, that Wells Fargo is entitled to the demand repurchase of the loans by DKMC, plus accrued interest, legal expenses, and other expenses that Wells Fargo may incur as a result of DKMC's default.  DKMC also agreed to reimburse Wells Fargo for the price paid by Wells Fargo for the servicing rights with respect to each of the loans, and is required to indemnify Wells Fargo for all costs and losses associated with such loans.

11.     On or about June 1, 2007, DK, Inc. and Wells Fargo entered into a Guaranty and Support Agreement (the "Guaranty"), in which DK, Inc. agreed to guarantee, *inter alia*, certain obligations, including payment and performance obligations, owed by DKMC to Wells Fargo pursuant to the Loan Agreement.  (A copy of the Guaranty is attached hereto as Exhibit C).

12.     Under Paragraph 2 of the Guaranty, DK, Inc. agrees to guarantee both the payment of amounts due to Wells Fargo from DKMC under the Loan Agreement and/or related documents and the performance of all obligations owed to Wells Fargo by DKMC under the Loan Agreement and/or related documents.  The Guaranty specifically provides that it is a guaranty of payment and performance.

13.     Under Paragraph 7 of the Guaranty, DK, Inc. made certain warranties and representations to Wells Fargo.  Specifically, DK, Inc. warranted and represented to Wells Fargo that every warranty, representation and obligation made or undertaken by DKMC in the Loan Agreement, Seller Guide and/or underlying loan documents related to the sale of any loan is true and correct.

14.     Paragraph 9 of the Guaranty provides that DK, Inc.'s obligations under the Guaranty are joint and several, absolute and unconditional and independent of any obligations of DKMC.

15.     Under Paragraph 12 of the Guaranty, DK, Inc. agrees to indemnify Wells Fargo for all costs and expenses, including attorneys' fees, incurred or paid by Wells Fargo in enforcing the Guaranty.

**B.      Home Equity Loan/Line of Credit Purchase Agreement and Home Equity Guaranty Agreement**

16.     On or about October 31, 2003, DKMC and Wells Fargo Bank entered into a Home Equity Loan/Home Equity Line Purchase Agreement (the "Home Equity Agreement"), in which Wells Fargo Bank agreed to purchase and DKMC agreed to sell certain home equity loans and/or home equity lines of credit.  (A copy of the Home Equity Agreement is attached hereto as Exhibit D).

17.     Paragraph 1 of the Home Equity Agreement incorporates the Wells Fargo Bank Home Equity Seller Guide (the "Home Equity Seller Guide"), which together form the complete agreement between the parties.  (A copy of the relevant representations and warranties of the Home Equity Seller Guide is attached hereto as Exhibit E).

18.     Pursuant to the Agreement, DKMC had the option to sell to Wells Fargo Bank loans meeting the qualifications listed in § 300.02 of the Home Equity Seller Guide.

As set forth under the Home Equity Seller Guide, DKMC agreed to provide accurate and complete loan documentation and made various representations, warranties and covenants with respect to loans sold to Wells Fargo Bank.

19.    In the event DKMC failed to fulfill its obligation to deliver qualifying loans with sufficient documentation or breached any representations, warranties and/or covenants made regarding any of the loans, the Home Equity Agreement and Home Equity Seller Guide provide, *inter alia*, that Wells Fargo Bank is entitled to the demand repurchase of the loans by DKMC, plus accrued interest, legal expenses, and other expenses that Wells Fargo Bank may incur as a result of DKMC's default.  DKMC also agreed to reimburse Wells Fargo Bank for the price paid by Wells Fargo Bank for the servicing rights with respect to each of the loans, and is required to indemnify Wells Fargo Bank for all costs and losses associated with such loans.

20.    On or about January 29, 2007, DKH and Wells Fargo Bank entered into a Guaranty and Support Agreement (the "Home Equity Guaranty"), in which DKH agreed to guarantee, *inter alia*, certain obligations, including payment and performance obligations, owed by DKMC to Wells Fargo Bank pursuant to the Home Equity Agreement.  (A copy of the Guaranty is attached hereto as Exhibit F).

21.    Under Paragraph 2 of the Home Equity Guaranty, DKH agrees to guarantee both the payment of amounts due to Wells Fargo Bank from DKMC under the Home Equity Agreement and/or related documents and the performance of all obligations owed to Wells Fargo Bank by DKMC under the Home Equity Agreement and/or related documents.  The Home Equity Guaranty specifically provides that it is a guaranty of payment and performance.

22.    Under Paragraph 7 of the Home Equity Guaranty, DKH made certain warranties and representations to Wells Fargo Bank.  Specifically, DKH warranted and represented to Wells Fargo Bank that every warranty, representation and obligation made or undertaken by DKMC in the Home Equity Agreement, Home Equity Seller Guide and/or underlying loan documents related to the sale of any loan is true and correct.

23.    Paragraph 9 of the Home Equity Guaranty provides that DKH's obligations under the Home Equity Guaranty are joint and several, absolute and unconditional and independent of any obligations of DKMC.

24.    Under Paragraph 12 of the Home Equity Guaranty, DKH agrees to indemnify Wells Fargo Bank for all costs and expenses, including attorneys' fees, incurred or paid by Wells Fargo Bank in enforcing the Home Equity Guaranty.

## COUNT I –SPECIFIC PEFORMANCE -- DKMC
(Bolger Loan - Repurchase)

25.    Wells Fargo realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

26.    Wells Fargo purchased the Bolger loan from DKMC (loan number 193955179) on or about June 1, 2004.

27.    DKMC made material misrepresentations with regard to the sale of the Bolger loan.

28.    The 80% LTV ratio of the Bolger loan exceeded the maximum allowable 75% LTV ratio for the type of property underlying the Bolger loan.

29.    DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Loan Agreement and Seller Guide.

30.    The foregoing constitutes a breach of the warranties, representations and

covenants made by DKMC to Wells Fargo under § 300.02 of the Seller Guide.

31.   As a result of DKMC's foregoing breaches, the Loan Agreeement and Seller Guide entitle Wells Fargo to require DKMC to repurchase the loan at the Purchase Price.

