# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| WELLS FARGO FUNDING, a Minnesota corporation, and WELLS FARGO BANK, N.A., a national banking association,<br><br>Plaintiffs,<br><br>vs.<br><br>DRAPER & KRAMER MORTGAGE CORP., a Delaware corporation, DRAPER AND KRAMER, INCORPORATED, a Delaware corporation, and DKH, Inc., a Delaware corporation, | No. 08 C 1806<br><br>Magistrate Judge Jeffrey Cole |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

On October 29, 2008, the parties memorialized on the record the terms of a settlement agreement that they had reached after an extended settlement conference. While there was to be a written document incorporating the terms on which they agreed in court, the parties explicitly agreed that there was a binding settlement agreement effective that day. (Transcript of Proceedings on 10/29/08, at 8-9)("Tr."). Now, despite having agreed to all of the material terms on the record, they disagree as to what they actually agreed to and, have filed cross motions to enforce their differing versions on the agreement. The parties consented to jurisdiction here on October 29, 2008. [27].

# I.
# BACKGROUND

This case is among the many that have, and no doubt will continue, to come in the wake of the recent mortgage debacle. As Wells Fargo's Complaint reads, Wells Fargo, as buyer, and Draper & Kramer Mortgage Corp. ("DKMC"), as seller, entered into two purchasing agreements, one covering residential mortgage loans and the other home equity loans. The Residential Mortgage Loan Purchase Agreement ("Mortgage Agreement") expressly incorporated the Wells Fargo Funding Seller's Guide ("Seller's Guide"), and the Home Equity Loan/Home Equity Line Purchase Agreement ("Home Equity Agreement") incorporated the Wells Fargo Bank Home Equity Seller's Guide, making them part of the Agreements. The "Seller's Guides" are exhaustive lists of dozens of representations, warranties, covenants, and documentation requirements that DKMC, like others who dealt with Wells Fargo, were required to make regarding loans they sold to Wells Fargo.

Pursuant to the Mortgage Agreement, DKMC had the option to offer for sale to Wells Fargo loans meeting the conditions listed in the Seller's Guide. If DKMC failed to fulfill its obligation to deliver qualifying loans with sufficient documentation or breached any representations, warranties, and/or covenants made regarding any of the purchased loans, the terms of the Mortgage Agreement and Seller's Guide entitled Wells Fargo to demand that DKMC repurchase the loans and pay accrued interest, legal expenses, and other expenses that Wells Fargo might incur as a result of DKMC's default. DKMC also had to reimburse Wells Fargo for the price paid by Wells Fargo for the servicing rights with respect to each of the loans, and had to indemnify Wells Fargo for all costs and losses associated with such loans.

Wells Fargo and Draper & Kramer, Inc. ("DKI") entered into a Guaranty and Support

2

Agreement (the "Guaranty"), in which DKI agreed to guarantee, *inter alia,* certain of DKMC's obligations to Wells Fargo, including payment and performance obligations under the Mortgage Agreement. DKI also made certain warranties and representations to Wells Fargo, including that every warranty, representation, and obligation made or undertaken by DKMC was true and correct. DKI also agreed to indemnify Wells Fargo for all costs and expenses, including attorneys' fees, incurred or paid by Wells Fargo in enforcing the Guaranty. The Guaranty provided that DKI's obligations were joint and several, absolute and unconditional, and independent of any obligations of DKMC.

The Home Equity Agreement between Wells Fargo and DKMC was similar to the Mortgage Agreement. It, too, incorporated a list of representations, warranties, covenants, and documentation requirements embodied in the Wells Fargo Bank Home Equity Seller's Guide. Through these documents, DKMC undertook the obligations it did in connection with the Mortgage Agreement and its accompanying Seller's Guide and subjected itself to the same liabilities. And, as with the Mortgage Agreement, Well Fargo got a guaranty of those Home Equity Agreement obligations, this time from DKH, Inc. ("DKH"), with basically the same terms as the ones from DKI.