32.   On or about December 21, 2007, Wells Fargo informed DKMC and DK, Inc. of the misrepresentations involving the Bolger loan and demanded that DKMC and DK, Inc. repurchase said loan.  (A copy of correspondence from Wells Fargo to DKMC and DK, Inc. is attached hereto as Exhibit G).

33.   The Purchase Price of the Bolger loan is, as of January 1, 2008, $291,192.11.  This amount continues to accrue interest and/or other fees and penalties.

34.   To date, DKMC has refused to repurchase the Bolger loan.

35.   DKMC's failure to repurchase the Bolger loan from Wells Fargo also constitutes a material breach of its contractual obligations to Wells Fargo under §305 of the Seller Guide and Loan Agreement.

WHEREFORE, Wells Fargo demands judgment in its favor and against DKMC as follows:

A.   A Court order declaring that DKMC must repurchase the Bolger loan from Wells Fargo for the purchase price, as of January 1, 2008, of at least $291,192.11;

B.   Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.   Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Loan Agreement; and

D.   Other relief as the Court deems just.

7

## COUNT II – SPECIFIC PERFORMANCE -- GUARANTY -- DK, Inc.
### (Bolger Loan - Guaranty)

36.     Wells Fargo realleges and incorporates Paragraphs 1 through 35 as though fully set forth herein.

37.     Under the terms of the Guaranty, DK, Inc. agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo pursuant to the Loan Agreement.

38.     DKMC has breached representations, warranties and covenants made with respect to the Bolger loan.  Pursuant to the Loan Agreement and Seller Guide, DKMC is therefore required to repurchase the Bolger loan from Wells Fargo at a Purchase Price of at least $291,192.11.  Wells Fargo has demanded that DKMC repurchase the Bolger loan, which DKMC has failed to do.

39.     Pursuant to the Guaranty, DK, Inc. is required to perform all obligations owed to Wells Fargo by DKMC for the Bolger loan.  DK, Inc. is therefore required to repurchase the Bolger loan from Wells Fargo.

40.     Wells Fargo has demanded that DK, Inc. repurchase the Bolger loan, and DK, Inc. has refused to do so.

WHEREFORE, Wells Fargo demands judgment in its favor and against DK, Inc. as follows:

A.     A Court order declaring that DK, Inc. must repurchase the Bolger loan from Wells Fargo for the purchase price, as of January 1, 2008, of at least $291,192.11;

B.     Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Guaranty; and

D.    Other relief as the Court deems just.

### COUNT III –SPECIFIC PEFORMANCE -- DKMC
(Juneau Loan - Repurchase)

41.    Wells Fargo realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

42.    Wells Fargo purchased the Juneau loan from DKMC (loan number 139610752) on or about October 14, 2004.

43.    DKMC made material misrepresentations with regard to the sale of the Juneau loan.

44.    The Juneau loan was delivered to Wells Fargo as an 80% no cash out refinance.  However, the loan did not meet the requirements of a refinance transaction.

45.    DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Loan Agreement and Seller Guide.

46.    The foregoing constitutes a breach of the warranties, representations and covenants made by DKMC to Wells Fargo under § 300.02 of the Seller Guide.

47.    As a result of DKMC's foregoing breaches, the Loan Agreement and Seller Guide entitle Wells Fargo to require DKMC to repurchase the loan at the Purchase Price.

48.    On or about December 21, 2007, Wells Fargo informed DKMC and DK, Inc. of the misrepresentations involving the Juneau loan and demanded that DKMC and DK, Inc. repurchase said loan.  (A copy of correspondence from Wells Fargo to DKMC and DK, Inc. is attached hereto as Exhibit G).

49.    The Purchase Price of the Juneau loan is, as of November 1, 2007,

$135,978.51. This amount continues to accrue interest and/or other fees and penalties.

50. To date, DKMC has refused to repurchase the Juneau loan.

51. DKMC's failure to repurchase the Juneau loan from Wells Fargo also constitutes a material breach of its contractual obligations to Wells Fargo under §305 of the Seller Guide and Loan Agreement.

WHEREFORE, Wells Fargo demands judgment in its favor and against DKMC as follows:

A. A Court order declaring that DKMC must repurchase the Juneau loan from Wells Fargo for the purchase price, as of November 1, 2007, of at least $135,978.51;

B. Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C. Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Loan Agreement; and

D. Other relief as the Court deems just.

## COUNT IV – SPECIFIC PERFORMANCE -- GUARANTY -- DK, Inc.
### (Juneau Loan - Guaranty)

52. Wells Fargo realleges and incorporates Paragraphs 1 through 24, and 41 through 51 as though fully set forth herein.

53. Under the terms of the Guaranty, DK, Inc. agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo pursuant to the Loan Agreement.

54. DKMC has breached representations, warranties and covenants made with respect to the Juneau loan. Pursuant to the Loan Agreement and Seller Guide, DKMC is

therefore required to repurchase the Juneau loan from Wells Fargo at a Purchase Price of at least $135,978.51. Wells Fargo has demanded that DKMC repurchase the Juneau loan, which DKMC has failed to do.

55. Pursuant to the Guaranty, DK, Inc. is required to perform all obligations owed to Wells Fargo by DKMC for the Juneau loan. DK, Inc. is therefore required to repurchase the Juneau loan from Wells Fargo.

56. Wells Fargo has demanded that DK, Inc. repurchase the Juneau loan, and DK, Inc. has refused to do so.

WHEREFORE, Wells Fargo demands judgment in its favor and against DK, Inc. as follows:

A. A Court order declaring that DK, Inc. must repurchase the Bolger loan from Wells Fargo for the purchase price, as of November 1, 2007, of at least $135,978.51;

B. Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C. Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Guaranty; and

D. Other relief as the Court deems just.

## COUNT V –SPECIFIC PEFORMANCE -- DKMC
### (Butler Loan - Repurchase)

57. Wells Fargo realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

58. Wells Fargo purchased the Butler loan from DKMC (loan number 199551714).

59.    DKMC made material misrepresentations with regard to the sale of the Butler loan.  The loan file is missing both a completed HUD form and evidence of a transfer of gift funds in the amount of $5,000.

60.    DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Loan Agreement and Seller Guide.

61.    The foregoing constitutes a breach of the warranties, representations and covenants made by DKMC to Wells Fargo under § 300.02 of the Seller Guide.