As it turned out – at least according to Wells Fargo's complaint – DKMC dropped the ball regarding several loans, of both the mortgage and home equity variety , and the guarantors – DKI and DKH – refused to honor their guarantees. The parties ended up in litigation, but shortly thereafter, they negotiated a settlement agreement. That agreement encompasses fifteen specified loans. Mindful of the court's cautions in *Lynch, Inc. v. SamataMason, Inc.,* 279 F.3d 487 (7th Cir. 2002), regarding the problems of fallible memory and the need to memorialize the results of

3

successful settlement conferences,[1] I had counsel put the terms of their agreement on the record.

But when they later tried to draft the written agreement, they disagreed as to two key terms.

First, whether, once DKMC made the $560,000 payment under the settlement agreement, Wells

Fargo had agreed to release the guarantors from their guarantees on *all* outstanding loans that were

not, and might never be, in default – not just the fifteen loans encompassed by the settlement

agreement. And second, whether Wells Fargo agreed to allow DKMC to try to sell it future loans.

## II.
## ANALYSIS

A settlement agreement, whether oral or written, is a contract, and thus its construction and

enforcement are governed by basic contract principles. *Laserage Tech. Corp. v. Laserage

Laboratories Inc.*, 972 F.2d 799, 802 (7th Cir.1992), the most fundamental of which is that "'the

primary object in construing a contract is to give effect to the intention of the parties involved.'"

*In re Doyle,* 144 Ill.2d 451, 468, 581 N.E.2d 669 (1991). An agreement is binding if the parties

agree on all material terms. *Abbott Laboratories v. Alpha Therapeutic Corp.,* 164 F.3d 385, 387

(7th Cir.1999); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 313-314, 515

N.E.2d 61 (1987). Oral settlement agreements are enforceable under Illinois law if "there is clearly

an offer and acceptance of the compromise and a meeting of the minds as to the terms of the

---

[1] "In short, the parties may well have reached a valid, enforceable settlement, a proper predicate for the dismissal of the suit with prejudice. But memory is fallible, even of events only two weeks in the past, and trial judges have a natural desire to see cases settled and off their docket, which may shape their recollection of settlement conferences. At the end of the November 23 conference, the magistrate judge should have called in a court reporter, dictated the terms of settlement as he understood them, and made sure that the parties agreed. Then there would have been a solid, indeed an unimpeachable, basis for his finding on December 6 that the case had indeed been settled and on terms accurately reflected in the draft submitted by SamataMason. This is the standard practice." *Lynch, Inc.* 279 F.3d at 490.

agreement." *Dillard v. Starcon Intern., Inc.*, 483 F.3d 502, 507 (7ᵗʰ Cir. 2007).[2] The essential terms

must be "definite and certain" so that a court can ascertain the parties' agreement from the stated

terms and provisions. *Id.*

Although it is a handy shorthand, the phrase, "meeting of the minds," is misleading if taken

literally. *See Laserage Technology Corp.*, 972 F.2d at 802. Today, there is no debate that the

formation of a contract does not actually require that the parties come to a subjective and congruent

understanding. There is common agreement that "no one will understand the true theory of contract

or be able to discuss some fundamental questions intelligently until he has understood that all

contracts are formal, that the making of a contract depends not on the agreement of two minds in

one intention, but on the agreement of two sets of external signs not on the parties having meant

the same thing but on their having said the same thing." Holmes, *The Path of the Law*, 10

Harv.L.Rev. 457, 464 (1897). *See also Dillard*, 483 F.3d at 507; *Navair, Inc. v. IFR Americas, Inc.*,

519 F.3d 1131, 1139 (10th Cir.2008)("Put another way, the inquiry will focus not on the question

of whether the subjective minds of the parties have met, but on whether their outward expression

of assent is sufficient to form a contract.").