62.    As a result of DKMC's foregoing breaches, the Loan Agreeement and Seller Guide entitle Wells Fargo to require DKMC to repurchase the loan at the Purchase Price.

63.    On or about December 21, 2007, Wells Fargo informed DKMC and DK, Inc. of the misrepresentations involving the Butler loan and demanded that DKMC and DK, Inc. repurchase said loan.  (A copy of correspondence from Wells Fargo to DKMC and DK, Inc. is attached hereto as Exhibit G).

64.    The Purchase Price of the Butler loan continues to accrue interest and/or other fees and penalties.

65.    To date, DKMC has refused to repurchase the Butler loan.

66.    DKMC's failure to repurchase the Butler loan from Wells Fargo also constitutes a material breach of its contractual obligations to Wells Fargo under §305 of the Seller Guide and Loan Agreement.

WHEREFORE, Wells Fargo demands judgment in its favor and against DKMC as follows:

A.    A Court order declaring that DKMC must repurchase the Butler loan from Wells Fargo for the purchase price in an amount to be determined at trial;

B.      Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.      Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Loan Agreement; and

D.      Other relief as the Court deems just.

## COUNT VI – SPECIFIC PERFORMANCE -- GUARANTY -- DK, Inc.
(Butler Loan - Guaranty)

67.     Wells Fargo realleges and incorporates Paragraphs 1 through 24 and 57 through 66 as though fully set forth herein.

68.     Under the terms of the Guaranty, DK, Inc. agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo pursuant to the Loan Agreement.

69.     DKMC has breached representations, warranties and covenants made with respect to the Butler loan.  Pursuant to the Loan Agreement and Seller Guide, DKMC is therefore required to repurchase the Butler loan from Wells Fargo.  Wells Fargo has demanded that DKMC repurchase the Butler loan, which DKMC has failed to do.

70.     Pursuant to the Guaranty, DK, Inc. is required to perform all obligations owed to Wells Fargo by DKMC for the Butler loan.  DK, Inc. is therefore required to repurchase the Butler loan from Wells Fargo.

71.     Wells Fargo has demanded that DK, Inc. repurchase the Butler loan, and DK, Inc. has refused to do so.

WHEREFORE, Wells Fargo demands judgment in its favor and against DK, Inc. as follows:

A.      A Court order declaring that DK, Inc. must repurchase the Butler loan from Wells Fargo for the purchase price in an amount to be determined at trial;

B.      Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.      Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Guaranty; and

D.      Other relief as the Court deems just.

## <u>COUNT VII –SPECIFIC PEFORMANCE -- DKMC</u>
(Antink Loan - Repurchase)

72.      Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

73.      Wells Fargo Bank purchased the Antink loan from DKMC (loan number 6540640839) on or about December 2, 2004.

74.      DKMC made material misrepresentations with regard to the sale of the Antink loan.

75.      DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Home Equity Agreement and Home Equity Seller Guide.

76.      The foregoing constitutes a breach of the warranties, representations and covenants made by DKMC to Wells Fargo Bank under § 300.02 of the Home Equity Seller Guide.

77.      As a result of DKMC's foregoing breaches, the Home Equity Agreement and Home Equity Seller Guide entitle Wells Fargo Bank to require DKMC to repurchase the loan at the Purchase Price.

78.    On or about December 21, 2007, Wells Fargo Bank informed DKMC and DKH of the misrepresentations involving the Antink loan and demanded that DKMC and DKH repurchase said loan.  (A copy of correspondence from Wells Fargo Bank to DKMC and DKH is attached hereto as Exhibit G).

79.    The Purchase Price of the Antink loan is, as of January 1, 2008, $219,233.34.  This amount continues to accrue interest and/or other fees and penalties.

80.    To date, DKMC has refused to repurchase the Antink loan.

81.    DKMC's failure to repurchase the Antink loan from Wells Fargo Bank also constitutes a material breach of its contractual obligations to Wells Fargo Bank under §305 of the Home Equity Seller Guide and Home Equity Agreement.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKMC as follows:

A.    A Court order declaring that DKMC must repurchase the Antink loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $219,233.34;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Agreement; and

D.    Other relief as the Court deems just.

## COUNT VIII – SPECIFIC PERFORMANCE -- GUARANTY -- DKH
(Antink Loan - Guaranty)

82.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 and 72 through 81 as though fully set forth herein.

15

83. Under the terms of the Home Equity Guaranty, DKH agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo Bank pursuant to the Home Equity Agreement.

84. DKMC has breached representations, warranties and covenants made with respect to the Antink loan. Pursuant to the Home Equity Agreement and the Home Equity Seller Guide, DKMC is therefore required to repurchase the Antink loan from Wells Fargo Bank at a Purchase Price of at least $219,233.34. Wells Fargo Bank has demanded that DKMC repurchase the Antink loan, which DKMC has failed to do.

85. Pursuant to the Home Equity Guaranty, DKH is required to perform all obligations owed to Wells Fargo Bank by DKMC for the Antink loan. DKH is therefore required to repurchase the Antink loan from Wells Fargo Bank.

86. Wells Fargo Bank has demanded that DKH repurchase the Antink loan, and DKH has refused to do so.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKH as follows:

A. A Court order declaring that DKH must repurchase the Antink loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $219,233.34;

B. Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C. Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Guaranty; and

D. Other relief as the Court deems just.

16

## COUNT IX –SPECIFIC PEFORMANCE -- DKMC
### (Chapman Loan - Repurchase)

87.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

88.    Wells Fargo Bank purchased the Chapman loan from DKMC (loan number 6540840728) on or about January 20, 2005.

89.    DKMC made material misrepresentations with regard to the sale of the Chapman loan.

90.    DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Home Equity Agreement and Home Equity Seller Guide.

91.    The foregoing constitutes a breach of the warranties, representations and covenants made by DKMC to Wells Fargo Bank under § 300.02 of the Home Equity Seller Guide.

92.    As a result of DKMC's foregoing breaches, the Home Equity Agreement and Home Equity Seller Guide entitle Wells Fargo Bank to require DKMC to repurchase the loan at the Purchase Price.

93.    On or about December 21, 2007, Wells Fargo Bank informed DKMC and DKH of the misrepresentations involving the Chapman loan and demanded that DKMC and DKH repurchase said loan.  (A copy of correspondence from Wells Fargo Bank to DKMC and DKH is attached hereto as Exhibit G).