Finally, "[l]anguage in a contract is not rendered ambiguous simply because the parties do

not agree upon its meaning," *Reynolds v. Coleman*, 173 Ill.App.3d 585, 527 N.E.2d 897, 903 (1ˢᵗ

Dist. 1988), and "[w]hat the parties to a written contract may have understood as to the meaning

of the language used is not admissible evidence." *Saddler v. National Bank of Bloomington*, 403

Ill.218, 85 N.E.2d 733 (1949). Finally, a unilateral, or self-induced, mistake is insufficient to void

---

[2] The parties agree that Illinois law governs the interpretation and enforcement of their settlement. *Baptist v. City of Kankakee*, 481 F.3d 485, 491 (7ᵗʰ Cir. 2007); *Lynch, Inc.*, 279 F.3d at 490.

a clear and unambiguous release. [3]

In some cases involving oral agreements, the statute of frauds can be a concern. But neither

party raises it as an issue, *Lynch, Inc.*, 279 F.3d at 490, and, in any event, the fact that their

agreement was recorded in open court removes the statute as an issue. *See Rose v. Mavrakis*, 343

Ill.App.3d 1086, 1094, 799 N.E.2d 469, 476-477 (1ˢᵗ Dist. 2003). *See also Cloud Corp. v. Hasbro,*

*Inc.*, 314 F.3d 289, 296 (7ᵗʰ Cir. 2002)(where parties agree on what was said there is no statute of

frauds issue); *Consolidation Services, Inc. v. KeyBank Nat. Ass'n*, 185 F.3d 817, 821 (7ᵗʰ Cir. 1999).

## A.
## The Parties Did Not Agree To Release DKH's And DKI's Guarantees
## On Any Loans Other Than The 15 Specified Loans That
## Were Enumerated In The Agreement

There is no dispute that DKMC agreed to pay Wells Fargo a total of $560,000 in settlement

of the litigation: $75,000 was to be paid within thirty days of the execution of the typed settlement

agreement, which the parties envisioned would be prepared, but which they agreed was not a

condition precedent to contract formation. [4] The balance of $485,000 was to be paid in six, equal,

---

[3] "One who attacks a settlement must bear the burden of showing that the contract he had made is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted." *Callen v. Pennsylvania R. Co.*, 332 U.S. 625, 630 (1948) (Emphasis added). *See also Cameron v. Bogusz*, 305 Ill.App.2d 267, 711 N.E.2d 1194, 1198 (1ˢᵗ Dist. 1999); *Kim v. Alvey*, Inc., 322 Ill.App.3d 657, 749 N.E.2d 368, 377 (1ˢᵗDist.2001)("a unilateral mistake does not render the agreement unenforceable")(collecting cases); *Cole Taylor Bank v. Cole Taylor Bank*, 224 Ill.App.3d 696, 586 N.E.2d 775, 782 (1ˢᵗ Dist. 1992). The parties do not contend that they mistakenly thought the settlement agreement meant something other than what it did, when fairly construed. Rather, they have differing views about what the words of the agreement they memorialized on the record mean.

[4] Under basic principles of contracts, even if parties agree, point by point, on all the terms of a contract, if they intend that the execution of a formal document shall be a prerequisite to their being bound-as opposed to it being merely a memorialization of the parties' bargain – there is no enforceable contract until the document is executed. *See PFT Roberson, Inc. v. Volvo Trucks North America, Inc.*, 420 F.3d 728, 731 (7th Cir.2005); *Quake Construction, Inc. v. American Airlines*, 141 Ill.2d 281, 287, 565 N.E.2d 990, 993 (1990). Until then each party is "free to walk away...." *Solaia Technology LLC v. ArvinMeritor*, 2006 WL
(continued...)

6

bimonthly installments. DKI and DKH guaranteed DKMC's payment obligation under the settlement agreement. Counsel for DKMC and the guarantors, in enunciating on the record the terms of the settlement agreement, said that after payment of the $560,000, the guarantee would come to an end. (Tr. at 3). But was this to be the end of the guarantee of the settlement agreement only, or were the multiple guarantees on other loans that were not part of the settlement agreement also to expire?

DKMC says that it was the intent of the parties that whatever guarantees existed on *any* outstanding loans were to be released upon payment of the $560,000. Wells Fargo insists that it only the obligation of DKI and DKH to pay the $560,000 in the event DKMC defaulted under the settlement agreement was to expire upon full performance of the settlement agreement. Below is the exchange on which the defendants rely:

> DKMC: And after the payment of the [$560,000] settlement [amount] their guarantee of the -
>
> THE COURT: Of the settlement.
>
> DKMC: -- will expire. After it is paid, there is no more guarantee.
>
> THE COURT: Well, it expires actually of its own force upon payment. But that's – that's fine. Put it in any you want to.
>
> DKMC: Just – *I just think it is important to be clear that the contract still controls loans that are out there that are not part of this case. And that after the year the guarantors will no longer guarantor [sic] – guarantee those loans.*
>
> THE COURT: Right. So the guarantee is strictly of the settlement, the contractual arrangement between the parties. It is not a guarantee any longer once the settlement is executed of the -- the loans that are presently in place -

---

[4](...continued)
695699 at *10 (N.D.Ill.2006). Where, however, as here, the parties agree that the execution of the written agreement is not a prerequisite to contract formation they are bound by the terms of their oral agreement.