94.    The Purchase Price of the Chapman loan is, as of January 1, 2008, $28,231.95.  This amount continues to accrue interest and/or other fees and penalties.

95.    To date, DKMC has refused to repurchase the Chapman loan.

96.    DKMC's failure to repurchase the Chapman loan from Wells Fargo Bank

also constitutes a material breach of its contractual obligations to Wells Fargo Bank under §305 of the Home Equity Seller Guide and Home Equity Agreement.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKMC as follows:

A.    A Court order declaring that DKMC must repurchase the Chapman loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $28,231.95;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Agreement; and

D.    Other relief as the Court deems just.

### COUNT X – SPECIFIC PERFORMANCE -- GUARANTY -- DKH
(Chapman Loan - Guaranty)

97.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 and 87 through 96 as though fully set forth herein.

98.    Under the terms of the Home Equity Guaranty, DKH agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo Bank pursuant to the Home Equity Agreement.

99.    DKMC has breached representations, warranties and covenants made with respect to the Chapman loan.  Pursuant to the Home Equity Agreement and the Home Equity Seller Guide, DKMC is therefore required to repurchase the Chapman loan from Wells Fargo Bank at a Purchase Price of at least $28,231.95.  Wells Fargo Bank has

demanded that DKMC repurchase the Chapman loan, which DKMC has failed to do.

100.    Pursuant to the Home Equity Guaranty, DKH is required to perform all obligations owed to Wells Fargo Bank by DKMC for the Chapman loan.  DKH is therefore required to repurchase the Chapman loan from Wells Fargo Bank.

101.    Wells Fargo Bank has demanded that DKH repurchase the Chapman loan, and DKH has refused to do so.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKH as follows:

A.    A Court order declaring that DKH must repurchase the Chapman loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $28,231.95;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Guaranty; and

D.    Other relief as the Court deems just.

### COUNT XI –SPECIFIC PEFORMANCE -- DKMC
(Betacour Loan - Repurchase)

102.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

103.    Wells Fargo Bank purchased the Betacour loan from DKMC (loan number 6541655349) on or about September 13, 2005.

104.    DKMC made material misrepresentations with regard to the sale of the Betacour loan.

105.    DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Home Equity Agreement and Home Equity Seller Guide.

106.    The foregoing constitutes a breach of the warranties, representations and covenants made by DKMC to Wells Fargo Bank under § 300.02 of the Home Equity Seller Guide.

107.    As a result of DKMC's foregoing breaches, the Home Equity Agreement and Home Equity Seller Guide entitle Wells Fargo Bank to require DKMC to repurchase the loan at the Purchase Price.

108.    On or about December 21, 2007, Wells Fargo Bank informed DKMC and DKH of the misrepresentations involving the Betacour loan and demanded that DKMC and DKH repurchase said loan.  (A copy of correspondence from Wells Fargo Bank to DKMC and DKH is attached hereto as Exhibit G).

109.    The Purchase Price of the Betacour loan is, as of January 1, 2008, $62,189.95.  This amount continues to accrue interest and/or other fees and penalties.

110.    To date, DKMC has refused to repurchase the Betacour loan.

111.    DKMC's failure to repurchase the Betacour loan from Wells Fargo Bank also constitutes a material breach of its contractual obligations to Wells Fargo Bank under §305 of the Home Equity Seller Guide and Home Equity Agreement.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKMC as follows:

A.    A Court order declaring that DKMC must repurchase the Betacour loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $62,189.95;

B.    Judgment of pre-judgment interest from the earliest date the cause of action

may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Agreement; and

D.    Other relief as the Court deems just.

### COUNT XII – SPECIFIC PERFORMANCE -- GUARANTY -- DKH
(Betacour Loan - Guaranty)

112.    Wells Fargo realleges and incorporates Paragraphs 1 through 24 and 102 through 111 as though fully set forth herein.

113.    Under the terms of the Home Equity Guaranty, DKH agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo Bank pursuant to the Home Equity Agreement.

114.    DKMC has breached representations, warranties and covenants made with respect to the Betacour loan.  Pursuant to the Home Equity Agreement and the Home Equity Seller Guide, DKMC is therefore required to repurchase the Betacour loan from Wells Fargo Bank at a Purchase Price of at least $62,189.95.  Wells Fargo Bank has demanded that DKMC repurchase the Betacour loan, which DKMC has failed to do.

115.    Pursuant to the Home Equity Guaranty, DKH is required to perform all obligations owed to Wells Fargo Bank by DKMC for the Betacour loan.  DKH is therefore required to repurchase the Betacour loan from Wells Fargo Bank.

116.    Wells Fargo Bank has demanded that DKH repurchase the Betacour loan, and DKH has refused to do so.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKH as follows:

A.    A Court order declaring that DKH must repurchase the Betacour loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $62,189.95;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the Home Equity Guaranty; and

D.    Other relief as the Court deems just.

## COUNT XIII – SPECIFIC PEFORMANCE -- DKMC
(Parker Loan - Repurchase)

117.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

118.    Wells Fargo Bank purchased the Parker loan from DKMC (loan number 6542177095) on or about January 24, 2006.

119.    DKMC made material misrepresentations with regard to the sale of the Parker loan.

120.    DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Home Equity Agreement and Home Equity Seller Guide.

121.    The foregoing constitutes a breach of the warranties, representations and covenants made by DKMC to Wells Fargo Bank under § 300.02 of the Home Equity Seller Guide.

122.    As a result of DKMC's foregoing breaches, the Home Equity Agreement and Home Equity Seller Guide entitle Wells Fargo Bank to require DKMC to repurchase the loan at the Purchase Price.

123.    On or about December 21, 2007, Wells Fargo Bank informed DKMC and DKH of the misrepresentations involving the Parker loan and demanded that DKMC and DKH repurchase said loan.  (A copy of correspondence from Wells Fargo Bank to DKMC and DKH is attached hereto as Exhibit G).

124.    The Purchase Price of the Parker loan is, as of January 1, 2008, $92,969.40.  This amount continues to accrue interest and/or other fees and penalties.