DKMC: Correct.

THE COURT: – in (unintelligible).

WELLS FARGO: Right.

(Tr. at 3)(Emphasis supplied).

DKMC's contention that this exchange makes clear that after payment of the $560,000 settlement amount, the guarantees of all outstanding loans would be released is unconvincing. First, the discussion was about the guaranty of the settlement agreement, not the multiple guarantees of those outstanding Mortgage and Home Equity Agreements that were not in default and were not part of the settlement agreement. Second, the defendants' counsel emphasized that the loans that were not part of the settlement agreement were still controlled by the preexisting contract between the parties. (Tr. 3).

The defendants contend that the next sentence – "and that after the year the guarantors will no longer guarantor [sic] – guarantee those loans"– reflects the parties' agreement that once the $560,000 had been paid all other outstanding guarantees would be released. But that reading makes the preceding sentence superfluous, for if all the guarantees were to be released upon payment of the $560,000 payment to Well Fargo, there would have been no point in stressing that the loans outside the settlement agreement were governed by the extant agreements applicable to them.

Moreover, the defendants' preoccupation with the italicized sentences ignores the informing context of what comes after the relied-upon statement and thus is contrary to the "fundamental principle of. . . language itself that the meaning of a word cannot be determined in isolation but must be drawn from the context in which it is used." *Textrom Lycoming Reciprocating Engine Division v. United Automobile, Aerospace & Agricultural Implement Workers of American,*

*Intern. Union*, 523 U.S. 653, 657 (1998). *See also Farmers Automobile Ins Assoc. v. St. Paul Mercury Ins. Co.*, 482 F.3d 976, 978 (7ᵗʰ Cir. 2007)("The contention is . . . unsound because of its neglect of context."); Scalia, A Matter of Interpretation: Federal Courts and the Law, 135 (1997)(the chief determinant of meaning is context).

This principle applies to contract interpretation, which is not a smorgasbord at which you take what you like and leave what does not appeal to your tastes. However much a snippet excised from the broader context of the whole agreement might suit your purposes, the interpretation of the contract cannot turn on that snippet to the exclusion of all else. *Great West Casualty Co. v. Mayorga*, 342 F.3d 816, 818 (7ᵗʰ Cir.2003). This is how the court explained the principles in *Air Line Stewards and Stewardesses Assoc., Local 550, TWU, AFL-CIO v. Trans World Airlines, Inc.*, 713 F.2d 319 (7ᵗʰ Cir.1983):

> When interpreting a contract under Illinois law, "[t]he intent of the parties to a contract must be determined with reference to the contract as a whole, not merely by reference to particular words or isolated phrases, but by reviewing each part in light of the others." ... The language of a settlement agreement must be construed literally in a straightforward manner, and courts must give full force and effect to each and every provision contained in these court-approved agreements. .... Thus, in interpreting the Settlement Agreement between the plaintiffs and TWA, under well-settled rules of contract interpretation, this court must give effect to each and every section of the Agreement, and must read the different sections harmoniously, and accord each section its proper weight, and not read the sections out of context to achieve a desired result as the plaintiffs request.

*Id.* at 321-322 (citations omitted).

First there is the matter of obvious inconsistency between the two sentences on which the defendants ultimately rely. Up to the point at which the defendants' counsel said "I think it is important to be clear that the contract still controls loans that are out there that are not part of this case" – all that was being referred to is the guarantee of the settlement agreement. If the very next

9

sentence – "after [payment of the $560,000] the guarantors will no longer guarantor [sic] – guarantee those loans" – had reference to *all* outstanding loans, not merely those in the settlement agreement – "the contract" would *not* "still control[ ] loans that are out there that are not part of this case." More importantly, the defendants' construction ignores everything that occurred after the statement on which they rely.