125.    To date, DKMC has refused to repurchase the Parker loan.

126.    DKMC's failure to repurchase the Parker loan from Wells Fargo Bank also constitutes a material breach of its contractual obligations to Wells Fargo Bank under §305 of the Home Equity Seller Guide and Home Equity Agreement.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKMC as follows:

A.      A Court order declaring that DKMC must repurchase the Parker loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $92,969.40;

B.      Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.      Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Agreement; and

D.      Other relief as the Court deems just.

## COUNT XIV – SPECIFIC PERFORMANCE -- GUARANTY -- DKH
### (Parker Loan - Guaranty)

127.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 and 117 through 126 as though fully set forth herein.

128.    Under the terms of the Home Equity Guaranty, DKH agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo Bank pursuant to the Home Equity Agreement.

129.    DKMC has breached representations, warranties and covenants made with respect to the Parker loan.  Pursuant to the Home Equity Agreement and the Home Equity Seller Guide, DKMC is therefore required to repurchase the Parker loan from Wells Fargo Bank at a Purchase Price of at least $92,969.40.  Wells Fargo Bank has demanded that DKMC repurchase the Parker loan, which DKMC has failed to do.

130.    Pursuant to the Home Equity Guaranty, DKH is required to perform all obligations owed to Wells Fargo Bank by DKMC for the Parker loan.  DKH is therefore required to repurchase the Parker loan from Wells Fargo Bank.

131.    Wells Fargo Bank has demanded that DKH repurchase the Parker loan, and DKH has refused to do so.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKH as follows:

A.    A Court order declaring that DKH must repurchase the Parker loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $92,969.40;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the Home Equity Guaranty; and

D.    Other relief as the Court deems just.

## COUNT XV –SPECIFIC PEFORMANCE -- DKMC
(Myrlie Loan - Repurchase)

132.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

133.    Wells Fargo Bank purchased the Myrlie loan from DKMC (loan number 6541762657) on or about October 27, 2005.

134.    DKMC made material misrepresentations with regard to the sale of the Myrlie loan.

135.    DKMC also failed to provide a qualifying loan and/or sufficient loan documentation as required by the Home Equity Agreement and Home Equity Seller Guide.

136.    The foregoing constitutes a breach of the warranties, representations and covenants made by DKMC to Wells Fargo Bank under § 300.02 of the Home Equity Seller Guide.

137.    As a result of DKMC's foregoing breaches, the Home Equity Agreement and Home Equity Seller Guide entitle Wells Fargo Bank to require DKMC to repurchase the loan at the Purchase Price.

138.    On or about December 21, 2007, Wells Fargo Bank informed DKMC and DKH of the misrepresentations involving the Myrlie loan and demanded that DKMC and DKH repurchase said loan.  (A copy of correspondence from Wells Fargo Bank to DKMC and DKH is attached hereto as Exhibit G).

139.    The Purchase Price of the Myrlie loan is, as of January 1, 2008, $109,134.35.  This amount continues to accrue interest and/or other fees and penalties.

140.    To date, DKMC has refused to repurchase the Myrlie loan.

141.    DKMC's failure to repurchase the Myrlie loan from Wells Fargo Bank also

constitutes a material breach of its contractual obligations to Wells Fargo Bank under §305 of the Home Equity Seller Guide and Home Equity Agreement.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKMC as follows:

A.    A Court order declaring that DKMC must repurchase the Myrlie loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $109,134.35;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Agreement; and

D.    Other relief as the Court deems just.

## COUNT XVI – SPECIFIC PERFORMANCE -- GUARANTY -- DKH
(Myrlie Loan - Guaranty)

142.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 and 132 through 141 as though fully set forth herein.

143.    Under the terms of the Home Equity Guaranty, DKH agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo Bank pursuant to the Home Equity Agreement.

144.    DKMC has breached representations, warranties and covenants made with respect to the Myrlie loan.  Pursuant to the Home Equity Agreement and the Home Equity Seller Guide, DKMC is therefore required to repurchase the Myrlie loan from Wells Fargo Bank at a Purchase Price of at least $109,134.35.  Wells Fargo Bank has demanded that DKMC repurchase the Myrlie loan, which DKMC has failed to do.

26

145.    Pursuant to the Home Equity Guaranty, DKH is required to perform all obligations owed to Wells Fargo Bank by DKMC for the Myrlie loan.  DKH is therefore required to repurchase the Myrlie loan from Wells Fargo Bank.

146.    Wells Fargo Bank has demanded that DKH repurchase the Myrlie loan, and DKH has refused to do so.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKH as follows:

A.    A Court order declaring that DKH must repurchase the Myrlie loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $109,134.35;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Guaranty; and

D.    Other relief as the Court deems just.

## COUNT XVII –SPECIFIC PEFORMANCE -- DKMC
(Wright Loan - Repurchase)

147.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

148.    Wells Fargo Bank purchased the Wright loan from DKMC (loan number 6540607234).

149.    DKMC made material misrepresentations with regard to the sale of the Wright loan.

150.    The loan was approved as a cash out refinance of primary property.  After

factoring in the borrower's net rental income loss and mortgage payments for properties whose rental income was not verified, the DSR was 90.41%, in violation of the requirements of the Home Equity Seller Guide.

151.    DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Home Equity Agreement and Home Equity Seller Guide.

152.    The foregoing constitutes a breach of the warranties, representations and covenants made by DKMC to Wells Fargo Bank under § 300.02 of the Home Equity Seller Guide.

153.    As a result of DKMC's foregoing breaches, the Home Equity Agreement and Home Equity Seller Guide entitle Wells Fargo Bank to require DKMC to repurchase the loan at the Purchase Price.

154.    On or about December 21, 2007, Wells Fargo Bank informed DKMC and DKH of the misrepresentations involving the Wright loan and demanded that DKMC and DKH repurchase said loan.  (A copy of correspondence from Wells Fargo Bank to DKMC and DKH is attached hereto as Exhibit G).

155.    The Purchase Price of the Wright loan is, as of January 1, 2008, $239,844.32.  This amount continues to accrue interest and/or other fees and penalties.