Following the snippet on which the defendants rely, the parties agreed that Wells Fargo would give and the defendants would accept a specific, rather than a general, release:

> THE COURT: Well, are these -- so -- but are these -- these are going to be general releases or are these specific releases? In other words, *I don't know what else you all have out there*, but these, I would think, are going to be releases of all -- it is -- these are specific releases, not general releases.
>
> WELLS FARGO: Specific releases –
>
> THE COURT: – *because you have got outstanding loans* –
>
> WELLS FARGO: Right.
>
> THE COURT: – *that still are not being released.*
>
> WELLS FARGO: These are specific releases for particular loans that are within the complaint, as well as three of them that are in addition.
>
> THE COURT: Okay.
>
> WELLS FARGO: So –
>
> THE COURT: But you're going to read those [15 loans] off. But as to *those* loans, Wells Fargo is releasing the guarantor's guarantee of *those* outstanding loans.
>
> WELLS FARGO: Right.

(Tr. at 7).

From this exchange it is clear that the only guarantees being released were those covering

10

the fifteen loans that were included in the settlement agreement. That counsel for the defendants understood the agreement this way was evident from his failure to have voiced any objection at the end of the above exchange. In some settings, inferences from silence may be perilous. Posner, Cardozo: A Study In Reputation, 37 (1990); *Coleman v. Interco, Inc. Division Plans*, 933 F.2d 550, 552 (7th Cir. 1991); but not always, and certainly not here. In the context of this case, the defendants' conspicuous silence is a tacit admission that only the loans (and their accompanying guarantees) included in the settlement agreement were being released. *Cf. Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002)(silence may constitute acceptance). *See United States v. Ward*, 377 F.3d 671, 675 (7th Cir. 2004). "When a statement is made in the presence of a party containing assertions of facts which, if untrue, the party would under all the circumstances naturally be expected to deny, failure to speak has traditionally been received as an admission." John W. Strong, McCormick on Evidence §262 at 171 (5th ed. 1999).

Moreover, if, as DKMC insists, *all* outstanding loans were being released – not just those named in the settlement agreement – it would have made no sense for the parties to have agreed on a specific release of the fifteen specified loans. Rather, they would have agreed on a general release, which would have encompassed all loans and would have made unnecessary the itemization of the fifteen loans the names of which were read into the record so that there would be no misunderstanding of what loans comprised the settlement agreement. (Tr. at 3-8).

DKMC's contention that the parties' selection of a specific, rather than a general, release is not relevant to the parties' intent apparently runs this way: "[t]he discussion is about the release of claims regarding the loans at issue in this case. That is different than the issue of the release of the guarantees. . . The release of the Guarantors as to liability for specifically identified loans does

11

not mean that the guarantors are not released form liability for other loans." (*Reply to Response in Opposition*, at 3). With all deference the argument is at once difficult to follow and in any event, mistaken. It carefully puts out of view the unambiguous explanation on page 7 of the transcript of proceedings that a specific, rather than a general release was chosen because there were "outstanding loans" that were "not being released."

Counsel for Wells Fargo read into the record the names of the fifteen loans (along with the accompanying guarantees) that were being released: Bolger, Juneau, and Butler were the first three names read. They were first mortgage loans and all three were mentioned in the complaint. (Tr. at 7). There were twelve second mortgage loans, eight of which were named in the complaint, and four of which were not. But all were "being settled as part of this agreement." (Tr. at 7-8). They were: Antink, Betacour, Botchway, Chapman, Travis, Mazloum, Ogden, Parker; Myrlie, Austin/Sorensen, Wright, and Markaryan. (Tr. at 7-8). At this point, I asked "is there anything else?" (Tr. at 8). There was no statement by counsel for the defendants that all outstanding loans were to be released, not merely the fifteen that had been enumerated by Wells Fargo's counsel.