156.    To date, DKMC has refused to repurchase the Wright loan.

157.    DKMC's failure to repurchase the Wright loan from Wells Fargo Bank also constitutes a material breach of its contractual obligations to Wells Fargo Bank under §305 of the Home Equity Seller Guide and Home Equity Agreement.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKMC as follows:

A.     A Court order declaring that DKMC must repurchase the Wright loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $239,844.32;

B.     Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.     Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Agreement; and

D.     Other relief as the Court deems just.

### COUNT XVIII – SPECIFIC PERFORMANCE -- GUARANTY -- DKH
(Wright Loan - Guaranty)

158.   Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 and 147 through 157 as though fully set forth herein.

159.   Under the terms of the Home Equity Guaranty, DKH agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo Bank pursuant to the Home Equity Agreement.

160.   DKMC has breached representations, warranties and covenants made with respect to the Wright loan.  Pursuant to the Home Equity Agreement and the Home Equity Seller Guide, DKMC is therefore required to repurchase the Wright loan from Wells Fargo Bank at a Purchase Price of at least $239,844.32.  Wells Fargo Bank has demanded that DKMC repurchase the Wright loan, which DKMC has failed to do.

161.   Pursuant to the Home Equity Guaranty, DKH is required to perform all obligations owed to Wells Fargo Bank by DKMC for the Wright loan.  DKH is therefore required to repurchase the Wright loan from Wells Fargo Bank.

162.   Wells Fargo Bank has demanded that DKH repurchase the Wright loan, and

DKH has refused to do so.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKH as follows:

A.     A Court order declaring that DKH must repurchase the Wright loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $239,844.32;

B.     Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.     Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Guaranty; and

D.     Other relief as the Court deems just.

### COUNT XIX –SPECIFIC PEFORMANCE -- DKMC
(Ogden Loan - Repurchase)

163.   Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

164.   Wells Fargo Bank purchased the Ogden loan from DKMC (loan number 6542310175).

165.   DKMC made material misrepresentations with regard to the sale of the Ogden loan.

166.   The loan application contains misrepresentations of the borrower's income. The borrower filed a Chapter 7 Bankruptcy Petition on or about October 30, 2007.  Using the verified 2005 income amount of $3,722 per month, as set forth in the borrower's bankruptcy filings, results in a debt-to-income ration of 100.34%, a material credit policy violation.

167.    DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Home Equity Agreement and Home Equity Seller Guide.

168.    The foregoing constitutes a breach of the warranties, representations and covenants made by DKMC to Wells Fargo Bank under § 300.02 of the Home Equity Seller Guide.

169.    As a result of DKMC's foregoing breaches, the Home Equity Agreement and Home Equity Seller Guide entitle Wells Fargo Bank to require DKMC to repurchase the loan at the Purchase Price.

170.    On or about March 14, 2008, Wells Fargo Bank informed DKMC and DKH of the misrepresentations involving the Ogden loan and demanded that DKMC and DKH repurchase said loan.  (A copy of correspondence from Wells Fargo Bank to DKMC and DKH is attached hereto as Exhibit H).

171.    The Purchase Price of the Ogden loan is, as of March 14, 2008, $31,700.84. This amount continues to accrue interest and/or other fees and penalties.

172.    To date, DKMC has refused to repurchase the Ogden loan.

173.    DKMC's failure to repurchase the Ogden loan from Wells Fargo Bank also constitutes a material breach of its contractual obligations to Wells Fargo Bank under §305 of the Home Equity Seller Guide and Home Equity Agreement.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKMC as follows:

A.    A Court order declaring that DKMC must repurchase the Ogden loan from Wells Fargo Bank for the purchase price, as of January 1, 2008, of at least $31,700.84;

B.    Judgment of pre-judgment interest from the earliest date the cause of action

may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

    C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Agreement; and

    D.    Other relief as the Court deems just.

## COUNT XX – SPECIFIC PERFORMANCE -- GUARANTY -- DKH
(Ogden Loan - Guaranty)

174.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 and 163 through 173 as though fully set forth herein.

175.    Under the terms of the Home Equity Guaranty, DKH agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo Bank pursuant to the Home Equity Agreement.

176.    DKMC has breached representations, warranties and covenants made with respect to the Ogden loan.  Pursuant to the Home Equity Agreement and the Home Equity Seller Guide, DKMC is therefore required to repurchase the Ogden loan from Wells Fargo Bank at a Purchase Price of at least $31,700.84.  Wells Fargo Bank has demanded that DKMC repurchase the Ogden loan, which DKMC has failed to do.

177.    Pursuant to the Home Equity Guaranty, DKH is required to perform all obligations owed to Wells Fargo Bank by DKMC for the Ogden loan.  DKH is therefore required to repurchase the Ogden loan from Wells Fargo Bank.

178.    Wells Fargo Bank has demanded that DKH repurchase the Ogden loan, and DKH has refused to do so.

    WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKH as follows:

A.     A Court order declaring that DKH must repurchase the Ogden loan from Wells Fargo Bank for the purchase price, as of March 14, 2008, of at least $31,700.84;

B.     Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.     Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Guaranty; and

D.     Other relief as the Court deems just.

## COUNT XXI – SPECIFIC PEFORMANCE -- DKMC
(Mazloum Loan – Make Whole Demand)

179.   Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 as though fully set forth herein.

180.   Wells Fargo Bank purchased the Mazloum loan from DKMC (loan number 6542309094).

181.   DKMC made material misrepresentations with regard to the sale of the Mazloum loan.

182.   There were undisclosed properties and credit policy violations related to the Mazloum loan.  Specifically, the borrower purchased a different property one week prior to the application date for the Mazloum loan.  There are two mortgages secured to the property that secures the Mazloum loan, resulting in a monthly payment in excess of $1,500 and a debt-to-income ration, including the undisclosed mortgages, of 68.37%, which is a credit policy violation of the requirements of the Home Equity Seller Guide.

183.   DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Home Equity Agreement and Home Equity Seller Guide.

184.    The foregoing constitutes a breach of the warranties, representations and covenants made by DKMC to Wells Fargo Bank under § 300.02 of the Home Equity Seller Guide.

185.    As a result of DKMC's foregoing breaches, the Home Equity Agreement and Home Equity Seller Guide entitle Wells Fargo Bank to require DKMC to make whole Wells Fargo Bank as a result of the undisclosed properties and credit policy violations.