Moreover, DKMC's interpretation makes no economic sense. Why would DKMC's payment of the settlement amount – which only covered fifteen loans – absolve the guarantors of their obligations under their Guaranty Agreements of other loans not being settled? Such largesse on Wells Fargo's part would make no commercial sense – at least none that the defendants can point to – and contracts should not be read to produce interpretations that make no commercial sense – even where the interpretation may be consistent with the contractual language. *See American Intern. Specialty Lines Ins. Co. v. Electronic Data Systems Corp.*, 347 F.3d 665, 670 (7th Cir. 2003); *Great West Casualty Co. v. Mayorga*, 342 F.3d 816, 818 (7th Cir.2003).

12

Contracts, it must not be forgotten, are not interpreted in a vacuum. *Nicor, Inc. v. Associated Elec. and Gas Ins. Services Ltd.*, 223 Ill.2d 407, 417, 860 N.E.2d 280, 286 (2006); *Tice v. American Airlines, Inc.*, 288 F.3d 313, 316 (7th Cir. 2002). A court must place itself in the position of the parties. *Intersport, Inc. v. National Collegiate Athletic Ass'n*, 381 Ill.App.3d 312, 319, 885 N.E.2d 532, 539 (1st Dist. 2008). Thus, when interpreting a contract, a court may look to the circumstances surrounding the transaction in order to discern the parties's intent. *In re Estate of Gallagher*, 383 Ill.App.3d 901, 905, 890 N.E.2d 1249, 1253 (1st Dist. 2008); *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill.App.3d 605, 614, 863 N.E.2d 743, 753 (1st Dist. 2007); *U.S. v. Ettrick Wood Products, Inc.* 916 F.2d 1211, 1216 (7th Cir.1990). The concept is not new. Learned Hand explained it long ago:

> The issue involves the baffling question which comes up so often in the interpretation of all kinds of writings: how far is it proper to read the words out of their literal meaning in order to realize their overriding purpose? * * * When we ask what (was) 'intended,' usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion.

*United States v. Klinger*, 199 F.2d 645, 648 (2nd Cir. 1952).[5]

---

[5] Quoted in *U.S. Trust Co. of N. Y. v. Jones*, 414 Ill. 265, 270-271, 111 N.E.2d 144, 147 (1953). This phrasing has never been eclipsed unless perhaps one looks to Judge Hand's earlier opinion in *Central Hanover B. & T. Co. v. C.I.R.*, 159 F.2d 167, 169 (2nd Cir. 1947):

> There is no more likely way to misapprehend the meaning of language--be it in a constitution, a statute, a will or a contract- than to read the words literally, forgetting the object which the document as a whole is meant to secure. Nor is a court ever less likely to do its duty than when, with an obsequious show of submission, it disregards the overriding purpose because the particular occasion which has arisen, was not foreseen. That there are hazards in this is quite true; there are hazards in all interpretation, at best a perilous course between dangers on either hand; but it scarcely helps to give so wide a berth to Charybdis's maw that one is in danger of being impaled upon Scylla's rocks.

Simply put, the context of the parties' transaction here was that certain of the loans DKMC had sold to Wells Fargo were not performing, and DKI and DKH were on the hook under their guarantees. There were other loans that were not in default and perhaps never would be. Under these circumstances, there was no motive for Wells Fargo to release the guarantees on those extant loans as part of a settlement of 15 non-performing loans. Moreover, if the parties intended that all guarantees were to be released upon payment of $560,000, there would have been no need to select a specific release and to enumerate the 15 loans that comprised the settlement agreement, for a general release would have subsumed those loans within its scope without the need for specification. These were after all sophisticated parties with sophisticated lawyers pursuing rational ends, thus their contract should not be interpreted to "produce absurd results, in the sense of results that the parties... are very unlikely to have agreed to seek." *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir.2002).

In sum, this is not and ought not be the semantic exercise DKMC attempted to make it. There must be "regard for the consequences of alternative interpretations, the parties being assumed to have intended something sensible by their contract." *Tice*, 288 F.3d at 316. "'...[W]here a contract is susceptible to one of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.'" *Sutter Ins. Co. v. Applied Systems, Inc.*, 393 F.3d 722, 726 (7th Cir.2004)(Posner, J.). Here the only sensible and rational construction of the agreement is that once DKMC completed its settlement payment, the guarantors were to be absolved of their obligations as to the 15 specified loans – but no others. And, as in *Sutter*, "this is not a case in

14

which the language of the contract is at war with the 'reasonable'" interpretation urged by the party

whose position the language disfavors. The language as a whole favors [Wells Fargo], not [the

defendants. Wells Fargo's] interpretation fits both the language of the contract and the contract's

commercial setting better than [defendants'] does. *Id.* at 726.