186.    On or about March 14, 2008, Wells Fargo Bank informed DKMC and DKH of the misrepresentations involving the Mazloum loan and demanded that DKMC and DKH make whole Wells Fargo Bank with respect to said loan.  (A copy of correspondence from Wells Fargo Bank to DKMC and DKH is attached hereto as Exhibit I).

187.    The Make Whole amount for the Mazloum loan is, as of March 14, 2008, $28,173.23.  This amount continues to accrue interest and/or other fees and penalties.

188.    To date, DKMC has refused to make whole Wells Fargo Bank for the Mazloum loan.

189.    DKMC's failure to make whole Wells Fargo Bank for the Mazloum loan also constitutes a material breach of its contractual obligations to Wells Fargo Bank under §305 of the Home Equity Seller Guide and Home Equity Agreement.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKMC as follows:

A.    A Court order declaring that DKMC must make whole Wells Fargo Bank for the Mazloum loan in an amount, as of March 14 2008, of at least $28,173.23;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28

U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Agreement; and

D.    Other relief as the Court deems just.

### COUNT XXII – SPECIFIC PERFORMANCE -- GUARANTY -- DKH
(Mazloum Loan - Guaranty)

190.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 and 179 through 189 as though fully set forth herein.

191.    Under the terms of the Home Equity Guaranty, DKH agreed to guarantee the performance and payment obligations owed by DKMC to Wells Fargo Bank pursuant to the Home Equity Agreement.

192.    DKMC has breached representations, warranties and covenants made with respect to the Mazloum loan.  Pursuant to the Home Equity Agreement and the Home Equity Seller Guide, DKMC is therefore required to make whole Wells Fargo Bank for the Mazloum loan in an amount of at least $28,173.23.  Wells Fargo Bank has demanded that DKMC make it whole for the Mazloum loan, which DKMC has failed to do.

193.    Pursuant to the Home Equity Guaranty, DKH is required to perform all obligations owed to Wells Fargo Bank by DKMC for the Mazloum loan.  DKH is therefore required to make whole Wells Fargo Bank for the Mazloum loan.

194.    Wells Fargo Bank has demanded that DKH make it whole for the Mazloum loan, and DKH has refused to do so.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKH as follows:

A.    A Court order declaring that DKH must make whole Wells Fargo Bank for

the Mazloum loan in an amount, as of March 14, 2008, of at least $28,173.23;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Guaranty; and

D.    Other relief as the Court deems just.

**COUNT XXIII**
**BREACH OF CONTRACT**
**LOAN AGREEMENT--DKMC**
(Bolger, Juneau and Butler loans)

195.    Wells Fargo realleges and incorporates Paragraphs 1 through 71 as though fully set forth herein.

196.    Count XXIII is pled in the alternative to Counts I, III and V.

197.    DKMC made material misrepresentations with regard to the sale of the Bolger, Juneau and Butler loans.    DKMC failed to provide a qualifying loan and/or sufficient loan documentation as required by the Loan Agreement and Seller Guide.

198.    Wells Fargo has demanded that DKMC repurchase the Bolger, Juneau and Butler loans, which DKMC has failed to do.

199.    The foregoing acts and omissions constitute a breach of the Loan Agreement and under § 300.02 of the Seller Guide.

200.    Wells Fargo has suffered damages as a result of DKMC's breach of the Loan Agreement in an amount of at least $427,170.62, plus the value of the Butler loan in an amount to be determined at trial.

WHEREFORE, Wells Fargo demands judgment in its favor and against DKMC as

follows:

A.     Judgment of compensatory damages of at least $427,170.62, plus the value of the Butler loan in an amount to be determined at trial;

B.     Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.     Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Loan Agreement; and

D.     Other relief as the Court deems just.

## COUNT XXIV
## BREACH OF CONTRACT
## GUARANTY—DK, INC
(Bolger, Juneau and Butler loans)

201.    Wells Fargo realleges and incorporates Paragraphs 1 through 71 and 195 through 200 as though fully set forth herein.

202.    Count XXIV is pled in the alternative to Counts II, IV and VI.

203.    Under the terms of the Guaranty, DK, Inc. agreed to guarantee the payment of amounts due to Wells Fargo pursuant to the Loan Agreement.

204.    Pursuant to the Loan Agreement, DKMC owes Wells Fargo breach of contract damages of at least $427,170.62, plus value of the Butler loan in an amount to be determined at trial.  Wells Fargo has demanded payment from DKMC, which DKMC has failed to make.

205.    Pursuant to the Guaranty, DK, Inc. owes Wells Fargo all amounts due and owing from DKMC for the Bolger, Juneau and Butler loans.

206.    Wells Fargo has demanded payment of such sums from DK, Inc., which DK,

Inc. has failed to make.

WHEREFORE, Wells Fargo demands judgment in its favor and against DK, Inc. as follows:

A.    Judgment of compensatory damages of at least $427,170.62, plus the value of the Butler loan in an amount to be determined at trial;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Guaranty ; and

D.    Other relief as the Court deems just.

**COUNT XXV**
**BREACH OF CONTRACT**
**HOME EQUITY AGREEMENT—DKMC**

(Antink, Chapman, Betacour, Parker, Myrlie, Wright, Odgen and Mazloum loans)

207.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24 and 72 through 194 as though fully set forth herein.

208.    Count XXV is pled in the alternative to Counts VII, IX, XI, XIII, XV, XVII, XIX and XXI.

209.    DKMC made material misrepresentations with regard to the sale of the Antink, Chapman, Betacour, Parker, Myrlie, Wright, Ogden and Mazloum loans.  DKMC failed to provide qualifying loans and/or sufficient loan documentation as required by the Home Equity Agreement and Home Equity Seller Guide.

210.    Wells Fargo Bank has demanded that DKMC repurchase the Antink, Chapman, Betacour, Parker, Myrlie, Wright and Ogden loans and that DKMC make whole Wells Fargo Bank for the Mazloum loan, which DKMC has failed to do.

211.    The foregoing acts and omissions constitute a breach of the Home Equity Agreement under § 300.02 of the Home Equity Seller Guide.