## B.

### The Settlement Regarding The Possibility Of Future Loan Transactions

That leaves the question of what did the parties' agree to concerning their future

relationship? DKMC contends that Wells Fargo agreed to allow DKMC to submit loans to it, but

says this entailed making DKMC a "correspondent lender." Wells Fargo argues that it never agreed

that it would make DKMC a correspondent lender – which would mean executing one of those

purchasing agreement incorporating a Seller's Guide like the ones involved in the complaint.

Here's how the topic was addressed on the record:

> THE COURT: Right. Okay. Well, let me say it because another -- another part of
> this agreement -- folks, you tell me if this is right or wrong -- is that the defendants
> will have the opportunity; that is, the power, to continue to do business with Wells
> Fargo if Wells Fargo is agreeable to accepting and buying loans from them. But that
> Wells Fargo will have no contractual or other kind of obligation to do so. And they
> will look at each individual loan origination as an initial matter. They have the
> absolute and sole discretion to deal with Draper & Kramer or not as they see fit on
> an individual basis.
>
> WELLS FARGO: On an individual loan basis.
>
> THE COURT: Individual loan basis, I'm sorry. In other words, what -- the reason
> I'm saying this is when we began Wells Fargo was of the view they wanted to do no
> further business with Draper & Kramer. And Draper & Kramer was quite anxious
> to have at least the opportunity to do business with Wells Fargo. And as our
> discussions evolved over the course of the day. Wells Fargo said, okay, we're not
> going to be bound to contract with you, but we'll -- we'll look at the situation as they
> see fit. Now Draper & Kramer has agreed to provide financial statements, if that's
> the right word, to Wells Fargo so that it can make the kind of informed

15

determination that it wants to make. . . . is that fair to say?

WELLS FARGO: *With one technical clarification. The way these business relationships are established is there is in fact a contract that is signed. There is the seller's guides -*

THE COURT: Right.

WELLS FARGO: -- and but they are -

THE COURT: Like the ones in this complaint.

WELLS FARGO: Exactly. *And that creates or establishes the opportunity for a company, such as Draper & Kramer, to sell loans to Wells Fargo.* My understanding is -- which is slightly different. It is a technical difference, and it may or may not be material is that *Wells Fargo will consider whether to continue to have that seller's guide relationship.*

THE COURT: Yeah, that's my understanding.

WELLS FARGO: Right.

THE COURT: *I didn't say it right.*

WELLS FARGO: Right. Okay.

THE COURT: *So are we all agreed on that?*

DKMC: *Yes.*

WELLS FARGO: Okay.

(Tr. at 11-12)(Emphasis supplied).

Based on this discussion, the settlement agreement provided that DKMC was to submit to Wells Fargo documentation (financial statements from the guarantors) that would allow it to make an informed decision as to *whether* it would deal with DKMC on what Wells Fargo called a "Seller's Guide" relationship. (Tr. at 12). DKMC insists that no such formal agreement was required and that it had the right to submit for consideration any loans it felt might be attractive to

16

Wells Fargo, which was then free to reject or accept the submission. The defendants contend that by requiring a Seller's Guide relationship as a prerequisite to submission, Wells Fargo has breached the settlement agreement. As DKMC puts it:

> [t]he operative clause seems to be, "Wells Fargo will consider whether to continue to have the seller's guide relationship." That statement does not say that Wells Fargo does not agree to accept loans until it agrees to a seller's guide relationship. That statement does not say that [DKMC's] right to submit loans for purchase is subject to Wells Fargo[sic] prior acceptance of a seller's guide relationship.

(*DKMC Motion to Enforce Settlement Agreement*, at 8).