212.    Wells Fargo Bank has suffered damages as a result of DKMC's breach of the Home Equity Agreement in an amount of at least $811,477.38.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKMC as follows:

A.    Judgment of compensatory damages of at least $811,477.38;

B.    Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Agreement; and

D.    Other relief as the Court deems just.

### COUNT XXVI
### BREACH OF CONTRACT
### HOME EQUITY GUARANTY—DKH

(Antink, Chapman, Betacour, Parker, Myrlie, Wright, Ogden and Mazloum loans)

213.    Wells Fargo Bank realleges and incorporates Paragraphs 1 through 24, 72 through 194 and 207 through 212 as though fully set forth herein.

214.    Count XXVI is pled in the alternative to Counts VIII, X, XII, XIV, XVI, XVIII, XX and XII.

215. Under the terms of the Home Equity Guaranty, DKH agreed to guarantee the payment of amounts due to Wells Fargo Bank pursuant to the Home Equity Agreement.

216. Pursuant to the Home Equity Agreement, DKMC owes Wells Fargo Bank breach of contract damages of at least $811,477.38. Wells Fargo Bank has demanded payment from DKMC, which DKMC has failed to make.

217. Pursuant to the Home Equity Guaranty, DKH owes Wells Fargo Bank all amounts due and owing from DKMC for the Antink, Chapman, Betacour, Parker, Myrlie, Wright, Ogden and Mazloum loans.

218. Wells Fargo Bank has demanded payment of such sums from DKH, which DKH has failed to make.

WHEREFORE, Wells Fargo Bank demands judgment in its favor and against DKH as follows:

A. Judgment of compensatory damages of at least $811,477.38;

B. Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C. Judgment of costs of this suit and an award of attorneys' fees pursuant to the terms of the Home Equity Guaranty; and

D. Other relief as the Court deems just.

## COUNT XXVII
## CONTRACTUAL ATTORNEYS' FEES
### DKMC, DK, INC. and DKH

(Loan Agreement, Guaranty, Home Equity Agreement and Home Equity Guaranty)

219.　Wells Fargo and Wells Fargo Bank reallege and incorporate Paragraphs 1 through 218 as though fully set forth herein.

220.　Pursuant to the terms of the Sellers Guide and Home Equity Sellers Guide, DKMC agreed to indemnify Wells Fargo and Wells Fargo Bank for all costs, including attorneys' fees, incurred by Wells Fargo and Wells Fargo Bank in the enforcement of the terms of the Loan Agreement, Sellers Guide, Home Equity Agreement and Home Equity Sellers Guide.

221.　Wells Fargo and Wells Fargo Bank sent a demand letter to DKMC, DK, Inc. and DKH seeking repurchase of the loans at issue in this complaint and have made other efforts to collect amounts due from DKMC, DK, Inc. and DKH.　.

222.　Despite these collection efforts undertaken by Wells Fargo and Wells Fargo Bank, DKMC, DK, Inc. and DKH have failed to repurchase the loans and/or make whole Wells Fargo Bank for the loans.

223.　As a result of DKMC's failure to repurchase the Bolger, Juneau, Butler Antink, Chapman, Betacour, Parker, Myrlie, Wright, and Ogden loans and failure to make whole Wells Fargo Bank for the Mazloum loan, Wells Fargo and Wells Fargo Bank, were forced to incur costs and attorneys' fees to enforce their rights under the Loan Agreement and Home Equity Agreement.

224.　Pursuant to the terms of the Guaranty, DK, Inc. agreed to indemnify Wells Fargo for all costs, including attorneys' fees, incurred by Wells Fargo in the enforcement of

the Guaranty.

225.　As a result of DK, Inc.'s breach of the Guaranty and failure to repurchase the Bolger, Juneau and Butler loans, Wells Fargo was forced to incur costs and attorneys' fees to enforce its rights under the Guaranty.

226.　Pursuant to the terms of the Home Equity Guaranty, DKH agreed to indemnify Wells Fargo Bank for all costs, including attorneys' fees, incurred by Wells Fargo Bank in the enforcement of the Home Equity Guaranty.

227.　As a result of DKH's breach of the Home Equity Guaranty and failure to repurchase the Antink, Chapman, Betacour, Parker, Myrlie, Wright, and Ogden loans and DKH's failure to make whole Wells Fargo Bank for the Mazloum loan, Wells Fargo Bank was forced to incur costs and attorneys' fees to enforce its rights under the Home Equity Guaranty.

228.　Wells Fargo and Wells Fargo Bank are therefore entitled to recover attorneys' fees and related costs incurred by them in bringing this lawsuit to enforce their rights under the Loan Agreement, Guaranty, Home Equity Agreement and Home Equity Guaranty.

WHEREFORE, Wells Fargo and Wells Fargo Bank demand judgment in their favor and against DKMC, DK, Inc. and DKH as follows:

A.　Judgment of contractual attorneys' fees and costs, in an amount to be proved later, incurred in conjunction with the prosecution of this lawsuit;

B.　Judgment of pre-judgment interest from the earliest date the cause of action may have arisen pursuant to 815 ILCS 205/2 and post-judgment interest pursuant to 28 U.S.C. § 1961;

C.    Judgment of costs of this suit; and

D.    Other relief as the Court deems just.

Respectfully submitted

WELLS FARGO FUNDING, INC. and
WELLS FARGO BANK, N.A.


By: /s/ Thomas M. Crawford
        One of Its Attorneys

Daniel G. Litchfield
Thomas M. Crawford
Kevin A. Titus
LITCHFIELD CAVO LLP
303 West Madison Street, Suite 300
Chicago, Illinois  60606
Telephone:    (312) 781-6669 (Litchfield)
                      (312) 781-6679 (Crawford)
                      (312) 781-6668 (Titus)
Facsimile:      (312) 781-6630

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues triable by jury.


Dated:  March 28, 2008                    Respectfully submitted

                                          WELLS FARGO FUNDING, INC. and
                                          WELLS FARGO BANK, N.A.

                                          By: /s/ Thomas M. Crawford
                                               One of Its Attorneys



Daniel G. Litchfield
Thomas M. Crawford
Kevin A. Titus
LITCHFIELD CAVO LLP
303 West Madison Street, Suite 300
Chicago, Illinois  60606
Telephone:   (312) 781-6669 (Litchfield)
             (312) 781-6679 (Crawford)
             (312) 781-6668 (Titus)
Facsimile:   (312) 781-6630