DKMC's interpretation is at odds with what the parties' agreement as expressed on the record. DKMC again impermissibly focuses on one phrase – calling it the "operative phrase" -- to the exclusion of the rest of the discussion. *Mayorga*, 342 F.3d at 818. Wells Fargo did not say that it would evaluate loans in the abstract. Quite the contrary, it was emphatic that it would consider whether to undertake a Seller's Guide relationship with DKMC – a relationship that was contractual in nature. It went on to explain how that was what "creates or establishes the opportunity for a company, such as [DKMC], to sell loans to Wells Fargo." (Tr. at 11). In other words, in order to offer individual loans for sale, DKMC had to have a Seller's Guide relationship. Perhaps that was a technicality, but it was one that was critical for Wells Fargo.

I then expressed my understanding of what counsel for Wells Fargo had just said and noted to the extent that I had misstated the need for a Seller's Guide relationship as a condition to future business, "I didn't say it right." (Tr. at 12). Wells Fargo responded, "right. Okay." (*Id.*). I then said, "so we all – we're all agreed with that?" (*Id.*). Counsel for the defendants said, "yes." (*Id.*). The defendants were to provide "the kind of financial information that Wells Fargo will need to be able to make the judgment of *whether* it should deal with you folks or not." The defendants'

counsel responded, "yes, including financial statements of the guarantors." (Tr. at 12)(Emphasis

supplied). There then followed a discussion about the confidentiality of any financial information

submitted by DKMC:

> THE COURT: "And the same is true of Draper & Kramer that those documents will
> be maintained confidential, only to be used for Wells Fargo's assessment of *whether*
> it wants to deal with them. Is that fair?"

> DKMC: That's fine.

(Tr. at 12-13)(Emphasis supplied).

> And finally, there was this exchange:

> WELLS FARGO: ...I think what will suffice is simple reference in the agreement
> that *should there be a business relationship in which Wells Fargo purchases loan*
> [sic] from Draper, that it may impact or reduce Draper's settlement obligations –
> payment obligations.

> THE COURT: Right. Okay.

> DKMC: But – but that's *yet to be determined.*

(Tr. at 13)(Emphasis supplied).

Wells Fargo's insistence on a Seller's Guide relationship as a prerequisite to considering

whether to purchase in the future loans from doing any future business with the defendants is the

way it did business with the defendants and other potential sellers of loans. (*See* Ex. A, #1-2,

3/28/08, Loan Purchase Agreement). Contracts, including settlement agreements, have to be read

in the context of the parties' dealings and commercial reality. *Tice*, 288 F.3d at 316. Parties are

charged with knowledge of a trade practice if they are, or should be, aware of it. *Carey v. Richards*

*Bldg. Supply Co.*, 367 Ill.App.3d 724, 727, 856 N.E.2d 24, 28 (2nd Dist. 2006), *Gord Industrial*

*Plastics, Inc. v. Aubrey Manufacturing, Inc.*, 127 Ill.App.3d 589, 591, 469 N.E.2d 389 (1984).

18

Their contracts must be interpreted "so that the contract is 'fair, customary, and such as prudent persons would naturally execute,' and is 'rational and probable.'" *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 687 (7th Cir. 2004).

The defendants' construction of the settlement agreement would give rise to a contract that was irrational and improbable. It would allow DKMC to submit loans for Wells Fargo's consideration without having to make the numerous "representations, warranties and covenants" that the Seller's Guide specified and which Wells Fargo's form Loan Purchase Agreement required of all those with which it did business. (Ex A, #1-2, 3/28/08). There is no sensible reason why, having been allegedly been burned by the defendants in connection with 15 loans, Wells Fargo would have eliminated the protective and commercially prudent conditions under which it did business with all other lenders and given DKM, a preferred status. [6] And, as the transcript makes clear, it did not do so.

## CONCLUSION

The defendants' Motion to Enforce Settlement Agreement [#37] is DENIED, and the plaintiff's Cross Motion to Enforce Settlement [#38] is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 4/14/09

---

[6] Early in the settlement conference, Wells Fargo expressed the view that it would not under any circumstances have further business dealings of any kind with the defendants. (Tr. at 11). Wells Fargo relaxed slightly that position when the settlement conference ended at 6:00 p.m. (Tr. at 2) and agreed to consider whether to have a Seller's Guide relationship. (Tr. at 11-12).